**FILED**
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TENN.

JAN 2 4 2000

BY_____
DEPUTY CLERK

OSCAR SMITH                )

    Petitioner         )

                        )    No. 3:99-0731

vs.                       )    Judge Trauger

                        )

RICKY BELL, Warden, Riverbend   )
    Maximum Security Institution   )

                        )

    Respondent       )

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Oscar Smith, pursuant to all rights available under Article I § 9 and Article III of the United States Constitution; the Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Fourteenth Amendments to the United States Constitution, 28 U.S.C. § 2201, and 28 U.S.C. § 2241 et seq., including 28 U.S.C. § 2254 (including as it existed prior to its amendment in 1996), respectfully moves this Court for a writ of habeas corpus declaring unconstitutional and invalid his convictions for first-degree murder and resulting death sentences.

## I.
## STATEMENT OF THE CASE

1.    Oscar Smith was convicted of three counts of first-degree murder in the Criminal Court of Davidson County, Tennessee, and sentenced to death. The charges arose out of the deaths of his wife, Judy Smith, and his two stepsons, Jason and Chad Burnett.

2.    His convictions and sentences were affirmed on direct appeal. State v. Smith, 868 S.W.2d 561 (Tenn. 1993).

3.    He then filed a petition for post-conviction relief in the Criminal Court of Davidson County, which was denied.

4.     On June 30, 1998, the Court of Criminal Appeals affirmed. The Tennessee Supreme Court denied permission to appeal on January 25, 1999.

5.     He sought a petition for writ of certiorari in the United States Supreme Court, which was denied on June 21, 1999. Smith v. Tennessee, U.S.No. 98-9094, 527 U.S. ___ (1999).

6.     He then filed a *pro se* unamended petition for writ of habeas corpus in this Court, seeking appointment of counsel to investigate and prepare an amended petition for writ of habeas corpus. This Court granted the motion for appointment of counsel and appointed the Federal Public Defender for the Middle District of Tennessee to represent Mr. Smith. Subsequently, this Court appointed Richard McGee, Esq., to serve as co-counsel.

7.     This Court entered an order setting January 24, 2000 as the date for counsel to file Oscar Smith's amended petition for writ of habeas corpus. This amended petition is filed in accordance with that order.

## II.
## CONSTITUTIONAL CLAIMS FOR RELIEF

8.     In violation of the Sixth and Fourteenth Amendments, trial counsel were ineffective at the guilt phase of trial to investigate and present evidence to establish a defense to the charges, evidence which also would have been relevant to sentencing. Counsel performed deficiently, and as a result, Oscar Smith was prejudiced:

a.     Trial counsel failed to present a complete defense to the charges against Oscar Smith, including by investigating and presenting evidence establishing either that someone else committed the offense or that there was a reasonable doubt about Oscar Smith's guilt. Governing standards of performance, including those of the American Bar Association adopted

2

by Tennessee, required counsel to investigate all avenues of defense on Oscar Smith's behalf. Evidence not investigated by counsel includes:

1)       Evidence showing that Billy Fields (Judy Smith's boyfriend) actually committed the murders, including, but not limited to:

(a)       Evidence that Fields was seen at the house on more than one occasion the day the bodies were found (October 2);

(b)       Evidence that Fields claimed he had only been at the house once on October 2, despite other reports to the contrary;

(c)       Evidence that witnesses believed Fields would have been involved in killing Judy Smith and her children; and

(d)       The fact that Fields, who was Judy Smith's boyfriend, would have had a motive to kill, since Judy was planning on getting back together with Oscar Smith.

2)       Evidence that a Black male was the perpetrator, as shown by evidence which includes the following:

(a)       After responding to a 911 call made from the victims' residence late on October 1, the police reported seeing a Black male at and around Judy Smith's house;

(b)       A Black male was again seen the next day on October 2 (the day the bodies were found) running away from the house and heading toward the bus stop before the bodies were discovered;

(c)       A confidential informant informed the police that Judy Smith had drug dealings with a Male Black, and that she had stolen his automobile. The

3

informant had been driving the Black male around the area looking for Judy Smith. It also appears that this information may not have been disclosed to defense counsel, and its non-disclosure also violates due process under *Brady*, at both the guilt and sentencing phases of trial.

        3)      Evidence that the murders were drug-related and/or motivated by robbery, given evidence which includes the following:

        (a)      Judy Smith was involved in using drugs and/or had acquaintances who had access to illicit drugs, and had gotten in bad with person(s) involved in drug dealing;

        (b)      Judy Smith was trying to get hundreds of dollars at the time of her death;

        (c)      Judy Smith's purse was stolen and never recovered.

        (d)      Such evidence indicates that the killings were motivated by drugs and/or by someone trying to rob Judy Smith and/or get money from the victims.

        b.      Trial counsel failed to establish a defense to the charges and/or bolster the alibi defense actually presented by the defense by conceding the prosecution's theory about the time of death, alleged by the prosecution to be approximately 11:30 p.m. on October 1. Counsel failed to investigate the time of death to show that the prosecution's theory about the time of death was inaccurate, that Oscar Smith's alibi defense was valid, and that there was reasonable doubt about guilt, because in reality death did not occur until the morning of October 2, when Oscar Smith was in Kentucky on his way to Morehead, Kentucky. Among the evidence which counsel failed to investigate in order to prove that the time of death was later than the prosecution claimed, and occurred on October 2, not October 1, includes:

4

1) Proof of rigor mortis, which indicates that the victims would have died between 5:00 a.m. and 9:00 a.m. on October 2;

2) Proof of livor mortis, which indicates that the victims died before 8:40 a.m. on October 2;

3) Proof that Jason's body had been moved after death, that such movement had to have occurred 15-30 minutes after death, and that Oscar Smith could not have been at the crime scene when the body was moved;

4) Proof of facts which differed between the late night of October 1 when the police arrived, and the time the bodies were later found on October 2, which indicates that the victims were killed after 11:30 p.m. on October 1, but in the morning of October 2, including:

(a) An alarm clock was set for 5:00 and was not ringing when the bodies were found, thus indicating that the victims had awakened on the morning of October 2, and were then killed after 5:00 a.m. No noises were heard by the police at 11:30 p.m. on October 1;

(b) There were lights on in the house at 11:30 p.m. on October 1 when the police arrived, but the lights were off when the bodies were found on October 2;

(c) Proof that the police heard no noise from the house at 11:30 p.m. on October 1, but a hair dryer was on when the bodies were found on October 2, confirming that the victims awakened (after 5:00 a.m.) and were using a hair dryer at the time of the attack;

(d) Proof that the back door was ajar when the bodies were

5

found on the afternoon of October 2, but not open when the police arrived at 11:30 p.m. on October 1.

(e)     All of this evidence indicates that the victims were not dead at 11:30 p.m. on October 1, but that they were murdered in the morning of October 2, by someone who entered the back door, and killed the victims in the morning hours of October 2.

c.     Trial counsel also failed to conduct forensic investigation to establish proof confirming the alibi defense and/or establishing a reasonable doubt about Oscar Smith's guilt, including, but not limited to, the failure of counsel to investigate and present the following evidence:

1)     Fingerprints from the crime scene which were not identified as being from Oscar Smith, including at least one print which was found on the wall, and which clearly did not come from Oscar Smith;

2)     Hair evidence, including evidence found in Jason's hand which was not from Oscar Smith, but which was never fully examined or tested to identify the exact person from whom that hair had come;

3)     Fingernail scrapings from the victims, which were never fully analyzed or investigated to determine their origins;

4)     Evidence on the sheet in the bedroom where Judy Smith was found, (including but not limited to blood, serology, and fiber evidence) to forensically prove that an alleged palm print on the sheet found near Judy Smith was not consistent with the prosecution's claims that it was made by Oscar Smith at the time of the killings, nor with the amount of blood that would have been on the sheet, and that the sheet contained additional evidence inconsistent

6

with the prosecution's claims of Oscar Smith's guilt;

5)    Evidence of foot prints and shoe prints found outside the house on the west and north sides of the house, for which casts were made, but which were never identified by the authorities, and which were not fully investigated to support the defense;

6)    A knife found under the house, which was never fully examined or tested for blood, fingerprints, or other forensic proof, to determine who had handled the knife, especially since the knife was found beneath the house near the ajar back door, indicating that the assailant threw it under the house when leaving. After the knife was recovered, the evidence packet containing the knife had been opened and the knife was then wiped, thus destroying critical evidence;

7)    Evidence on a glove found in the house, which was never fully examined or tested to show its inconsistency with being worn or used by Oscar Smith;

8)    A brown belt which was found in the hallway, which was never fully examined and tested to confirm the defense;

9)    Ballistics evidence, including a live round found at the house, the several bullet fragments found in the victims, and several fragments found in the walls and elsewhere in the house (which were never fully identified as to their origin), to demonstrate that they were fired from more than one weapon, or by more than one person;

10)    The fact that an alarm clock was set for 5:00 and found in the house, but which was not ringing, indicating that the murders occurred after 5:00 in the morning on October 2, and not on October 1, as the prosecution maintained;

11)    Proof of the hair dryer being found engaged on October 2 when the

7

bodies were found, as being inconsistent with the prosecution's theory of the case;

12) The existence of a bologna sandwich in the house, which had a bite taken out of it, none of which was apparently found to be in the victims' stomachs;

13) Serological and other trace evidence concerning the manner and cause of Judy Smith's death and the death of the two boys, including all such evidence from the house or clothing or the bodies which would otherwise identify the assailant or assailants.

d. Trial counsel failed to secure the assistance of a forensic pathologist to assist in the defense of the case, to investigate the time of death and the circumstances of the victims' death, to establish proof inconsistent with the prosecution's theory and to establish a defense of alibi and/or reasonable doubt, and to cross-examine the prosecution's experts about various issues, including but not limited to: time of death, the length of the struggle, that there would have been large amounts of blood on the actual perpetrator, that Jason's body had been moved in a manner inconsistent with Oscar Smith's guilt, and to show that the prosecution's estimates of time of death were not accurate or invalid, and, See e.g., ¶ 8b (incorporated by reference).

e. Trial counsel failed to secure the services of a criminologist, to establish evidence inconsistent with the prosecution's theory of the case, including but not limited to, counsel's failure to:

1) Prove that the prosecution's theory that the victims were killed after the 911 call but before the police arrived was not probable, especially given that the prosecution's theory was essentially that three persons were killed, the killer cleaned up, and then left within a matter of minutes;

2) Establish that there was no valid photographic evidence concerning

8

the gloves establishing that they were in fact used in the offense by the defendant;

       3)      Cross-examine Sgt. Johnny Hunter about the inconsistencies between the prosecution's theory and the evidence at the crime scene, including the inconsistencies between the crime scene drawings and the actual crime scene, including but not limited to, a telephone which was in the house and off the hook, but not included in the crime scene drawings;

       f.      Trial counsel failed to employ a linguist to assist in the defense in demonstrating that Oscar Smith's purported use of past tense concerning the deaths of his family members was not competent proof of guilt.

       g.      Trial counsel failed to employ a speech perception expert, to demonstrate that the prosecution's use of a written transcript of what it perceived to be the contents of the 911 tape was in fact inaccurate but highly prejudicial, and failed to get the transcript excluded on that basis, as it was prejudicial and unduly influenced the jury to interpret the tape as being consistent with the prosecution's assertions, when in fact, the tape is essentially unintelligible. Moreover, the prosecution sent Detective McElroy to be with the woman who answered the 911 call and proffered her a purported transcript of the call and remained with her until she agreed that the tape said what the transcript said. This overbearing on the witness also constitutes a due process violation.

       h.      Trial counsel was ineffective for failing to fully and properly consult with petitioner concerning defense strategy and decisions, including:

       1)      Counsels' failure to fully discuss with Oscar Smith counsels' conceding the issue of the time of death;

       2)      Counsels' failure to fully discuss with Oscar Smith counsels'

9

concession about the significance of evidence at the crime scene;

3) Counsels' failure to fully discuss with Oscar Smith counsels' decision not to present evidence from a medical examiner or forensic scientist;

4) Counsels' failure to fully discuss with Oscar Smith counsels' decision not to examine or test the apparently bloody knife found underneath the house;

5) Counsels' failure to fully discuss with Oscar Smith a conflict about who was to be lead counsel, where the investigator had been removed prior to trial, and without the knowledge of Oscar Smith. Oscar Smith would not have waived the conflict of interest arising out of the Public Defender's Office simultaneous representation of prosecution witness Larry Terlecki had he known that there was conflict within the defense team about who would be lead counsel;

6) Counsel did not let Oscar Smith participate fully in the jury selection process and did not fully consult with him concerning the exercise of peremptory challenges.

7) Counsel failed to cross-examine a Mr. Watts, who testified during trial, despite Oscar Smith's desire that he be cross-examined about his inaccurate testimony concerning Mr. Smith's guns.

i. Counsel did not exercise any peremptory challenges during jury selection.

j. Counsel failed to investigate and/or challenge the results of examinations of testing done on forensic evidence by the Tennessee Bureau of Investigation (T.B.I.), including but not limited to ballistic evidence and serology evidence; and the Federal Bureau of Investigation (F.B.I.), including but not limited to audiotape evidence and hair and fiber evidence, and whatever other analyses may have been done by either laboratory.

10

k.     For failing to raise constitutional objections to jury instructions concerning:

1)     The credibility of witnesses (See ¶18, incorporated by reference)

2)     Definitions of premeditation and deliberation, which lessened the prosecution's burden of proof (See Post-Conviction Application For Permission To Appeal, pp. 90-92, incorporated by reference; ¶ 16, incorporated by reference);

3)     Evaluation of expert witnesses (Tr. Vol. XX, p. 2968, Vol. XXII, p. 3271)(See Post-Conviction Application For Permission To Appeal, pp. 92-93, incorporated by reference);

4)     Reasonable doubt, which lessened the prosecution's burden of proof. See Tr. Vol. XX, pp. 2974-2980, Vol. XXII, p. 2978; ¶9 (incorporated by reference).

9.     The jury instructions on "reasonable doubt" at both phases of trial were unconstitutional under the Sixth, Eighth, and Fourteenth Amendments:

a.     The guilt phase instructions were unconstitutional, because they lessened the prosecution's burden of proving the elements of the offense beyond a reasonable doubt:

1)     At the guilt phase of trial, the jury received the following instructions on the meaning of reasonable doubt:

(a)     First, the jury was instructed that the jury need only be "morally certain" of Oscar Smith's guilt and be able to "let the mind rest easily as to the certainty of guilt" under that "moral certainty" standard

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required as to every proposition of

11

proof requisite to constitute the offense.

Tr. Vol. XX, p. 2975.

> (b)    Second, the jury was further instructed that the jury needed only to reach a "satisfactory conclusion" of Oscar Smith's guilt, with "satisfactory conclusion" being equated with the "moral certainty" language quoted *supra*:

> > Before a verdict of guilty is justified, the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole to a *satisfactory conclusion*, and producing, in effect, a *moral certainty* that the defendant, and no one else committed the offense.

Tr. Vol. XX, p. 2974 (emphasis supplied).

> (c)    Third, the whole standard of "reasonable doubt" was undermined by the fact that the jury was instructed to determine guilt under their own standard of proof, viz. to "render your verdict with absolute fairness and impartiality *as you think truth and justice dictate*." Tr. Vol. XX, p. 2978 (emphasis supplied).

> 2)    The guilt determination thus violated the Constitution, because the "moral certainty" language, combined with the "satisfactory conclusion" language, combined with the "as you think truth and justice dictate" language suggested to the jury a standard of proof less than proof beyond a reasonable doubt. Indeed, "moral certainty" by itself is an unconstitutional definition of "reasonable doubt," and the rest of the instruction did not in any way properly state the burden of proof. Permitting the jury to convict based upon a mere "satisfactory conclusion" of guilt allowed conviction in spite of reasonable doubts. Similarly, jurors were still allowed to convict if they felt that "truth and justice dictate[d]" a conviction, notwithstanding the existence of reasonable doubts. Accordingly, the convictions were obtained in violation of the Sixth, Eighth,

12

and Fourteenth Amendments. See e.g., Cage v. Louisiana, 498 U.S. 39 (1991); Victor v. Nebraska, 511 U.S. 1 (1994); In Re Winship, 397 U.S. 358 (1970).

      b.    The jury also received unconstitutional "reasonable doubt" instructions at the sentencing phase of trial:

      1)    At the sentencing phase of trial, the jury received a similar definition of "reasonable doubt" which required only "moral certainty" on the part of the jurors:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty is not demanded by the law but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the verdict.

Tr. Vol. XXII, pp. 3268-3269. Another similar instruction was given to the jury. Tr.Vol. XXII, p. 3277.

      2)    For all the reasons stated in ¶ 9a, *supra*, such instruction at the sentencing phase was likewise unconstitutional, as it lessened the prosecution's burden of proving aggravating circumstances and the necessity of a death sentence.

      10.    Statements made by the defendant should have been suppressed under the Fourth, Fifth, Sixth, and Eighth Amendments:

      a.    After the homicides, Oscar Smith was taken to the Robertson County Sheriff's Office in Springfield, Tennessee, where he was questioned for about 35 minutes.

      b.    Detective Don Bennett told Oscar Smith upon his arrival at his home that the Nashville police needed to talk to him, and that Mr. Smith needed to ride in a police car to a nearby interstate highway, where the Nashville Police would meet him. Oscar Smith got into

13

the police car and rode to the interstate. Tr. Vol. II, pp. 192-194.

c.      Detective Mike Smith, of the Nashville Metropolitan Police Department transported Mr. Smith to Springfield, but never advised him of his *Miranda* rights, asserting that Oscar Smith was not in custody. Tr. Vol. II, pp. 208-212. Smith testified, however, that questioning was terminated when Oscar Smith requested an attorney. Tr. Vol. II, p. 213.

d.      Oscar Smith testified at the suppression hearing, *inter alia*, that he felt he had no choice but to go with the police, that he was never asked whether he was willing to leave his home, he was not asked whether he objected to going to Springfield, did not feel free to leave, and was told near the end of the interview that "it will be a little bit" before he could go home. Tr. Vol. II, pp. 239-248.

e.      The trial court ruled at the suppression hearing that the statements were admissible.

f.      Subsequently, at the trial, Detective E.J. Bernard (who did not testify at the suppression hearing) stated that while in Springfield he was watching Oscar Smith "to make sure that either he didn't try to leave or run away." Tr. Vol. XVI, p. 2354.

g.      Because Oscar Smith was in custody, because he was not read his rights, and because those statements were subsequently used against him at trial, the introduction of those statements was unconstitutional.

h.      Further, because the trial court did not consider the testimony of Detective Bernard when holding that the statements were admissible at the suppression hearing, the statements should have been suppressed at trial, and Oscar Smith was denied a full and fair hearing during the state court process. He is therefore entitled to a hearing on this claim before this Court.

14

11.     The aggravating circumstances weighed by the jury when imposing the death sentences were unconstitutional, in violation of the Sixth, Eighth, and Fourteenth Amendments, and therefore the death sentences are unconstitutional:

a.      As to each victim, the jury weighed a "heinous, atrocious, or cruel" aggravating circumstance which was unconstitutionally vague, in violation of the Constitution:

1)      The trial court instructed the jury that it could impose the death sentence if it found that the offense was "heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tr. Vol. XXII, 3278-3279; T.R. 12-13. See Tenn. Code Ann. §39-2-203(i)(5).

2)      The trial court also provided additional instructions concerning the meaning of the terms in the aggravating circumstance: "Heinous: Grossly wicked or reprehensible; abominable; odious; vile.  Atrocious: Extremely evil or cruel; monstrous; exceptionally bad; abominable.  Cruel: Disposed to inflict pain or suffering; causing suffering; painful.  Torture: The infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious.  Depravity: Moral corruption; wicked or perverse act." Tr. Vol. XXII, 3278-3279.

3)      The aggravating circumstance on its face and as further defined in the jury charge was unconstitutionally vague under the Eighth and Fourteenth Amendments. Shell v. Mississippi, 498 U.S. 1 (1990); Maynard v. Cartwright, 486 U.S. 356 (1988); Godfrey v. Georgia, 446 U.S. 420 (1980); Barber v. Tennessee, 513 U.S. 1184, 115 S.Ct. 1177 (1995)(Stevens, J., concurring in denial of certiorari); Houston v. Dutton, 50 F.3d 381 (6th Cir. 1995).

4)      Also, there has been no new "sentencing calculus" as to each sentence on which the jury relied upon this unconstitutional aggravating factor, and therefore Oscar Smith is entitled to relief. Houston v. Dutton, 50 F.3d at 387.

15

5) Consequently, Oscar Smith is entitled to habeas corpus relief as to each of his death sentences, and to a new sentencing hearings before a properly empaneled state court jury. Rickman v. Dutton, 854 F.Supp. 1305 (M.D.Tenn. 1994) aff'd on other grounds, 131 F.3d 1150 (6th Cir. 1997).

b. The jury weighed an unconstitutional felony-murder aggravating circumstance concerning the deaths of Chad and Jason Burnett:

1) As to Counts two and four, the jury was instructed that it could find, as an aggravating circumstance, that "The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy or unlawful throwing, placing or discharging of a destructive device or bomb." T.R. 12-13; Tenn.Code Ann. §39-3-203(i)(7); Tr. Vol. XXII, pp. 3281-3282.

2) The jury was further instructed on the felony of first-degree murder as being the felony underlying the felony-murder circumstance. Tr.Vol. XXII, pp. 3281-3282; 3284.

3) The jury found this aggravating circumstance as to counts two and four. T.R. 230-231.

4) The jury, however, had been instructed at the guilt phase of trial that it could have found the deaths of the boys to have been committed in the course of a felony, but the jury acquitted on those charges of felony-murder, when it acquitted on counts 3 & 5 of the indictment. Therefore it was inapplicable and applied arbitrarily here, and in violation of due process.

16

5)    In addition, the felony-murder circumstance double-counted facts used in the "avoiding arrest" factor (See ¶11c, *infra*) as well as the "mass-murder" aggravating circumstance. See *infra*, ¶ 11d:

(a)    Indeed, the jury used the killing of each of the other two victims as the sole basis for finding the felony-murder circumstance as well as the mass murder circumstance. Each additional death was counted twice as a reason to impose the death sentence. The single killing of each of the other victims thus arbitrarily constituted two aggravating circumstances, when each killing could at most only constitute one aggravating circumstance. his capriciously and arbitrarily skewed the sentencing decision toward death.

(b)    Therefore, the use of the other killings as two aggravating circumstances was arbitrary, and ratcheted the case up into a death sentence by adding additional aggravating circumstances where in reality, fewer actually existed. This double-counting was unconstitutional. United States v. McCullah, 76 F.3d 1087, 1111-1112 (10th Cir. 1996); Stringer v. Black, 503 U.S. 222 (1992) ("When the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence." Indeed, when the same aggravating factor is counted twice, the defendant is essentially condemned twice for the same culpable act, which is inherently unfair. McCullah, 76 F.3d at 1111.

6)    This double-counting invalidates the circumstances, but despite the invalidity of this circumstance, there has been no new "sentencing calculus" as to each sentence on which the jury relied upon this unconstitutional aggravating factor, and therefore Oscar Smith is entitled to relief. Houston v. Dutton, 50 F.3d at 387.

17

7)      Consequently, the death sentences imposed for the killing of Chad and Jason Burnett must be reversed. Oscar Smith is entitled to habeas corpus relief and to new sentencing hearings before a properly empaneled state court jury. Rickman v. Dutton, 854 F.Supp. 1305 (M.D.Tenn. 1994) aff'd on other grounds, 131 F.3d 1150 (6th Cir. 1997).

c.      The "avoiding arrest" aggravating circumstance was inapplicable here, unsupported by sufficient evidence, and otherwise unconstitutional and invalid, in violation of the Sixth, Eighth, and Fourteenth Amendments.

1)      As to the killings of Jason and Chad Burnett, the jury was instructed that it could find as an aggravating circumstance that the "murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." T.R. 12-13; Tenn.Code Ann. §39-2-203(i)(6)(1982). The jury returned a finding of this circumstance as to counts 2 and 4. T.R. 230-231.

2)      There was insufficient evidence to support the circumstance, as it is directed to the killing of a witness to another current crime or some previous crime. *Raybin*, Tennessee Criminal Practice And Procedure §32.39 (1985).

3)      Further, there is no evidence to support the prosecution's contention that Chad or Jason were killed to prevent a lawful arrest or prosecution for the killing of Judy Smith. The prosecution's theory was "nothing more than speculation." See State v. Wright, 756 S.W.2d 669, 673 (Tenn. 1988). There was no proof beyond a reasonable doubt that Judy Smith was killed first. Further, there is no proof whatsoever that this was the dominant motive for the killing of the two boys, which therefore precludes its application. See White v. State, 403 So.2d 331 (Fla. 1981).

18

4)     Also, this aggravating circumstance was inconsistent with a finding that the offense was "heinous, atrocious, or cruel" See State v. Black, 815 S.W.2d 166, 197 (Tenn. 1991)(Reid, C.J., dissenting).

5)     Moreover, the jury double-counted the felony-murder and "avoiding arrest" aggravating circumstances, because they were based upon identical facts, but used to establish two aggravating circumstances, and thereby skewed the jury's sentencing decision in favor of death.

6)     Despite the invalidity of this circumstance, there has been no new "sentencing calculus" as to each sentence on which the jury relied upon this unconstitutional aggravating factor, and therefore Oscar Smith is entitled to relief. Houston v. Dutton, 50 F.3d at 387.

7)     Consequently, the death sentences imposed for the killing of Chad and Jason Burnett must be reversed. Oscar Smith is entitled to habeas corpus relief and to new sentencing hearings before a properly empaneled state court jury. Rickman v. Dutton, 854 F.Supp. 1305 (M.D.Tenn. 1994) aff'd on other grounds, 131 F.3d 1150 (6th Cir. 1997).

d.     The "mass murder" aggravating circumstance was likewise unconstitutional, under the Sixth, Eighth, and Fourteenth Amendments:

1)     As to each homicide, the jury was instructed that it could find, as an aggravating circumstance, that the "defendant committed 'mass murder' which is defined as the murder of three or more persons within the State of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan." T.R. 12; Tenn. Code §39-2-203 (i)(12)(1982). The jury found this aggravating circumstance as to each homicide. T.R. 229-

19

231.

       2)     There was insufficient evidence to support a finding of this aggravating circumstance, because "The Legislature intended serial or mass murders perpetrated over an <u>extended</u> but definite period and committed in a similar fashion as part of a pattern to be an aggravating circumstance to justify the imposition of the death penalty." <u>State v. Bobo</u>, 727 S.W.2d 945, 951 (Tenn. 1987). This case does not fit within that definition because the homicides did not occur over an extended period of time.

       3)     Further, the "mass murder" circumstance double-counted the "felony-murder circumstance also found by the jury, by adding an additional aggravating circumstance where none existed. This was arbitrary and capricious. <u>See</u> ¶11b5.

       4)     Also, there has been no new "sentencing calculus" as to each sentence on which the jury relied upon this unconstitutional aggravating factor, and therefore Oscar Smith is entitled to relief. <u>Houston v. Dutton</u>, 50 F.3d at 387.

       5)     Consequently, Oscar Smith is entitled to habeas corpus relief as to each of his death sentences, and to a new sentencing hearings before a properly empaneled state court jury. <u>Rickman v. Dutton</u>, 854 F.Supp. 1305 (M.D.Tenn. 1994) <u>aff'd on other grounds</u>, 131 F.3d 1150 (6th Cir. 1997).

      12.    In violation of the Sixth, Eighth, and Fourteenth Amendments, at the sentencing phase of trial, counsel were ineffective:

       a.     For failing to fully investigate and present evidence of Oscar Smith's mental health, including full exposition of available mitigating evidence and mental health problems in his family, including:

1) His father's being diagnosed as schizophrenic;

2) His brother being found to have a thought disorder;

3) His being treated for mental difficulties in 1983;

4) His son Merle having neurological impairments and retardation;

5) Potential organic brain damage or genetic defects suffered by Oscar Smith;

b. For failing to object to the constitutionality of the death penalty, *See* ¶22 *infra*;

c. For failing to object to jury instructions:

1) The "heinous, atrocious, or cruel" aggravating circumstance, which was unconstitutionally vague and overbroad; <u>See</u> ¶ 11, *supra*;

2) Instruction on the effect of mitigating evidence; <u>See</u> ¶ 20, *infra*.

3) The felony-murder aggravating circumstance; <u>See</u> ¶ 11, *supra*.

4) Reasonable doubt, which lessened the prosecution's burden of proof (Tr. Vol. XXII, pp. 3268-3269; ¶9 *supra*);

5) Expert witnesses (Tr. Vol. XXII, p. 3271), which watered down his proof at sentencing by telling jurors to receive it with caution, and that it involved "a field of speculation;" <u>See</u> ¶ 19, *infra*;

6) Credibility of witnesses; <u>See</u> ¶ 18 *infra*;

7) Instructions which shifted the burden of proof to Oscar Smith to show the existence of mitigating circumstances; <u>See</u> ¶ 20c;

8) Instructions using "unanimously" which misled the jury into

·21

believing that mitigating circumstances had to be found unanimously, in violation of the Eighth and Fourteenth Amendments. See Tr. Vol. XXII, pp. 3276-3278;

    d.    For failing to object to improper arguments. See ¶13 *infra* (incorporated herein by reference).

13.    In violation of the Sixth, Eighth, and Fourteenth Amendments, the prosecution engaged in *improper, unconstitutional, and inflammatory arguments*, including arguments:

    a)    Relying on prosecutorial expertise for imposing the death sentence, viz. The prosecution assured the jury that as representatives of the state, they has never seen such a situation as existed in this case (Arg. Tr. 18);

    b)    Inflaming the jury and again relying on prosecutorial expertise by calling the offense one of the most horrible cases that anyone in the courthouse had ever been associated with, which also injected personal knowledge not subject to cross-examination or proof (Arg. Tr. 18, 79);

    c)    Inflammatory arguments about slaughter and slaughterhouse, Oscar Smith having once worked in such an establishment (Arg. Tr. 2, 7, 8, 97);

    d)    Arguments unsupported by the record about insurance money which Oscar Smith allegedly stood to gain through the deaths (Arg. Tr. 3, 4, 12, 28-30, 49)

    e)    Arguments characterizing mitigating evidence as a "justification" when it is not (Arg. Tr. 97)

    f)    Arguments that a life sentence would not be a life sentence (Arg. Tr. 95-96)

    g)    Unsupported arguments that Oscar Smith had been arrested five or six times (Arg. Tr. 102)

22

h) Arguments designed to relieve the jury of its sense of responsibility and by injecting into the jury's calculus the feelings of the victims' family (Arg. Tr. 102-103)(asking for the death sentence "on behalf of them and their family", and talking about the wounds of this family)

14. The trial court improperly admitted purported expert testimony which was untrustworthy, in violation of the Sixth, Eighth, and Fourteenth Amendments:

a. Detective Johnny Hunter testified that he used an "alternative light source" technique to allegedly identify a palm print found on a sheet in the house, and he later testified that, based upon his analysis, the print was from Oscar Smith.

b. The "alternate light source" technique used by Detective Hunter was not reliable and highly prejudicial, and there was (and is) no proof that this purported technique is, from a scientific standpoint, either reasonably reliable or trustworthy. Compare Tenn.R.Evid.703; Fed.R.Evid. 703; Kumho Tire Co. v. Carmichael, 119 S.Ct. 1167 (1999); Daubert v. Merrill Dow Pharmaceuticals, 509 U.S. 579 (1993). In fact, this purported technique was so lacking in acceptance as being relied upon by experts or trustworthy that Detective Hunter had never before testified concerning this alleged technique. Tr.Vol. XIV, p. 2036. Even the T.B.I. failed to use such a technique. Tr. Vol. XIV, pp. 1926-1927.

c. With the test being unreliable and not valid as proof under accepted standards for the reliability of testimony (including those throughout the fifty states) its introduction in this case violated Oscar Smith's right to due process, to a fundamentally fair trial and sentencing hearing, and to a highly reliable determination of guilt and sentence, in violation of the Eighth and Fourteenth Amendments.

23

15.     The trial court improperly admitted an enhanced version of a 911 tape and a purported transcript of the contents of the enhanced tape, in violation of the Sixth, Eighth, and Fourteenth Amendments:

a.      The trial court admitted, over objection, an enhanced version of a tape of the 911 call made from the victims' residence on the night of October 1.

b.      The court then allowed witnesses to testify, based upon hearing the enhanced tape, that the voices were those of Jason and Chad Burnett. Tr. Vol. XIII, pp. 1811-1812, 1879-1880.

c.      Then, the trial court allowed the prosecution to present to the jury what the prosecution claimed was an accurate transcript of the enhanced tape, which allegedly contained the name Frank. Tr. Vol. XVII, p. 2506, 2125-2126. Even Cheryl Dalton, the operator who took the call, did not hear that name when she took the call, and only stated that the name was on the enhanced tape after the tape was enhanced and she was given an alleged transcript of the enhanced tape. Tr. Vol. XV, pp. 2127-2130, 2133.

d.      The enhanced tape was itself hearsay and the prosecution's alleged transcript of the enhanced tape was also hearsay as well, and neither fell within a firmly-rooted exception to the hearsay rule, and lacked reliability, especially the transcript. Further, the admission of the transcript was fundamentally unfair, as it skewed the jury's determination of guilt and sentence by placing a stamp of approval on the prosecution's claims about the contents of the 911 call.

e.      As a result of the admission of the enhanced tape and the purported transcript, Petitioner was denied his right to confrontation, to a highly reliable guilt and sentencing determination, and to due process under the Sixth, Eighth, and Fourteenth

24

Amendments.

16.    Jury instructions on premeditation and deliberation violated the Sixth, Eighth, and Fourteenth Amendments, because they lessened the prosecution's burden of proving the essential elements of first-degree murder beyond a reasonable doubt:

a.    The jury was instructed, *inter alia*, that "premeditation could be conceived and deliberately formed in an instant" and that premeditation could be inferred form repeated blows. See Tr.Vol. XX, pp. 2949-2950 for the entire charge on premeditation and deliberation.

b.    However, it is clear that, under Tennessee law, premeditation cannot be formed in an instant. State v. Brown, 836 S.W.2d 530 (Tenn. 1992). Nor do repeated blows establish first-degree murder. Id. Similarly, the jury was not instructed on the meaning of deliberation, except that it required cool purpose.

c.    The instructions thus allowed the prosecution to convict without requiring, beyond a reasonable doubt, all of the elements of first-degree murder, in violation of due process, and the Sixth, Eighth, and Fourteenth Amendments.

17.    There was insufficient evidence to support the convictions, in violation of the Fourteenth Amendment, especially where the prosecution was required to exclude all reasonable hypotheses except the guilt of the Petitioner. See Tr. Vol. XX, p. 2974 ("[T]he facts must exclude every other reasonable theory except that of guilt."). That standard simply was not met.

18.    Jury instructions on the credibility of witnesses violated the Sixth, Eighth, and Fourteenth Amendments, because it infringed upon the jury's prerogative to assess the credibility of witnesses, as they required the jury to ignore certain discrepancies and to preclude the jury from discrediting a witness unless "it should plainly appear that some witness has willfully testified

25

falsely." Tr. Vol. XX, pp. 2976-2977; Vol. XXII, p. 3270; See Petitioner's Post-Conviction Application for Permission To Appeal, pp. 84-86. This required the jurors to credit unreliable testimony and lessened the prosecution's burden of proof, in violation of due process, and the right to a reliable guilt and sentencing proceeding.

19. Jury instructions on the consideration of expert witnesses (Tr. Vol. XXII, p. 3271), unconstitutionally watered down Oscar Smith's proof at sentencing by telling jurors to receive it with caution, and that it involved "a field of speculation," thereby depriving him of a fair and reliable sentencing hearing, in violation of the Eighth and Fourteenth Amendments.

20. Jury instructions on the effect of mitigating evidence violated the Sixth, Eighth, and Fourteenth Amendments:

      a.    Jury instructions only allowed consideration of "extreme" mental or emotional disturbance as a mitigating factor (Tr. Vol. XXII, pp. 3279-80, 82, 85; See Post-Conviction Application For Permission To Appeal, p. 87, incorporated by reference)

      b.    Jury instructions required the jury to unanimously agree as to sentence, thereby discounting mitigating evidence (Tr. Vol. XXII, pp. 3273-3276; See Post-Conviction Application For Permission To Appeal, p. 88, incorporated by reference)

      c.    Jury instructions shifted the burden of proof to the defendant to establish mitigating evidence or else require the death sentence (Tr. Vol. XXII, pp. 3275-3276; See Post-Conviction Application For Permission To Appeal, pp. 88-90, incorporated by reference)

21. The trial court improperly permitted consideration of fear of the victim, in violation of the Sixth, Eighth, and Fourteenth Amendments:

      a.    Judy Smith's father, Don Robirds, testified, over objection, that Judy Smith

26

expressed fear of Oscar Smith before her death. Tr. Vol. XIII, p. 1768. He did not testify to any particular statement made by her concerning her then existing state of mind, emotion, or physical condition.

b.     Similarly, Judy Smith's sister, Teresa Zastrow, testified over objection to additional statements of Judy Smith, including Judy Smith's supposed fear of Oscar Smith, a threat allegedly made by Oscar Smith, and an allegation of assault. Tr. Vol. XIII, pp. 1868-1873.

c.     Billy Fields, Judy Smith's boyfriend (who was suspected as having committed the offenses) also testified about Judy Smith's alleged fear of Oscar Smith. Tr. Vol. XV, pp. 2158-2161, 2176. The fact that Fields was suspected of the offense also calls into question the inherent veracity of Fields' claims.

d.     Sheila Gunther also testified about similar hearsay statements allegedly made by Judy Smith, including purported threats. Tr. Vol. XVI, pp. 2294, 2295, 2309, 2316-2319.

e.     Oscar Smith could not confront the statements made by these witnesses, because they were hearsay statements of Judy Smith, and did not fall within a well-established exception to the hearsay rule. Consequently, they were admitted in violation of Oscar Smith's right to confront the witnesses against him and his rights to due process and a reliable guilt and sentencing determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

22.     The Tennessee death penalty statute is unconstitutional, in violation of the Sixth, Eighth, and Fourteenth Amendments, for all the reasons stated in Petitioner's Direct Appeal Brief, pp. 178-191 (specifically incorporated herein by reference: discussing constitutional issues), and his Post-Conviction Application For Permission to Appeal, pp. 104-132 (specifically incorporated herein by reference):

a.      It does not clearly establish the burden of proof at sentencing;

b.      It does not sufficiently narrow the class of persons eligible for the death sentence;

c.      It does not sufficiently limit the jury's exercise of discretion in imposing sentence;

d.      It requires a mandatory death sentence if aggravating circumstances outweigh mitigating circumstances;

e.      It gives too little weight to non-statutory mitigating circumstances;

f.      It does not require the jury to make the ultimate determination as to sentence;

g.      It does not inform the jury about its power to give a life sentence out of mercy;

h.      It does not require jury factfinding at sentencing, thereby precluding effective review of the sentence on appeal;

i.      It prohibits the jury from learning the consequences of a non-unanimous verdict;

j.      The death sentence is *per se* cruel and unusual punishment;

k.      Electrocution constitutes cruel and unusual punishment in violation of evolving standards of decency;

l.      The death penalty is imposed in a discriminatory manner;

m.      The proportionality and arbitrariness review conducted by the Tennessee Supreme Court is inadequate, including because there is no uniform or comprehensive procedure

28

for collecting data on first-degree murder cases, the process of collecting such data is inadequate, the jury does not report mitigating circumstances, there was no published standard for reviewing arbitrariness in this case;

n.     The death sentencing process permits the introduction of unreliable evidence by the prosecution;

o.     The prosecution is allowed to make two final arguments, and the defendant is only allowed to make one argument, and not in closing.

23.     Under the Sixth, Eighth, and Fourteenth Amendments, the trial court improperly failed to provide requested instructions, which precluded a fair trial and sentencing hearing. See Post-Conviction Application For Permission To Appeal, pp. 96-104 (incorporated by reference). Those instructions include:

a.     An instruction that a life sentence would be a life sentence;

b.     Any lingering or residual doubt was to be considered as a mitigating circumstance at sentencing;

c.     Mercy was appropriate in capital sentencing;

d.     An instruction that mitigation evidence was not a justification or excuse;

e.     An instruction which would further define the balancing of mitigating and aggravating factors at sentencing (Proposed Defense Instruction No. 6);

f.     An instruction that cooperation with law enforcement officers was appropriately considered as mitigating evidence;

g.     An instruction clarifying the true meaning of the mass murder aggravating circumstance (Proposed Defense Instruction No. 11);

29

h.      An instruction that the jury could return a life sentence even if the aggravating circumstances outweighed the mitigating circumstances.

24.      In violation of the Sixth, Eighth, and Fourteenth Amendments, appellate counsel failed to present any and all meritorious issues on direct appeal, including those cited *supra*, and all issues contained in this petition for writ of habeas corpus, ¶¶ 8 et seq. Moreover, appellate counsel was ineffective for failing to raise the following claims, claims which Oscar Smith did not waive:

a.      The error in the trial court's failure to provide requested instructions at both the guilt and sentencing phases of trial, including:

1)      An instruction that a life sentence would be a life sentence;

2)      Any lingering or residual doubt was to be considered as a mitigating circumstance at sentencing;

3)      Mercy was appropriate in capital sentencing

4)      An instruction that mitigation evidence was not a justification or excuse

5)      An instruction which would further define the balancing of mitigating and aggravating factors at sentencing;

6)      An instruction that cooperation with law enforcement officers was appropriately considered as mitigating evidence;

7)      An instruction clarifying the true meaning of the mass murder aggravating circumstance

8)      An instruction that the jury could return a life sentence even if the

aggravating circumstances outweighed the mitigating circumstances. See Post-Conviction Application For Permission To Appeal, pp. 98-104 (incorporated herein by reference).

        b.      The prejudicial effect of the trial court's admission of the 911 transcript, which was highly prejudicial because it influenced the jury to believe the prosecution's assertions about the content of the tape.

25.     Electrocution constitutes cruel and unusual punishment in violation of evolving societal standards of decency, because it inflicts excessive pain and physical harm.

26.     In violation of the Sixth, Eighth, and Fourteenth Amendments, the death sentence violates the petitioner's fundamental right to life. The right to life is a fundamental right recognized by the United States Constitution, and as such, the government may not deprive him of his life absent proof that the deprivation of this fundamental right is necessary to promote a compelling state interest and the least restrictive means of achieving that compelling interest. The state has not done so, and cannot do so. Consequently, the death sentence must be overturned.

27.     In violation of the Eighth and Fourteenth Amendments, the death penalty constitutes cruel and unusual punishment as a result of the length of time Oscar Smith has been incarcerated and incarcerated under sentence of death following the offense for which he is convicted. The death sentence is therefore unconstitutionally cruel and unusual. See Lackey v. Texas, 514 U.S. 1045, 115 S.Ct. 1421 (1995)(Stevens, J., respecting denial of certiorari).

        a.      The offense in question allegedly occurred in October, 1990.

        b.      Since that time, Oscar Smith has been pursuing non-frivolous, available remedies in the state courts of Tennessee and in this Court.

        c.      As it now stands, it has been nearly 10 years since the offense.

31

d.    As a result of the delays, execution of the death sentence would constitute cruel and unusual punishment, given the mental strain of incarceration for all these years. See Lackey v. Texas, supra; Pratt v. Attorney General of Jamaica, 2 A.C. 1, 4 All E.R. 769 (Privy Council 1993)(en banc).

28.  In violation of the Sixth, Eighth, and Fourteenth Amendments, the cumulative effect of the errors at the guilt and sentencing phases of trial rendered the guilt and sentencing determinations unfair, unconstitutional, and unreliable.

## CONCLUSION

WHEREFORE, this Court should grant Petitioner Oscar Smith's petition for writ of habeas corpus and order that he be discharged from the unconstitutional custody under which he now labors, and order that he be discharged from custody unless retried and resentenced within a reasonable period of time. The Court should grant Petitioner any requested discovery or process needed for the investigation and full presentation of his claims of constitutional error. Also, the Court should conduct an evidentiary hearing on his claims of constitutional deprivation. The Court should also grant whatever additional relief is just and proper. 28 U.S.C. §2243.

32

Respectfully Submitted,


Paul R. Bottei
Assistant Federal Public Defender
Office of the Federal Public Defender
Middle District of Tennessee
810 Broadway, Suite 200
Nashville, Tennessee 37203
(615) 736-5047

Richard McGee, Esq.
601 Woodland Street
Nashville, Tennessee 37206
(615) 254-0202

By: *Paul R Bottei*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document has been mailed by first-class mail to Joseph Whalen, Esq., Assistant Attorney General, 425 5th Avenue North, Nashville, Tennessee 37243

Date: *January 24, 2000*

*Paul R Bottei*