UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

OSCAR SMITH,                  )
                                   )
        Petitioner,      )
                                   )
v.                            )        No. 3:99-0731
                                 )        Judge Trauger
RICKY BELL, WARDEN,     )
                                 )
        Respondent.     )

### M E M O R A N D U M

### I. INTRODUCTION

The petitioner is a prisoner in the Riverbend Maximum Security Institution (RMSI) in Nashville, Tennessee. He brings this action under 28 U.S.C. § 2254, challenging the constitutionality of his convictions and death sentence. The petitioner names Ricky Bell, Warden at RMSI, as the respondent to this action.

### II. FACTUAL BACKGROUND

The petitioner was tried on three counts of premeditated first-degree murder in the deaths of Judith Smith ("Judith") and her two teenage sons, Chad and Jason Burnett ("Chad" and "Jason"), and two counts of felony-murder in the deaths of Chad and Jason. The evidence adduced at the guilt/innocence phase of the petitioner's trial, held July 23 through July 25, 1990, is summarized below.

      1)      Oscar Frank Smith ("the petitioner") and Judith married in 1985. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, p. 1807) It was Judith's third marriage (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, p. 1806) and the petitioner's second (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, p. 2806). Judith had two sons – Chad and Jason – by a previous marriage who, at the time of the murders, were 16 and 13 respectively. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, pp. 1806-1807) The petitioner also had two children by a previous marriage (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, p. 2806), who basically had been raised by the

petitioner's mother and, at the time of the murders, were 14 and 17 (DE # 12, Add. 1, Bk. 8 of 9, Vol. XIX, p. 2705). In the second year of her marriage to the petitioner, Judith gave birth to twin boys. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, p. 1808)

2)   On June 17, 1989, the petitioner and Judith separated, after an apparently violent confrontation between the petitioner and Judith's thirteen-year-old son, Jason. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, pp. 1868-1871)

3)   Judith's sister, Theresa Zastrow ("Zastrow"), testified that Judith told her the petitioner and Jason had gotten into a fight at the petitioner's trailer, that the petitioner had put a gun to Jason's head, and that the petitioner had fired a shot into the air as Judith and Jason were leaving. According to Zastrow, Judith told her that the petitioner warned her not to try to take the car or the twins, and that he would kill her if she called the police. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, pp. 1869-1870)

4)   Judith swore out a warrant against the petitioner for aggravated assault in connection with this incident. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, pp. 2190-2192) On August 1, 1989, Judith swore out a second warrant for aggravated assault, alleging that the petitioner had assaulted her. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, p. 2191)

5)   Sally Goodman ("Goodman") – an administrator with the General Session and Domestic Relations Courts in Robertson County – testified that there were two warrants pending against the petitioner at the time of the murders. The first warrant, dated June 17, 1989, was for the aggravated assault against Jason, with respect to which Goodman testified that she had seen a swollen bite mark on Jason's back. (DE # 14, Add. 1, Bk. 6 of 9, Vol. XV, 2192-2194) The second warrant, dated August 1, 1989, was for the aggravated assault against Judith. (DE # 14, Add. 1, Bk. 6 of 9, Vol. XV, 2191)

6)   A contentious issue in the ensuing divorce proceedings was custody of the three-year-old twins. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, p. 2196) Judith had been given temporary custody; the petitioner had visitation rights every other weekend and had been ordered to pay support. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, pp. 2196-2197)

2

7)	On Sunday, October 1, the petitioner, who had visitation with his twins that weekend, took them to Judith's home at 324 Lutie Street.  (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, pp. 2807-2809) Despite their marital problems, the petitioner and Judith left the twins with Chad and Jason for the entire day, while they spent hours drinking coffee in two different Waffle House restaurants (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, 2061-2063, 2069-2071), looked for a replacement used car for Judith (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, pp. 2810-2811), bought flowers at a florist (DE # 12, Add. 1, Bk. 8 of 9, Vol. XIX, pp. 2791-2792), and had dinner at the Gold Rush restaurant on Elliston Place (DE # 12, Add, 1, Bk. 7 of 9, Vol. XVIII, pp. 2632-2633).  Numerous witnesses testified to these events, and the testimony included the fact that the couple talked quietly and did not appear to be arguing.  (DE # 12, Add. 1, Bk. 6 of 9, Vols. XV, pp. 2063, 2072; XVIII, 2636-2637; XIX, p. 2793)

8)	The petitioner drove Judith back to 324 Lutie Street between 9:30 and 10:00 p.m. that evening, then took the twins back home with him and left them with his mother.  (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, p. 2814-2815, 2885)

9)	Judith's sister, Teresa Zastrow ("Zastrow"), testified that she called Judith at 10:30 p.m. on the night of the murders and that they had talked for approximately fifteen minutes.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, p. 1875)

10)	Cheryl Dalton ("Dalton") – employed by the Metro-Nashville Police Department Communications Division at the time of the murders – testified that she received a 911 "panic call" from 324 Lutie Street at 11:20 p.m. that night.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, pp. 2091, 2124)  Dalton identified the tape introduced at trial as a copy of the tape of that call.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, pp. 2091-2092)  Dalton testified further that a transcript of the call introduced as State's Exhibit 18 at trial was an accurate representation of what she heard on the enhanced version of the tape.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, p. 2125)

11)	Police were dispatched to the scene and arrived shortly after the call.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, pp. 2136-2137)  After knocking on the front door, receiving no answer, hearing no noise, and looking around the side of the house, the officers departed, concluding that the call was a "false

3

call." (DE # 14, Add. 1, Bk. 6 of 9, Vol. XV, pp. 2137-2139)

12)     The next day, Monday, at approximately 3:00 p.m., the bodies of Judith, Chad, and Jason were found murdered at 324 Lutie Street. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, pp. 1821-1823, 1849-1852, 1876-1877, 1894-1895, 1899) There were no signs of forced entry. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 1944, 1970)

13)     Judith was found lying on the bed in her bedroom with gunshot wounds in her neck and arm, ice pick-like puncture wounds to her chest, and her neck slit. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 1946) Jason was found on the floor at the foot of that bed, with numerous knife wounds to his neck, abdomen and chest, and defensive wounds on his hands. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 1948) He was lying on his left side with his intestines protruding from his abdominal wounds. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 1948) Found under him, never explained, was a hair dryer that was running. (DE # 12, Add. 1, Bk. 6 of 9, Vols. XIII, pp. 1822, 1877; XIV, p. 1948) Chad was found in the kitchen, where a violent struggle had taken place and where the 911 call, in all likelihood, originated. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, pp. 1959-1960, 1965) He had gunshot wounds to his head, chest and shoulder, knife wounds to his chest, back, abdomen and neck, ice pick-like puncture wounds to his chest, and defensive wounds on his hands. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVII, pp. 2564-2592)

14)     Sergeant Johnny Hunter ("Sgt. Hunter") – officer in charge of the Metro Latent Fingerprint Section at the time of the murders – testified as to physical evidence recovered at the crime scene. A leather tooling instrument called an awl, which looks much like an ice pick, was found with blood on it in the kitchen. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 1962) A left-hand cotton work glove was found in the bedroom where Judith's and Jason's bodies were. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, pp. 1954-1955) A live .22 caliber cartridge was found in the bedroom across the hall from where Judith's and Jason's bodies were found. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 1955) A partially-eaten pizza and a bologna sandwich with one bite out of it were found on the kitchen counter. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 1962) A palm print made in blood was found on the sheet near Judith's body on the bed. (DE # 12, Add. 1,

4

Bk. 6 of 9, Vol. XIV, pp. 1947) Jason's fingerprints were found on a kitchen table leg that had been broken off from the table and on the telephone receiver and telephone base in the kitchen. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, pp. 2022-2023) Other latent prints were recovered from the scene and examined, one of which did not match the petitioner's. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 2024) A bloody footprint in the kitchen likewise was never connected to the petitioner. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 1979) Sergeant Hunter testified that Jason had some strands of hair in his hand, which Special Agent Chester Blythe (Agent Blythe) of the FBI testified turned out to be Judith's and Jason's. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, pp. 1997-1998, 2046, 2058) A partially-written letter that Judith had been writing to Billy Fields (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, pp. 1880-1881), the man she was seeing at the time of the murders, and a partially-written letter that Chad had been writing to his girlfriend (DE # 12, Add. 1, Bk. 6 of 9, Vols. XIII, p. 1881; XIV, pp. 1969, 1986) were recovered from the scene as well.

15) The .22 caliber weapon that was used to shoot the victims was never recovered from the crime scene or elsewhere. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 2039; Bk. 7 of 9, Vol. XVII, pp. 2366, 2463) The knife used to stab all three of the victims was never recovered. (DE # 14, Add. 13, Ex. 12, pp. 11-12, 50) The awl, which probably made the puncture wounds, contained no identifiable fingerprints. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 1973)

16) Detective Don Bennett ("Detective Bennett") of the Robertson County Sheriff's Office testified that he drove to the petitioner's home on the day that the bodies were discovered and told the petitioner that officers of the Metropolitan-Nashville Police Department ("Metro") wanted to speak with him. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, pp. 2333-2334) Detective Bennett testified that the petitioner accompanied him without ever asking why the Metro officers wanted to talk with him. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2334)

17) Metro Detectives E. J. Bernard ("Detective Bernard") and Mike Smith ("Detective Smith") testified that they interviewed the petitioner at the Robertson County Sheriff's Office. Both detectives testified that the petitioner never

5

asked them why he was being questioned. (DE # 12, Add. 1, Bk. 7 of 9, Vols. XVI, p. 2338, 2349; XVIII, p. 2648) Detective Bernard testified that the petitioner had told them he had spent much of Sunday helping Judith look for a car and that he had left her house that evening at between 9:00 and 9:30 p.m. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, 2351-2352) Detectives Bernard and Smith testified that the petitioner had told them that he had dropped the twins off at his mother's house, packed and left for Kentucky between 10:00 and 10:30 p.m., where he was to perform some work for his employer. (DE # 12, Add. 1, Bk. 7 of 9, Vols. XVI, p. 2351; XVIII, p. 2649). According to Detective Bernard, the petitioner told him that the drive had taken longer than it should have because of fog. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2353) Detectives Bernard and Smith testified further that, when referring to Judith, the petitioner spoke of her in the past tense repeatedly, even before he had been told of the murders. (DE # 12, Add. 1, Bk. 7 of 9, Vols. XVI, p. 2353; XVIII, p. 2648) Moreover, when he was told of the murders well into the interview, the petitioner did not ask the officers the logical questions of where, when, how and by whom. (DE # 12, Add. 1, Bk. 7 of 9, Vols. XVI, p. 2354; XVIII, p. 2649)

18) Detective Bernard testified that the petitioner had abrasions on his right hand, right elbow, left back and shoulder blade, which Sgt. Hunter testified were photographed. (DE # 12, Add. 1, Bk. 6 of 9, Vols. XIV, p. 1992; XVI, p. 2355-2357)

19) When interviewed later that evening, the petitioner's mother told three different officers – Detective Bernard, Metro Detective Grady Eleam ("Detective Eleam"), and Sgt. Hunter – that the petitioner had arrived home at approximately 10:15 p.m. on the night of the murders, dropped off the twins, went to his trailer and then left for Kentucky. (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, p. 2915, 2923, 2928) Detective Bernard testified further that, when he asked her what time the petitioner had left for Kentucky, she told him that she did not know. (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, 2915)

20) Detective Larry Flair ("Detective Flair") collected an empty leather holster, two belts with the name "Frank" on them, a .22 caliber cartridge, and leather-working tools from the petitioner's trailer during a search on October 13, 1989. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVII, pp. 2367-2370)

6

21) Tommy Heflin (Heflin) – a Tennessee Bureau of Investigation (TBI) firearms examiner – testified that, although the bullets recovered from the victims' bodies were different from the cartridge recovered from the petitioner's trailer, the firearm used in committing the murders could have fired both types of ammunition. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVII, pp. 2470-2472)

22) Don Robirds ("Robirds") – Judith's father, and Chad's and Jason's grandfather – testified that he heard the petitioner threaten to kill his daughter in the Spring, before they separated, and again a couple of weeks prior to the murders. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, pp. 1808-1809, 1814-1815) Robirds also testified that, two to three weeks before the murders, the petitioner told him to tell Judith that "the gloves are coming off." (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, 1808-1809)

23) Judith's sister, Zastrow, testified that she saw rope burns on Judith's wrists and throat from the attack that led to Judith's swearing out the second warrant and that Judith stayed for a time in a shelter before going back to her house at 324 Lutie Street in Nashville, where she had lived with Chad, Jason, and the twins after the separation. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, pp. 1872-1873, 1886)

24) Sheila Gunther ("Gunther") – one of Judith's co-workers at the Waffle House in Nashville – testified that, at Judith's request, she listened in on telephone calls that the petitioner made to Judith at work over a period of four to six weeks in the summer of 1989, in which Gunther overheard the petitioner threaten to kill Judith on at least a dozen occasions. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, pp. 2309, 2317-2318) Gunther testified that the petitioner usually threatened to shoot Judith, but that once he threatened to stab her. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2318) Gunther further testified that she heard the petitioner threaten to kill Chad and Jason, because he felt that Judith was better to them than she was to the twins. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2318) In August, the petitioner, who apparently knew that Gunther was listening in on his conversations with Judith, threatened to kill her and her children during one of the calls. (DE # 12, Add. 1, Bk 7 of 9, Vol. XVI, pp. 2318-2321)

25) Jerry Williams ("Williams") – one of the petitioner's co-

workers at the Maintenance Service Corporation – testified that, while driving around together in 1988, the petitioner offered to kill Williams's wife if Williams would kill Judith. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2288)  Williams also testified that the petitioner came to his house two weeks later, repeated his offer, and said that he would pay Williams to kill Judith.  (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, pp. 2288-2289)

26)  Raymond Merritt ("Raymond Merritt") – another of the petitioner's co-workers at the Maintenance Service Corporation – testified that the petitioner asked him twice if he knew anyone who would kill his family, specifying that the twins were not to be harmed.  (DE # 12, add. 1, bk. 7 of 9, Vol. XVI, p. 2265)  The second time the petitioner offered to pay $20,000 if Merritt could find someone who would kill Judith and her teenage sons.  (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, pp. 2264-2265)

27)  The petitioner was the beneficiary on one or more life insurance policies insuring the lives of Judith, Chad and Jason.  In February of 1989, the petitioner and Judith took out a family life insurance policy with Liberty National Insurance on the lives of the petitioner, Judith, Chad and Jason, the twins, and the petitioner's two children by his previous marriage.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, pp. 2207-2208)  The insurance on Judith's life was $20,000, and Chad and Jason's lives were insured for $5,000 each.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, p. 2208)  The petitioner was the beneficiary on the insurance covering the lives of Judith, Chad and Jason.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, p. 2208)  The beneficiary on the life insurance for the petitioner was the petitioner's mother.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, p. 2209)  This policy lapsed in July of 1989, during the separation, but was renewed by reinstatement when the petitioner and his father paid the premium on August 15, which was two weeks after the aggravated assault warrant was taken out for the assault against Judith and two months after the earlier warrant for aggravated assault on Jason.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, p. 2209)  On March 6, 1989, another policy insuring the petitioner, Judith, and their six children was taken out with American General Life Insurance Company, insuring the petitioner and Judith for $20,000 each, and each of the children for $10,000.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, p. 2199)  Each of the policies

taken out in 1989 was with a different company and not with United Insurance Company of America, where the petitioner and Judith had had life insurance in effect since August of 1985. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2248) That policy would pay the petitioner $4,000 upon the death of Chad or Jason, and $10,000 upon the death of Judith, unless her death was accidental, in which case the policy paid $20,000. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2248)

28) Ron Merritt ("Ron Merritt") – the Maintenance Service Corporation plant manager – testified that the petitioner had been assigned the Friday prior to the murders, *i.e.*, September 29, 2989, to go to Seal Master Corporation ("Seal Master") the following Monday. (DE #12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2222) Merritt testified to several unusual aspects of that assignment. First, the petitioner came to him and asked if he could drive to Morehead, Kentucky Sunday night, instead of Monday morning, a request that Merritt considered unusual because the customer was not expecting a service representative until mid-day because of the drive. (DE # 12, Add. 1, Bk. 7 of 9, Vols. XVI, pp. 2222-2223; XIX, p. 2681) Merritt testified that the petitioner telephoned Maintenance Service Corporation at 7:19 a.m. on Monday morning to let them know that he was at the customer's plant, which was not the customary practice. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, pp. 2223-2224) Merritt also testified that he found a 12-foot wide roll of plastic, normally kept at the loading dock, opposite the petitioner's work station when he closed the plant that Friday afternoon. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, pp. 2225-2226)

29) Zastrow testified that, during their telephone conversation shortly before the murders, Judith told her the petitioner had taken the twins with him because he had told her he was off work the following day. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, p. 1875)

30) Barbara Kohus – a signal process analyst with the FBI – introduced the enhanced version of the 911 tape into evidence (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVII, pp. 2503-2505) On the tape, a voice identified as Jason's yells, "Help me!" as a second voice, identified as Chad's, screams in the background, "Frank, no, God, help me!" (DE # 12, Add. 1, Bk. 6 of 9, Vol. III, pp. 1812, 1880) The tape concludes

9

abruptly with Jason saying "324 Lutie Street."[1]

31)  Robards and Zastrow testified that the petitioner always went by the name "Frank," and not Oscar. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, pp. 1808, 1868)  Raymond Merritt testified that the petitioner wore a belt with the name "Frank" on it, and, when he asked the petitioner why, the petitioner told him that his "real name was Frank." (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2253)  As previously noted, *supra* at p. 7, Detective Flair recovered two leather belts from the petitioner's trailer, both with the name "Frank" on them. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVII, pp. 2367-2368)

32)  The petitioner testified that he went by both "Frank," his middle name, and "Oscar," his first name. (DE # 13, Add. 1, Bk. 8 of 9, Vol. XX, p. 2857)

33)  Danny Abston (Abston) – who was visiting his father-in-law at 318 Lutie Street the night of the murders – testified that he observed a white LTD that looked like "an old police car" in the driveway of the victims' house between 11:00 and 11:15 p.m. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, p. 2150)

34)  Raymond Merritt testified that the petitioner drove "a white Ford, an old squad car." (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2253)  Detective Smith testified that the petitioner's car was "a four door white Ford, Crown Victoria . . . an old police car." (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVII, p. 2651)

35)  The petitioner testified that he owned a 1987 Ford LTD, "an ex-police patrol car . . . ." (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, pp. 2871-2872)

36)  Dr. Mona Gretel Harlan (Dr. Gretel Harlan) – the Assistant Davidson County Medical Examiner – testified that Judith's and Chad's bodies exhibited wounds made by three different weapons: gunshot wounds from .22 caliber bullets, multiple

---

[1]  These words were not understood at the time by the 911 operator.  It was only after the tape was "enhanced" by the FBI, which process removed extraneous, interfering sounds, that she could make out the words.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, pp. 2133-2134; XVII, pp. 2503-2504)

10

stab and slashing wounds made by a knife,[2] and wounds made by an object like an ice pick or an awl. Jason's wounds were inflicted by a knife only. Dr. Gretel Harlan fixed the time of death at between 11:20 and 11:30 p.m. on October 1. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVIII, pp. 2559-2623)

37)     Jerry Watts ("Watts") – one of the petitioner's co-workers at Maintenance Service Corporation – testified that the petitioner owned a .22 caliber pistol and that the petitioner was thinking about selling it. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, pp. 2230-2231) Watts testified that the petitioner's .22 caliber pistol, to which the petitioner referred as his "baby," was in a hand-tooled leather holster that the petitioner told Watts he had made himself. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2231) Watts further testified that, on July 3, 1989, he met the petitioner at a local shooting range, where they fired the petitioner's firearms, including the .22 caliber pistol. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, pp. 2230-2231) Watts identified an empty holster introduced into evidence as the one that the .22 caliber revolver had been in, the holster that the petitioner claimed to have made. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2232)

38)     Watts' testimony about shooting on a range with the petitioner was corroborated by Larry Hickerson ("Hickerson") – vice-president and general manager of Gun City U.S.A. – whose records showed that both the petitioner and Watts fired at the range on July 3, 1989. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2245)

39)     The petitioner denied owning a .22 caliber pistol at the time in question and claimed that he had not owned one since the late 1960s or early 1970s. (DE # 12, Add. 1, Bk. 8 of 9, p. 2876) The petitioner also denied having told Watts that he had made the leather holster, which was recovered empty from the petitioner's trailer. (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, p. 2873)

---

[2]     In her testimony, Dr. Gretel Harlan, the Assistant Davidson County Medical Examiner, testified that the knife used did not exhibit the characteristics of having a serrated edge. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVIII, pp. 2572-2573, 2600, 2610-2611) Although she could not identify the type of knife used with absolute certainty, she stated that it had a sharp edge (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVIII, pp. 2571, 2575, 2610, 2613), that it was either a single-edged knife, or double-edged knife with one edge dulled (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVIII, pp. 2572, 2611), and that it was between 2.5 and 4.8 inches in length (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVIII, pp. 2581, 2607, 2608).

11

40) Robards, Zastrow, Watts, and witness for the defense, William Sergeant ("Sergeant"), whom the petitioner had known for thirteen years, all testified that the petitioner carried a buck or folding-type knife on his belt with a blade 3 to 4 inches in length. ((DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, pp. 1810, 1872; Bk. 7 of 9, Vols. XVI, p. 2230; XIX, pp. 2670-2671) Sergeant also testified that the petitioner was ambidextrous. (DE # 12, Add. 1, Bk. 8 of 9, Vol. XIX, pp. 2669-2670)

41) Detective Bernard testified that, when he asked the petitioner if he ever carried a knife on his belt, the petitioner replied, "Never." (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2357)

42) The petitioner testified at trial that he had not carried a knife on his belt since the early 1970s. (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, p. 2875)

43) The petitioner, his mother, father, daughter, and Raymond Merritt all testified that the petitioner was a leather crafts enthusiast. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2253)

44) Linda Davis ("Davis") – manager of the Tandy Leather Company – testified that the awl found at the murder scene was a very basic leather-working tool used to punch holes and mark guidelines. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVII, pp. 2385-2386) An awl was not found among the petitioner's leather-working tools recovered from his trailer. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVII, pp. 2384-2386, 2395, 2400) When shown some of the leather items that the petitioner had made, Davis testified that an awl would have been required for the work and that none of the other tools recovered from the petitioner's trailer could have performed the same function. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVII, pp. 2395, 2398, 2400)

45) The petitioner denied that the awl found at the murder scene was his and identified another tool among his tools that he claimed could have performed the same function as an awl. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XX, p. 2853)

46) The petitioner testified that he left his trailer for Kentucky at 11:30 p.m. (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, pp. 2818, 2820) and that, making two stops at convenience stores for gas (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, p. 2822), he

12

arrived in Morehead, Kentucky a little after 7:00 a.m. the following morning, October 2.  (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, p. 2825).

47)    Metro Detective Terry McElroy ("Detective McElroy") testified that he drove from the petitioner's trailer to the Kentucky job site, and from Judith's house to the Kentucky job site, and back, via two different routes.   Detective McElroy testified that, under no circumstances, would the trip require much more than five hours.  (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVII, pp. 2429-2431)

48)    As previously noted, *supra* at p. 6, the petitioner told Detective Bernard that he took so long to get to Kentucky because it was foggy.  The petitioner also testified at trial that he had been delayed by fog.  (DE # 12, Add. 1, Bk. 8 of 9, Vol XX, p. 2852)  However, weather reports introduced by the prosecution, and by stipulation, did not substantiate the petitioner's claim that his trip was slowed by dense fog most of the way.  (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, pp. 2852, 2889-2892, 2908-2909)

49)    The petitioner produced five toll receipts for his trip on the Blue Ridge parkway, all of which, except for one, were dated October 2, with no times noted.  (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, pp. 2822-2823)  The receipt for the middle toll booth *en route* was dated October 1, which the petitioner claimed was simply a mistake by the toll booth.  (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, pp. 2824, 2895-2896)

50)    Clinton Ray Curtis ("Curtis") – an employee at Seal Master – testified that the petitioner arrived on the job at approximately 8:00 a.m. on October 2.  (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2325)  Curtis further testified that, in a conversation about a recent mass-murder at a McDonald's in California, the petitioner stated, "You never know when one of us could snap and do something like that."  (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVI, p. 2326)

51)    Sergeant Hunter testified that he observed what appeared to be a bloody, left-hand palm print next to Judith on the sheet during his initial sweep of the crime scene.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 1947)  When reevaluating the evidence on January 30, 1990, Sgt. Hunter discovered that the bloody palm print on the sheet was missing two fingers.  (DE

13

# 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 2004) Sergeant Hunter testified that he identified the bloody palm print in the lab using an Alternative Light Source (ALS) illumination technique, that the palm print had fifteen points of identification, whereas the FBI only required eight points of identification, and that there were no unexplainable dissimilarities. (DE# 12, Add. 1, Bk. 6 of 7, Vol. XIV, 2007-2017) Sergeant Hunter introduced photographs at trial of the petitioner's left hand, which showed that the petitioner was missing the same two fingers as the bloody palm print on the sheet. (DE# 12, Add. 1, Bk. 6 of 7, Vol. XIV, p. 1992)

## III  PROCEDURAL HISTORY

The Davidson County Grand Jury returned a five-count indictment against the petitioner: three counts of premeditated first-degree murder in the deaths of Judith, Chad, and Jason (counts 1, 2, and 4), and two counts of felony-murder in the deaths of Chad and Jason Burnett (counts 3 and 5). (DE # No. 12, Add. 1, Bk. 1 of 9,  Tech. Record, pp. 3-8)[3]  The State filed notice of intent to seek the death penalty on March 2, 1990. (DE # 12, Add. 1, Bk. 1 of 9, Tech. Record, pp. 12-13)

The guilt/innocence phase of the petitioner's trial began on July 23, 1990. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, p. 1757)  On July 25, 1990, the jury returned a verdict of guilty on the first-degree murder charges against the petitioner contained in counts 1, 2, and 4 and a verdict of not guilty on the two felony-murder charges. (DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, pp. 2983-2986)  The penalty phase of the trial began the next day, July 26, 1990. (DE # 12, Add. 1, Bk. 9 of 9, Vol. XXI, p. 3018)  The petitioner called fifteen witnesses, including a pediatric neurologist (DE # 12, Add. 1, Bk. 9 of 9, Vol. XXI, pp. 3124-3132), a psychiatrist (DE # 12, Add. 1, Bk. 9 of 9, Vol. XXI,

---

[3]     Addendum No. 1 consists of the trial Technical Record ("Tech. Record"), plus twenty-two volumes of transcript of the evidence (Vols. I-XXII) bound into nine unnumbered volumes.  To facilitate reference to these documents, the court has marked and refers to these nine bound volumes as Book (Bk.) 1 of 9 through Bk. 9 of 9.  Book 1 of 9 contains both the Tech. Record of the trial and Volume I of the trial transcript.  In Bk. 1 of 9, as elsewhere, the respondent has not complied with Rule 8(a), Local Rules of Court, which requires that "[a]ll exhibits to pleadings . . . be paginated progressively beginning with the principal document, and continuing through the last page of the document, including exhibits."  The Tech. Record is numbered sequentially from p. 1 through p. 275, with Volume I of the transcript of the evidence beginning after p. 275, the first few pages of which are unnumbered, and the remainder of which have only the original page numbers.

14

pp. 3146-3155), and a clinical psychologist (DE # 12, Add. 1, Bk. 9 of 9, Vol. XXI, pp. 3156-3208) to testify during the penalty phase. The State introduced evidence of the petitioner's conviction at the guilt/innocence phase of the trial, photographs of the murder scene, testimony of the Assistant Davidson County Medical Examiner, Dr. Gretel Harlan, and the testimony of a psychologist who had examined the petitioner. (DE # 12, Add. 1, Bk. 9 of 9, Vols. XXI, pp. 3028-3044; XXII, pp. 3211-3223)

At the conclusion of the penalty phase, the jury determined that the petitioner should be sentenced to death on counts 1, 2, and 4. (DE# 12, Add. 1, Bk. 9 of 9, Vol. XXII, pp. 3289-3291) In reaching their verdict, the jury determined that two aggravating circumstances applied to each of the three murders: 1) they were "especially heinous, atrocious, or cruel in that [they] involved torture or depravity of mind"; 2) the murders constituted a "mass-murder." (DE # 12, Add. 1, Bk. 1 of 9, Tech. Record, pp. 229-231) As to the murders of Chad and Jason, the jury determined that the murders were committed: 3) "for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution"; 4) "while engaged in committing . . . or was attempting to commit, or was fleeing after committing . . . any first degree murder . . . ." (DE # 12, Add. 1, Bk.1 of 9, Tech. Record, pp. 230-231) Judgment was entered on July 26, 1990, at which time the petitioner was sentenced to death. (DE # 12, Add. 1, Bk. 1 of 9, Tech. Record, pp. 232-235)

On August 17, 1990, the petitioner filed a motion for judgment of acquittal as to both the guilt and penalty phases of the trial, as well as a motion for a new trial. (DE # 12, Add. 1, Bk. 1 of 9, Tech. Record, pp. 236-245) All three motions were denied on August 29, 1990. (DE # 12, Add. 1, Bk. 1 of 9, Tech. Record, p. 266)

The petitioner filed a notice of appeal on September 4, 1990, raising twenty issues. (DE # 12, Add. 1, Bk. 1 of 9, Tech. Record, p. 267) The Tennessee Supreme Court affirmed the judgment

of the trial court on November 18, 1993 (DE # 12, Add. 4), [4] following which the petitioner's request for a rehearing was denied on January 5, 1994 (DE # 12, Add. 5-8).  Thereafter, the petitioner filed a petition for a writ of *certiorari* in the United States Supreme Court, which the Court denied on October 31, 1994.  (DE # 12, Add.9-11)

The petitioner filed a *pro se* petition for post-conviction relief on July 8, 1997.  (DE # 14, Add. 12, Vol. 1, pp. 1-7)  Counsel was appointed, following which the petitioner's  motion for "second counsel" was granted.  (DE # 14, Add. 12, Vol. 1, pp. 8-10, 15-22)  On May 1, 1995, the petitioner filed an amended petition for post-conviction relief, and a second amended petition on June 18, 1996.  (DE # 14, Add. 12, Vol. 1, pp. 24-50)  In his first amended petition, the petitioner raised sixty-nine claims of ineffective assistance of counsel, twenty-one claims pertaining to alleged defects in the jury instructions, thirteen claims of prosecutorial misconduct, and two other claims.[5] In his second amended petition, the petitioner raised two additional claims of ineffective assistance of counsel.

An evidentiary hearing was held in state court on July 1 through July 5, 1996.  (DE # 14, Add. 12, Vols. 2-9)  The post-conviction court denied the petitioner's request for relief on October 15, 1996.  (DE # 14, Add. 12, Vol. 1, pp. 60-74)

The petitioner filed a notice of appeal from the judgment of the post-conviction court on November 12, 1995 (DE # 14, Add.  12, Vol. 1, p. 75), with respect to which the Tennessee Court of Criminal Appeals ("Court of Criminal Appeals") affirmed the judgment of the post-conviction court on June 30, 1998.  (DE # 14, Add. 17,  p. 56)  Thereafter, the petitioner filed an application for permission to appeal in the Tennessee Supreme Court, which was denied on January 25, 1999.

---

[4]    At the time of the petitioner's convictions, death penalty appeals were reviewed directly by the Tennessee Supreme Court.  Thus, there was no review by the Court of Criminal Appeals on direct appeal.

[5]    Among his claims on post-conviction, the petitioner repeated those that had been raised on direct appeal "to preserve the[] issues for review in other forums . . . ."  (DE # 14, Add. 12, Vol. 1, pp. 45-46)

16

(DE # 14, Adds. 18, 20)  The petitioner's subsequent petition for a writ of *certiorari* in the United States Supreme Court was denied on June 21, 1999.  *Oscar Franklin Smith v. State of Tennessee*, 527 U.S. 1026 (1999).

Proceeding *pro se*, the petitioner filed this federal petition under 28 U.S.C. § 2254 on August 5, 1999.  (DE # 1)  Following the appointment of counsel and co-counsel (DE # 3, 17), the petitioner filed an amended petition on January 24, 2000 (DE # 18).  The respondent filed an answer on March 9, 2000 (DE # 19), to which the petitioner filed a reply on June 1, 2000 (DE # 23).

The petitioner filed a motion for summary judgment on July 14, 2000, to which the State responded on August 28, 2000, and the petitioner replied on September 29, 2000.  (DE # 32-33, 43-44, 47-48)  The respondent also filed a motion for summary judgment on July 14, 2000.  (DE # 35, 52)  The petitioner filed a response on December 2, 2002, to which the respondent replied on December 16, 2002, and the petitioner filed a "surreply" on December 20, 2003 (DE # 103-105).

On January 21, 2003, the court ordered the parties to file briefs regarding whether the petitioner was entitled to an evidentiary hearing.  (DE # 106)  The petitioner filed his brief on March 5, 2003, arguing that he was (DE # 109); the respondent filed his brief on March 20, 2003, arguing that he was not.  (DE # 114)  Following the petitioner's reply to the respondent's brief, filed March 27, 2003 (DE # 115), the court granted an evidentiary hearing limited to:

> trial counsel's effectiveness at the guilt phase of trial as it relates to counsel's investigation of the victims' time of death, the bloody palm print found at the crime scene, and the blood[y] knife found beneath the victims' home.  Additionally, petitioner may present evidence on the use of Alternative Light Source evidence at his trial but only as it relates to trial counsel's investigation of and objection to such evidence.  To the extent that respondent maintains that any of petitioner's evidence presented at the evidentiary hearing should have been discovered previously and presented in state court proceedings, he may present his own evidence and argument on those issues at the hearing.

(DE # 116, p. 2)  The respondent filed a motion on May 5, 2003 to alter or amend the court's Order granting an evidentiary hearing, which was denied on May 19, 2003.  (DE # 117, 119)  The respondent then filed a motion *in limine* regarding the testimony of Walter Hofman, M.D. regarding the time of death, which was denied at the evidentiary hearing.  (DE # 171, 176)

An evidentiary hearing was held on November 24, 2003.  (DE # 179)  The petitioner and respondent filed their post-hearing briefs on January 20, 2004 and March 5, 2004 respectively.  (DE # 181, 188)

Accompanying his post-hearing brief, the petitioner filed a motion to amend his petition to add a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), to which the respondent filed a response in opposition, and the petitioner replied.  (DE # 180, 182-183)  The court granted the petitioner's motion to amend on February 12, 2004, following which the petitioner filed a supplemental brief, alleging that "state agents withheld material, exculpatory evidence and knowingly presented false testimony at trial concerning the bed sheet recovered from the crime scene . . . ." in violation of *Brady*.  (DE # 184, 186)  The petitioner filed a supplement to his amendment on February 27, 2004. (DE # 185)  The respondent filed an answer to the petitioner's amendment, arguing that the petitioner's *Brady* claim was filed beyond the one-year limitation established by the  Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), that it also was procedurally defaulted, and that it was without merit.  (DE # 187)

On April 1, 2004, the petitioner filed a document containing supplemental authority purportedly showing that Dr. Charles Harlan (Dr. Charles Harlan), the Davidson County Medical Examiner, committed perjury during the state post-conviction hearing.  (DE # 189)  On April 22, 2005, the petitioner filed additional supplemental authority purportedly establishing that Dr. Charles Harlan had engaged in criminal, unprofessional, and unethical activities and that, because of this alleged conduct, the petitioner did not receive a full and fair hearing on post-conviction.  (DE # 197)

The petitioner argues that he is entitled to a hearing on this claim. The respondent has not responded.

On August 10, 2004, the petitioner filed a notice of supplemental authority regarding his claim that he is entitled to *federal habeas corpus* relief on the "Heinous, atrocious, or cruel," "mass-murder," and "felony-murder" aggravating circumstances. (DE # 190) On September 1, 2004, the petitioner filed a notice pertaining to the foregoing document, clarifying that nothing in his August 10, 2004 document was intended to imply that the petitioner was disclaiming any right to federal *habeas corpus* relief with respect to those issues already before the court. (DE # 191) Again, the respondent has not responded.

Finally, on April 7, 2005, the petitioner filed a motion for a full *de novo* review of all claims raised in his *habeas corpus* petition, arguing that, under the law passed by the United States Congress in the case of Marie Schiavo, *i.e.*, *Relief of the Parents of Theresa Marie Schiavo*, Pub. L. 109-103 (S. 686)(Mar. 21, 2005) (the Schiavo Act), he "is no longer subject to any provisions of the Antiterrorism and Effective Death Penalty Act of 1996 . . . nor are any of his claims subject to any assertion of procedural default." (DE # 195) The respondent filed a response in opposition on April 19, 2005 (DE # 196), following which the petitioner filed supplemental authority in support of his demand for a *de novo* review of all his claims based on the Schaivo Act (DE # 196, 200).

## IV. ANALYSIS

### A. Grounds for *Habeas Corpus* Relief

Petitions for federal *habeas corpus* relief filed after April 24, 1996 are subject to the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996) (AEDPA). *See Martin v. Mitchell*, 280 F.3d 594, 602 (6th Cir. 2002)(citing *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1977). Title 28 U.S.C. § 2254, as amended by the AEDPA, provides the following with respect to granting a writ of *habeas corpus* to prisoners who are in custody pursuant

19

to a state court judgment:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id*. at § (d).  The "unreasonable application" of clearly established federal law differs from an "incorrect application."  *Williams v. Taylor*, 529 U.S. 362, 365 (2000).  Under the former, "a federal *habeas corpus* court may grant relief if the state court identifies the governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id*.  The latter clause is satisfied when a state court "arrives at a conclusion opposite that reached by [the Supreme] Court on a question of law or . . . decides a case differently than the Court . . . on a set of materially indistinguishable facts."  *Id*. at 364-65.  Where state courts have made factual determinations regarding issues presented for federal *habeas corpus* review, such determinations are presumed to be correct, and the petitioner has the burden of rebutting that presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see Miller-el v. Cockrell*, 537 U.S. 322, 324 (2003).

### B.  Procedural Default

The AEDPA places notable restrictions on a federal court's ability to grant *habeas corpus* relief to state prisoners.  First, federal *habeas corpus* courts may only consider claims that a petitioner has previously raised before the state courts.  *See* 28 U.S.C. § 2254(b); *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002).  Claims that have not been raised in state court are deemed

20

unexhausted and are ordinary dismissed, without prejudice, so that the petitioner may pursue them in state court. *Alley*, 307 F.3d at 385 (citing *Rose v. Lundy*, 455 U.S. 509, 518 (1982)). However, if the petitioner is barred from raising an unexhausted claim in state court due to a state procedural rule, then that claim is procedurally defaulted for purposes of federal habeas review. *See Coleman v. Thompson*, 501 U.S. 722, 752-753 (1991). A claim also is procedurally defaulted where that claim was presented to the state court, but the court, rather than reaching the merits of the claim, relied on an independent and adequate state ground, such as a state procedural rule barring review of the claim, in deciding the claim. *Id.* at 734-735.

If a claim is procedurally defaulted, then federal *habeas corpus* review is prohibited unless the petitioner demonstrates "cause" and "prejudice" for his failure to raise the claim in state court while state court remedies were available, or that a miscarriage of justice will result from the lack of review. *Alley*, 307 F.3d at 386; *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000). To show "cause," a petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994). "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel, or that 'some interference by officials' made compliance impracticable," constitutes "cause" under this standard. *Murray*, 477 U.S. at 488 (citations omitted); see also *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002)("Cause is shown when the factual basis of the claim was 'reasonably unknown' to the defendant's counsel."). To show "prejudice," the default of the claim must not merely have created a possibility of prejudice to the defendant, but it must have "worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *Jamison*, 291 F.3d at 388 (citing *United States v. Frady*, 456 U.S. 152, 170-171 (1982)).

To demonstrate a "fundamental miscarriage of justice," a petitioner must show that the

21

alleged constitutional violation probably resulted in the conviction of one who actually is innocent. *Murray*, 477 U.S. at 496. This exception applies only in "extraordinary cases," *Id*., and requires a petitioner to show that he is "actually innocent." *Schlup v.Delo*, 513 U.S. 298, 327 (1995).

"These rules apply both to entirely new legal claims and new factual bases for relief; for a claim to be considered exhausted, the petitioner must have 'fairly presented' to the state courts the 'substance of his federal habeas corpus claim." *Alley*, 307 F.3d at 386 (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982))(internal citations omitted); *see also Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998)("[T]he doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal courts."). "Although 'bits of evidence' which were not before the state courts will not render a claim unexhausted, where a federal habeas petitioner presents newly discovered evidence or other evidence not before the state courts such as to place the case in a significantly different posture, the state courts must be given the opportunity to consider the evidence." *Sampson v. Love*, 782 F.2d 53, 57 (6th Cir. 1986)(quoting *Jones v. Hess*, 681 F.2d 688, 691 (10th Cir. 1982)(internal citations omitted))

In determining whether any of the petitioner's claims for relief are procedurally defaulted, the court will first determine which claims are unexhausted, either for failure to raise them in state court or for failure to observe a state procedural rule. The court will then determine whether these unexhausted claims are procedurally defaulted. And finally, the court will decide whether the petitioner has demonstrated sufficient cause and prejudice to overcome such procedural default.

Following is the court's analysis of those claims that the respondent contends are procedurally defaulted.

 1. Defense counsel were ineffective for not investigating and presenting the defense that the murders were committed by an unidentified black man, or that they were drug related. (DE # 18, ¶ 8.a.2)-a.3), pp. 3-4)

22

The record shows that the petitioner raised the claim in ¶ 1 above on post-conviction, but only as to Billy Fields (Fields), Judith's boyfriend (who is not black). (DE # 14, Add. 12, Vol. 1, ¶ I.C.(6), p. 30; Add. 14, Vol. 1, pp. 72-73) The exact two claims specified in 1) above were not raised in state court prior to being raised in the instant proceedings. These claims, therefore, are unexhausted.[6, 7]

> 2. Defense counsel were ineffective for not establishing a stronger defense to the charges and/or bolstering the petitioner's alibi defense by challenging the prosecution's theory as to the time of death based on whether an alarm clock in the house was on or off, and whether the back door to the house was ajar. (DE # 18, ¶ 8.b.4)(a), 4)(d), pp. 5-6)

The record shows that the claims in ¶ 2 above were not raised in state court prior to being raised in the instant proceedings. These claims are unexhausted.[8]

> 3. Defense counsel were ineffective for not conducting a forensic investigation to establish reasonable doubt as to the petitioner's guilt, or to bolster the petitioner's alibi based on: a) unidentified fingerprints found at the crime scene; b) hair evidence found in Jason's hand; c) fingernail scrapings taken from the victims; d) evidence on the sheet where Judith was found to prove that the bloody palm print was not made by the petitioner at the time of the murders, as well as other unspecified evidence that was inconsistent with the

---

[6]    The exhausted part of this claim (that Billy Fields committed the murders) – ¶ 8.a.1) in the petition – is addressed *infra* at pp. 74-77.

[7]    The respondent argues here, and elsewhere, that the petitioner's claim should be considered procedurally defaulted, because the petitioner did not raise this claim in the Tennessee Supreme Court. (DE # 19, p. 1) The petitioner brought this action in 1999, and Rule 39, Tenn. Sup. Ct. Rules has since been amended. Federal *habeas corpus* petitioners are no longer required to proceed in the Tennessee Supreme Court to satisfy the federal *habeas corpus* exhaustion requirements. *See Adams v. Holland*, 330 F.3d 398, 401-06 (6th Cir. 2003). The Sixth Circuit has held that Rule 39 is to be applied retroactively. *Id.* at 405.

[8]    The exhausted parts of this claim (that defense counsel were ineffective for not challenging the time of death based on evidence pertaining to *rigor mortis* and *livor mortis*, evidence that Jason's body had been moved after his death, evidence that the lights were on in the house when the police arrived the night of the murders but not when the bodies were found the next day, and evidence that no noise was heard when the police arrived the night of the murders but that a hair dryer was found on when the bodies were found the next day) – ¶¶ 8.b.1)-3), 4)(b)-(c) in the petition – are addressed *infra* at pp. 77-79.

23

> petitioner's guilt; e) footprints outside the house; f) a glove
> found in the house; g) a belt found in the hallway; h) ballistics
> evidence; i) the alarm clock; j) a partially eaten bologna
> sandwich; k) serological and other trace evidence.[9] (DE # 18,
> ¶ 8.c.1)-5), 7)-10), 12)-13), pp. 6-8)

The record shows that the petitioner did not raise claims a), c) through e), and g) through k),

in ¶ 3 above in his petition for post-conviction relief. (DE # 14, Add. 12, Vol. 1, pp. 1-10, 24-50)

Although the petitioner raised b) above in his petition for post-conviction relief (DE # 14, Add. 12,

Vol. 1, ¶ I.A.(5), p. 28), he did not renew this claim on appeal (DE # 14, Add. 14, Vol. 1). The

petitioner raised the claim in f) above on post-conviction, but only in the context of defense

counsels' failure to consult a criminologist (DE # 14, Add. 14, ¶ I.C, pp. 83-88), not for failure to

conduct a forensic investigation, which is his claim here. The claims in 3 ¶ above are

unexhausted.[10]

> 4.    Defense counsel were ineffective for not retaining the
>       services of a criminologist to cross-examine Sgt. Hunter on
>       that part of the claim in ¶ 8.e.3) pertaining to the telephone
>       being off the hook. (DE # 18, 8.e.3), p. 9)

The record shows that the claim in ¶ 4 above was not raised in state court prior to being

raised in the instant petition. This claim is unexhausted.[11]

---

[9]    The petitioner uses expressions such as "but not limited to" throughout his petition. Such vague expressions are
inconsistent with Rule 2(c), Rules – Section 2254 Cases, which provides that "[t]he petition must . . . specify all the
grounds for relief available to the petitioner . . . [and] state the facts supporting each ground . . . ." *Id.* at § (c)(1)-(2).
The court is not required to conjure up un-pled factual allegations implied by such vague expressions, nor will it read
into such open-ended claims that additional claims exist.

[10]    The exhausted parts of this claim (that defense counsel were ineffective for not conducting a forensic investigation
of the broken knife found under the house and the hair dryer found on when the bodies were discovered) – ¶¶ 8.c.6), 11)
in the petition – are addressed *infra* at pp. 79-80.

[11]    The exhausted parts of this claim (that defense counsel were ineffective for not obtaining the services of a
criminologist to challenge the prosecution's theory as to the time of death, to establish that there was no valid
photographic evidence of the glove proving that it was used during the murders, to assist in the cross-examination of Sgt.
Hunter as to the prosecution's theory of how the murders occurred and evidence found at the scene of the crimes) – ¶¶
8.e.1)-3) in the petition – are addressed *infra* at pp. 83-85.

5.      Defense counsel were ineffective for not challenging that "the prosecution sent Detective McElroy to be with the woman who answered the 911, and remained with her until she agreed that the tape said what the transcript said," thereby resulting in an alleged due process violation. (DE # 18, ¶ 8.g, p. 9)

The record shows that, although the petitioner raised the claim in ¶ 5 above on post-conviction, he did so in the context of defense counsels' failure to consult a speech perception expert. The manner in which the transcript was developed constituting a due process violation was not raised on post-conviction. (DE # 14, Add. 12, Vol. 1, ¶ I.A.(4), p. 28; Add. 14, Vol. 1, pp. 93-94) This claim is unexhausted.[12]

6.      Defense counsel were ineffective for not consulting with the petitioner regarding the following: a) conceding the time of death; b) the significance of the crime scene evidence; c) the decision not to present evidence from a medical examiner or forensic scientist; d) the decision not to examine the broken knife found under the house; e) the issue of who was lead counsel, that the investigator had been removed prior to trial, and defense counsel's simultaneous representation of a prosecution witness named Larry Terlecki; f) the jury selection process, including the decision not to use any peremptory challenges; g) the decision not to cross-examine Watts regarding his testimony about the petitioner's guns. (DE # 18, ¶ 8.h, pp. 9-10)

The record shows that the petitioner raised the claims in ¶ 6 above on post-conviction, but only in the context of having not waived these claims. (DE # 14, Add. 12, pp. 31-32; Add. 17, ¶ (5), pp. 49-50) The petitioner first raised these claims in the context of ineffective assistance of counsel in his application for permission to appeal on post-conviction. (DE # 14, Add. 18, ¶ V, pp. 52-60) These claims are unexhausted.

7.      Defense counsel were ineffective for not exercising any

---

[12]   The exhausted part of this claim, *i.e.*, that defense counsel were ineffective for not consulting with a speech perception expert, is addressed *infra* at pp. 87-89.

peremptory challenges during jury selection. (DE # 18, ¶ 8.i., p. 10)

The record shows that the petitioner raised claim ¶ 7 above in his post-conviction petition. (DE # 14, Add. 12, Vol. 1, ¶ I.D(3), p. 31) However, the petitioner did not renew this claim on appeal. (DE # 14, Add. 14, Vol. 1) This claim is unexhausted.

      8.     Defense counsel were ineffective for not investigating and/or challenging the TBI's ballistics and serology tests, and the FBI's tests performed on the audio tape, hair, and fiber evidence. (DE # 18, ¶ 8.j, p. 10)

The record shows that the claim in ¶ 8 above was not raised in state court prior to being raised in the instant action. This claim is unexhausted.

      9.     The "reasonable doubt jury" instruction at both the guilt and penalty phases was unconstitutional. (DE # 18, ¶ 9, pp. 11-13)

The record shows that the petitioner did not raise the claim ¶ 9 above on direct appeal. (DE # 12, Add. 2) Although the petitioner did raise this claim on post-conviction (DE # 14, Add. 12, Vol.1, ¶¶ III(1), p. 34, IV. A(a)(1), p. 35), both the post-conviction court and the Court of Criminal Appeals determined that it had been waived (DE # 14, Add. 12, Vol. 1, ¶ XV, p. 71; DE # 14, Add. 17, p. 55).

      10.    The trial court erred because it did not suppress the statements that the petitioner made to the police, in violation of his rights under the Fourth and Eighth Amendments. (DE # 18, ¶ 10, pp. 13-14)

The record shows that the petitioner raised claim ¶ 10 above on direct appeal, but only under the Fifth and Fourteenth Amendments. (DE # 12, Add. 2, pp. 69-77) The petitioner renewed this same claim on post-conviction (DE # 14, Add. 12, Vol. 1, ¶ 5.a, p. 24), the post-conviction court ruling that issues raised on direct appeal were beyond the scope of its review (DE # 14, Add. 12, Vol. 1, ¶ XVIII, p. 72). The petitioner raised this claim on appeal, but argued only that the post-

26

conviction court erred in ruling that issues raised on direct appeal were beyond the scope of its review. (DE # 14, Add. 14, Vol. 1, pp. 187) The Court of Criminal Appeals affirmed the judgment of the post-conviction court. (DE # 14, Add. 17, p. 55) The claims in ¶ 10 above are unexhausted.[13]

> 11. The following aggravating circumstances weighed and applied by the jury were unconstitutional: a) the "heinous, atrocious, or cruel" (HAC) aggravating circumstance; b) the "felony-murder" aggravating circumstance; c) the "avoiding-arrest" aggravating circumstance; d) the "mass-murder" aggravating circumstance. (DE # 18, ¶¶ 11.a-d, pp. 15-20)

The record shows that each of the aggravating circumstances in ¶ 11 above was raised on direct appeal, but solely in terms of trial court error based on claims of insufficient evidence, and then, only in terms of the Eighth and Fourteenth Amendments. (DE # 12, Add. 2, pp. 155-160, 169-173, 161-168, 174-177) The petitioner did not raise the claims in ¶ 11 above in state court, as he does in this action, in terms of the constitutionality of the aggravating circumstances, the lack of new sentencing calculi, double counting, conflicts associated with applying multiple aggravating circumstance, perceived inconsistencies between the jury's verdict and the application of the aggravating circumstances, or on any other grounds alleged.[14] Except as noted in n. 14 below, these

---

[13]  The petitioner did not raise this claim in terms of the Fourteenth Amendment in the instant action. The exhausted part of this claim, *i.e.*, that under the Fifth Amendment, is addressed *infra* at pp. 54-56.

[14]  With respect to the HAC aggravating circumstance, the petitioner claimed on post-conviction that the trial court "erroneously instructed the jury regarding the definition of heinous, atrocious and cruel aggravating circumstance[s]," thereby violating his rights under the Sixth, Eighth, and Fourteenth Amendments. (DE # 14, Add. 12, Vol. 1, ¶ IV.A.(6), p. 35) This claim was deemed to have been waived, because it had not been raised on direct appeal. (DE # 14, Add. 12, Vol. 1, ¶ XV, p. 71; Add. 17, p. 55) The petitioner first argued that the HAC aggravating circumstance is unconstitutional, as he does in the instant action, on appeal from the judgment of the post-conviction court. (DE # 14, Add. 14, ¶ IV.A, pp. 108-110) However, the Court of Criminal Appeals determined that claim to have been waived as well. (DE # 14, Add. 17, p. 55) As to the "felony-murder" aggravating circumstance, the petitioner argued on post-conviction only that the trial court "erred in not defining the felonies presented to the jury during the definition of the felony-murder aggravat[or] . . . ." (DE # 14, Add. 12, Vol. 1, ¶ IV.A.(16), p. 13) With respect to the petitioner's "mass-murder" claim, on post-conviction he argued only that the trial court erred "in refusing to give the [petitioner's] proposed instructions . . . ." (DE # 14, Add. 12, Vol. 1, ¶ IV.A.(10), p. 36) Both the post-conviction court and the Court of Criminal Appeals deemed the petitioner's "felony-murder" and "mass-murder" claims to have been waived. (DE # 14, Add. 12, Vol. 1, ¶ XV, p. 71; Add. 17, p. 55) The petitioner did not raise the "avoiding-arrest" aggravating circumstance on post-conviction.

27

claims either have been waived or are unexhausted.[15]

> 12. Defense counsel at sentencing were ineffective for failing to investigate and present evidence of the petitioner's mental health, for failing to object to the constitutionality of the death penalty, and for failing to object to the instruction that "only allowed consideration of 'extreme' mental or emotional disturbance as a mitigating factor. (DE # 18, ¶ 12.a-b, c.2, pp. 20-21)

The petitioner's mental health claim in ¶ 12 above was raised on post-conviction as part of his claim that defense counsel failed to investigate unspecified areas of his background and introduce all appropriate mitigating evidence at sentencing. (DE # 14, Add.12, Vol. 1, ¶¶ D and E, p. 33) The record shows, however, that the petitioner did not renew this claim on appeal from the judgment of the post-conviction court. As to the petitioner's claim regarding the constitutionality of the death penalty, the record shows that that claim was raised on post-conviction in the context of ineffective assistance of appellate counsel (DE # 14, Add. 12, Vol. 1, ¶ V.C, p. 38-39), not ineffective assistance of trial counsel at sentencing. The record shows that the claim pertaining to the instruction regarding what mental health factors the jury could consider was not raised in state court prior being raised in the instant proceedings. These claims are unexhausted.[16]

> 13. The State engaged in improper, unconstitutional, and inflammatory arguments. (DE # 18, ¶ 13, pp. 22-23)

The record shows that the petitioner did not raise claim ¶ 13 above on direct appeal. (DE

---

[15]  The petitioner does raise the HAC and "felony-murder" aggravating circumstances in the instant action in the context of trial court error based on claims of insufficiency of the evidence. The only claims that the petitioner raises in those terms are the "avoiding-arrest" and "mass-murder" aggravating circumstances. (DE # 18, ¶¶ 11.c, d), pp. 18, 20) As these claims have been exhausted (DE # 19, pp. 31-32), they are addressed *infra* at pp. 56-59. Although the petitioner couches these claims in terms of the Fifth, Sixth, and Fourteenth Amendments, because he did not raise these claims in the context of the Sixth Amendment in state court, those claims will be addressed only in terms of the Eighth and Fourteenth Amendments.

[16]  The exhausted parts of this claim (that defense counsel were ineffective for not objecting to the jury instructions on the HAC aggravating circumstance, the felony-murder aggravating circumstance, reasonable doubt, expert witness credibility, witness credibility, burden of proof, jury instructions that used the term "unanimously," and for failing to object to improper arguments) – ¶¶ 12.c. 1), 3)-8) and 12.d in the petition – are addressed *infra* at pp. 98-109.

28

# 12, Add. 2)  He raised this claim for the first time on post-conviction.  (DE # 14, Add. 12, Vol. 1, ¶ VI(6), p. 4; Add. 14, Vol. 1, pp. 97-98)  Both the post-conviction court and the Court of Criminal Appeals determined that this claim was waived.   (DE # 14, Add. 12, Vol. 1, ¶ XVI, p. 71; Add.17, 55)

> 14. Sergeant Hunter's testimony on the ALS violated the petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments.  (DE # 18, ¶ 14, p. 23)

The claim in ¶ 14 above was raised on direct appeal and post-conviction in the context of trial court error based on state evidentiary rules, not that Sgt. Hunter's testimony itself constituted a violation of the petitioner's rights.  (DE # 12, Add. 2, pp. 106-112; DE # 14, Add.12, Vol. 1, ¶ IX(6), p. 45)  This claim is unexhausted.[17]

> 15. The trial court erred in admitting an enhanced version of the 911 tape, and a transcript of that enhanced tape, in violation of the petitioner's Eighth Amendment rights.  (DE # 18, ¶ 15, pp. 24-25)

The record shows that claim ¶ 15 above was raised on direct appeal in the context of trial court error, alleging violations under the Fifth, Sixth, and Fourteenth Amendments.  (DE # 12, Add. 2, pp. 117-124)  The first time the petitioner raised this claim under the Eighth Amendment was in the instant proceedings.  The petitioner's claim under the Eighth Amendment is unexhausted.[18]

> 16. The jury instruction on premeditation and deliberation was constitutionally defective, and violative of the petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments. (DE # 18, ¶ 16, p. 25)

The record shows that claim ¶ 16 above was not raised on direct appeal under any theory.

---

[17]   Notwithstanding that this claim, as will be shown *infra* at p. 52, is procedurally defaulted for purposes of *federal habeas corpus* review, it is addressed on the merits anyway, *infra* at pp.  124-128.

[18]   The exhausted parts of this claim, *i.e.*, that under the Sixth and Fourteenth Amendments, are addressed *infra* at pp. 59-61.

Case 3:99-cv-00731   Document 201   Filed 09/30/05   Page 29 of 144 PageID #: 29

The petitioner first raised this claim on post-conviction, alleging violations of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (DE # 14, Add. 12, Vol. 1, ¶ III.(2), p. 35; Add. 14, Vol. 1, pp. 124-127) Both the post-conviction court and the Court of Criminal Appeals determined that this claim was waived. (DE # 14, Add. 12, Vol. I, ¶ XV, p. 71; Add. 17, p. 55)

> 17. The jury instruction on witness credibility was constitutionally defective. (DE # 18, ¶ 18, pp. 25-26)

The record shows that claim ¶ 17 above was not raised on direct appeal. The issue of the witness credibility jury instruction was raised for the first time in the petitioner's petition for post-conviction relief. (DE # 14, Add. 12, Vol. 1, ¶¶ III.(5), IV.A(5), p. 35; Add. 14, Vol. 1, pp. 117-119) Both the post-conviction court and the Court of Criminal Appeals determined that this claim was waived. (DE # 14, Add. 12, Vol. I, ¶ XV, p. 71; Add. 17, p. 55)

> 18. The expert witness jury instruction was constitutionally defective. (DE # 18, ¶ 19, p. 26)

The record shows that claim ¶ 18 above was not raised on direct appeal. The first time that this claim was raised was in the petitioner's post-conviction petition. (DE # 14, Add. 12, Vol. 1, ¶¶ III.(4) and IV.A(4), p. 35; Add. 14, Vol. 1, pp. 127-128) Both the post-conviction court and the Court of Criminal Appeals determined that this claim was waived. (DE # 14, Add. 12, Vol. I, ¶ XV, p. 71; Add. 17, p. 55)

> 19. The jury instruction on mitigating evidence was constitutionally defective. (DE # 18, ¶ 20, p. 26)

The record shows that claim ¶ 19 above was not raised on direct appeal. The first time that this claim was raised was in the petitioner's post-conviction petition. (DE # 14, Add. 12, Vol. 1, ¶¶ IV.A.(2)-(3), (7), p. 35; Add. 14, Vol. 1, pp. 127-128) Both the post-conviction court and the Court of Criminal Appeals determined that this claim was waived. (DE # 14, Add. 12, Vol. I, ¶ XV, p. 71; Add. 17, p. 55)

20. The testimony of Robirds and Fields violated the petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments. (DE # 18, ¶¶ 21.a-e, pp. 26-27) Zastrow's testimony pertaining to Judith's fear of the petitioner, and Gunther's testimony pertaining to threats that she overheard the petitioner make to Judith, violated the petitioner's rights under the Eighth Amendment. (DE # 18, ¶¶ 21.a-e, pp. 26-27)

The record shows that the petitioner raised claim ¶ 20 above as to Robirds and Fields, but only in the context of alleged violation of state evidentiary rules, not on the grounds that the testimony itself violated the petitioner's constitutional rights. (DE # 12, Add. 2, pp. 87-90, 113-116) The record shows that the petitioner raised this claim on direct appeal as to Gunther and Zastrow, but only in terms of the Fifth, Sixth, and Fourteenth Amendments. (DE # 12, Add. 2, pp. 91-98, 134-138) The petitioner's claims as to Robirds and Fields are unexhausted in their entirety, as are those related to Gunther and Zastrow under the Eighth Amendment.[19]

21. The Tennessee death penalty statute is unconstitutional under the grounds set forth in sub-paragraphs a, e-g, i, l-o in paragraph 22 of the petition. (DE # 18, ¶ 22, pp. 27-28)

The record shows that, although the petitioner challenged the constitutionality of Tennessee's death penalty statute on direct appeal, he did not raise the factual predicates corresponding to the sub-paragraphs in ¶ 21 above on direct appeal. (DE # 12, Add. 2, pp. 178-191) The petitioner raised these claims for the first time on post-conviction. (DE # 14, Add. 12, Vol. 1, ¶ VIII.A, C, E, I, K, pp. 42-44) Both the post-conviction court and the Court of Criminal Appeals determined that the petitioner's claims regarding the constitutionality of Tennessee's death penalty statute had been previously determined, the Court of Criminal Appeals also determining that claims in ¶ 21 above

---

[19] The exhausted claims as to Gunther and Zastrow, *i.e.*, those under the Fifth, Sixth, and Fourteenth Amendments, are discussed *infra* at pp. 63-65.

were waived because they were not raised on direct appeal.[20]  (DE # 14, Add. 12, Vol. 1, ¶ XX, p. 74; Add. 17, p. 55)

> 22. The trial court erred in not providing the jury instructions requested by the defense.  (DE # 18, ¶ 23, pp. 29-30)

The record shows that the petitioner did not raise claim ¶ 22 above on direct appeal.  Rather, he raised it for the first time on post-conviction.  (DE # 14, Add. 12, Vol. 1, ¶¶ IV.A(8)-(16), pp. 35-36; Add. 14, pp. 132-140)  The Court of Criminal Appeals deemed this claim to have been waived.  (DE # 17, p. 55)

> 23. Appellate counsel failed to raise the trial court's refusal to provide an instruction to the jury clarifying mass-murder, and an instruction that the jury could return a life sentence even if the aggravating circumstances outweighed the mitigators.  (DE # 18, ¶ 24.a.7)-8), pp. 30-31)  Appellate counsel also failed to raise the prejudicial effect of the 911 transcript.  (DE # 18, ¶ 24.b, p. 31)

The record shows that the petitioner did not raise the claims in ¶ 23 above on post-conviction.  (DE # 14, Add. 12, Vol. 1, ¶¶ V.A-D, pp. 36-39)  These claims are unexhausted.[21]

> 24. Electrocution constitutes cruel and unusual punishment.  (DE # 18, ¶ 25, p. 31; DE # 19, pp. 48-49)

A review of the record shows the petitioner did not raise the claim in ¶ 24 above on direct appeal except as one of several examples in support of his overarching challenge to the

---

[20]  The exhausted parts of this claim (that Tennessee's death penalty statute is unconstitutional, because it does not clearly establish the burden of proof at sentencing, because it does not adequately narrow the class of persons eligible for the death sentence, because it does not sufficiently limit the jury's exercise of discretion, because it requires the death sentence if the aggravating circumstances outweigh the mitigating circumstances, because it does not require fact-finding by the jury, because the death penalty is per se cruel and unusual punishment, because electrocution constitutes cruel and unusual punishment) – ¶¶ 22.b-d, h, j-k in the petition – are addressed *infra* at p. 65.

[21]  The exhausted parts of this claim (that counsel on appeal was ineffective for not raising trail court error for not giving jury instructions requested by the defense that a life sentence is a life sentence, that lingering or residual doubt should be considered as a mitigating circumstance, that mercy was appropriate in a capital case, that mitigation was not a justification or an excuse, for not further defining the balancing of aggravating and mitigating circumstances, and that cooperation with law enforcement should be considered as a mitigating circumstance)  – ¶¶ 24.a.1)-6) in the petition – are addressed *infra* at p. 109-111.

constitutionality of Tennessee's death penalty statute (DE # 12, Add. 2, pp. 190-191), just as he did

on post-conviction (DE # 14, Add. 12, Vol. 1, p. 42). The Tennessee Supreme Court did not address

this issue as a separate constitutional claim on direct appeal (DE # 12, Add. 4, p. 582). On post-

conviction, the Court of Criminal Appeals determined that this claim was either previously

determined, or waived. (DE # 14, Add. 17, p. 55) In either event, this claim is unexhausted.[22]

> 25.   The death penalty violates the petitioner's right to life. (DE
> # 18, ¶ 26, p. 31)

The record shows that the petitioner did not raise the claim in ¶ 25 above in state court prior

to raising it in the instant proceedings. This claim is unexhausted.

> 26.   The death penalty constitutes cruel and unusual punishment
> given the length of time that the petitioner has been
> incarcerated under a sentence of death. (DE # 18, ¶ 27, pp.
> 31-32)

The record shows that the petitioner did not raise the claim in ¶ 26 above in state court prior

to raising it in the instant proceedings. This claim is unexhausted.

> 27.   The cumulative effect of errors in both phases of the trial
> rendered the determination of guilt and his sentencing
> unconstitutional under the Sixth, Eighth, and Fourteenth
> Amendments. (DE # 18, ¶ 28, p. 32; DE # 19, 32)

The record shows that the petitioner did not raise the claim in ¶ 27 above on direct appeal

as independent grounds for relief. Rather, he embedded his "cumulative-effect" claim in conclusory

fashion in numerous claims on direct appeal, each alleging trial court error in applying Tennessee's

---

[22]    Even if this claim were not waived/unexhausted, it is without merit for two reasons. First, the Supreme Court of the United States has upheld the constitutionality of electrocution. *See In re Kemmler*, 136 U.S. 436, 446-49 (1890). Second, the Tennessee legislature has amended Tenn. Code Ann. 40-23-114 to read: "Any person who commits an offense prior to January 1, 1999, for which such person is sentenced to the punishment of death may elect to be executed by electrocution by signing a written waiver waiving the right to be executed by lethal injection." *Id.* at § (b). As lethal injection is now the default means of execution in Tennessee, the petitioner will not be electrocuted unless he elects otherwise. Should he do so, where a state gives an inmate a choice between methods of execution, the inmate waives his right to challenge the constitutionality of the method chosen. *See Stewart v. LeGrand*, 526 U.S. 115, 119 (1999).

rules of evidence, not on constitutional grounds. (DE # 12, Add. 2, p. 90, 97, 105, 115, 124, 130, 138, 142, 147) The record shows that the first time petitioner raised this claim in its present form was on appeal from the judgment of the post-conviction court. (DE # 14, Add. 14, Vol. 1, p. 191) This claim is unexhausted.

## C. Petitioner's Unexhausted Claims

A petition for federal *habeas corpus* relief will not be considered unless the petitioner has first exhausted all available state court remedies for each claim presented in his petition. 28 U.S.C. § 2254(b)-(c); *see Carey v. Saffold*, 536 U.S. 214, 220 (2002); *Whiting v. Burt*, 395 F.3d 602, 612 (6th Cir. 2005); *Alley*, 307 F.3d at 385 (6th Cir. 2002); *Carter v. Bell*, 218 F.3d, 581, 606-07 (6th Cir. 2000). This means that, as a condition precedent to seeking federal *habeas corpus* relief, "the habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *Anderson*, 459 U.S. at 6 (1982)(quoting *Picard v. Connor*, 404 U.S. 270, 275, 277-78 (1971)); *Rose*, 455 U.S. at 522; *Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004); *Rust*, 17 F.3d at 160. "[T]he doctrine of exhaustion requires that a claim be presented to the State courts under the same theory in which it is later presented in federal court." *Wong*, 142 F.3d at 322.

Once the federal claims have been raised in the state's highest court, the exhaustion requirement is satisfied, even if that court refuses to consider them. *Granberry v. Greer*, 481 U.S. 129, 134 (1987); *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990). Claims not first raised in state court are unexhausted and are ordinarily dismissed without prejudice to give the petitioner the opportunity to pursue them in state court. *Rose*, 455 U.S. at 518, 520-22. However, if an unexhausted claim would be procedurally barred under state law, then that claim is procedurally defaulted for the purposes of federal *habeas corpus* review. *See Coleman*, 501 U.S. 752-53; *Teague v. Lane*, 489 U.S. 288, 297-99 (1989); *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *Seymour*,

224 F.3d at 549-60. The question regarding those claims identified as unexhausted, *supra* at pp. 23-34, is whether they are procedurally defaulted as well.

The post-conviction statute in effect in Tennessee at the time of the petitioner's conviction, Tenn. Code Ann. § 40-30-102 (repealed in 1995), provided the following:

> A prisoner in custody under sentence of a court of this state must petition for post-conviction relief under this chapter within three (3) years of the date of the final action of the highest state appellate court to which an appeal is taken or consideration of such petition is barred.

On May 10, 1995, the present Post-Conviction Procedure Act ("the present Post-Conviction Act") replaced the prior Act in its entirety. *See* 1995 Tenn. Pub. Act 207, §§ 1 and 3. In passing the present Post-Conviction Act, the Legislature provided, *inter alia*:

> This act shall take effect upon becoming a law, the public welfare requiring it and shall govern all petitions for post-conviction relief filed after this date, and any motions which may be filed after this date to reopen petitions for post-conviction relief which were concluded prior to the effective date of this act.

1995 Tenn. Pub. Act 207, § 3. The Tennessee Supreme Court has determined that the present Post-Conviction Procedure Act applies to criminal cases in which judgment became final under the previous Act. *See Carter v. State*, 952 S.W.2d 417, 420 (Tenn. 1997).

Under the present Post-Conviction Act, Tennessee's post-conviction statute, Tenn. Code Ann. § 40-30-102 (1995), provides, *inter alia*:

> Except as provided in subsections (b) and (c), a person in custody under a sentence of a court of this state must petition for post-conviction relief under this part within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of such petition shall be barred. The statute of limitations shall not be tolled for any reason, including any tolling or saving provision otherwise available at law or equity. Time is of the essence of the right to file a petition for post-conviction relief or motion to reopen established by this

35

chapter, and the one-year limitations period is an element of the right
to file such an action and is a condition upon its exercise.

*Id.* at § (a).  The Tennessee post-conviction statute goes on to say that:

> This part contemplates the filing of only one (1) petition for post-
> conviction relief.  In no event may more than one (1) petition for
> post-conviction relief be filed attacking a single judgment.  If a prior
> petition has been filed which was resolved on the merits by a court of
> competent jurisdiction, any second or subsequent petition shall be
> summarily dismissed.  A petitioner may move to reopen a post-
> conviction proceeding that has been concluded, under the limited
> circumstances set out in § 40-30-117.

*Id.* at § (c).  The limited circumstances in Tenn. Code Ann. § 40-30-117 (1995) are that:

> (1)    "The claim in the motion is based on a final ruling of an
>         appellate court establishing a constitutional claim that was not
>         recognized as existing at the time of trial. . . ."
>
> (2)    "The claim in the motion is based upon new scientific
>         evidence establishing that such petitioner is actually innocent
>         . . . ."
>
> (3)    "The claim asserted in the motion seeks relief from a sentence
>         that was enhanced because of a previous conviction and such
>         conviction in the case in which the claim is asserted was not
>         a guilty plea with an agreed sentence, and the previous
>         conviction has subsequently been held to be invalid . . . ."
>
> (4)    "It appears the facts underlying the claim, if true, would
>         establish by clear and convincing evidence that the petitioner
>         is entitled to have the conviction set aside or the sentence
>         reduced."

*Id.* at §§ (a)(1)-(a)(4).

The petitioner's conviction became final on November 17, 1994, when the United States

Supreme Court denied his request for a writ of *certiorari*.  (DE # 12, Add.  11)  As more than one

year has passed since the judgment in the petitioner's criminal case became final, he is time-barred

under Tenn. Code Ann. § 40-30-102(a) from filing a petition for post-conviction relief.  Even if the

36

petitioner were not time-barred from seeking post-conviction relief, he is barred from seeking it because he already has sought state post-conviction relief once. Finally, for reasons that will become apparent, none of the "limited circumstances" provided in §§ 40-30-117(a)(1)-(a)(4) are present in this action. Therefore, the "motion-to-reopen" provision in § 40-30-102(c) is inapplicable. For these reasons, the petitioner's unexhausted claims are procedurally defaulted.

Although exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine intended to promote comity between the states and the federal government by giving the states the initial opportunity to pass on and correct alleged violations of a prisoner's federal rights. *Granberry*, 481 U.S. at 133. For the court to consider a claim that is procedurally defaulted, the petitioner must demonstrate both cause and prejudice for the failure to raise those claims in state court, or that a miscarriage of justice will result if the claims are not reviewed. *Wainwright*, 433 U.S. at 87, 90-91; *Seymour*, 224 F.3d at 550. The cause and prejudice analysis pertaining to the claims addressed above is combined *infra* at p. 39-40 with the cause and prejudice analysis of those claims that were deemed by state courts to have been waived.

### D. Petitioner's Waived Claims

With respect to those claims that are identified as waived, *supra* at pp. 26-27, 29-33, the Sixth Circuit employs a four-part analysis when the state argues that a federal *habeas corpus* claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). The court must: 1) ascertain whether there is an applicable state procedural rule; 2) decide whether the state courts actually enforce the rule; 3) determine whether the state procedural forfeiture is an adequate state ground on which the State relies to foreclose review of a federal constitutional claim. *Id.* If the first three parts of the *Maupin* test are satisfied, then the petitioner must satisfy the fourth part, *i.e.*, he must demonstrate that there was cause for him not to follow the rule and that he was actually prejudiced, or that a substantial miscarriage of justice will

37

occur if the claim is not reviewed.  *Id.*

As to the first part of the four-part *Maupin* test, the waiver rule in effect in 1990 when the petitioner filed his notice of appeal provided that:

> A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented.

Tenn. Code Ann. § 40-30-112(b)(1).  Because there was an applicable state waiver rule in effect at the time in question, the first part of the *Maupin* test is satisfied.

Whether the state courts regularly followed the state's waiver rule, the second part of the test under *Maupin*, is to be determined as of the time that the rule was applied.  *Richey v. Mitchell*, 395 F.3d 660, 680 (6th Cir. 2005). A review of Tennessee case law shows that the "waiver rule" was, in fact, regularly followed at the time it was applied to the petitioner.  *See e.g., State v. Smith*, 814 S.W.2d 45, 46-47 (Tenn. 1991); *Johnson v. State*, 797 S.W.2d 578, 579 (Tenn. 1990); *see also Hutchinson v. Bell*, 303 F.3d 720, 738-39 (6th Cir. 2002)(citing *Cone v. Bell*, 243 F.3d 961, 969 (6th Cir. 2001)), *rev'd and remanded on other grounds* (535 U.S. 685 (2002)(holding that Tennessee's "waiver rule" is regularly applied).[23]

Finally, with respect to the third part of the *Maupin* test, the Sixth Circuit already has determined that Tennessee's waiver rule constitutes an adequate and independent rule established by state law precluding *habeas corpus* relief.  *Hutchinson*, 303 F.3d at 738-39.

Because Tennessee's waiver rule satisfies the first three parts of the four-part test under *Maupin*, the court looks next to whether the petitioner has shown cause and prejudice or that a

---

[23]    The wording of Tennessee's waiver rule addressed by the Sixth Circuit in *Hutchison* is the same as the rule in effect at the time the petitioner filed his notice of appeal, except that the rule addressed in *Hutchison* codified the following two exceptions: ". . . unless: (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or (2) The failure to present the ground was the result of state action in violation of the federal or state constitution."  Apart from these two exceptions, which do not apply here, the two waiver rules are identical.

substantial miscarriage of justice will result if these claims are not reviewed.

### E.  Cause and Prejudice Analysis

In order for claims that are procedurally defaulted to be considered, the petitioner is required to satisfy both prongs of the two-part cause and prejudice test or show that a substantial injustice will occur if the court does not consider his claims.  *See Coleman*, 501 U.S. at 722. To establish cause the petitioner must provide a substantial reason for the default that is external to him. *Amandeo v. Zant*, 486 U.S. 214, 223 (1988); *Jamison*, 291 F.3d at 386; *Rust*, 17 F.3d at 161.  More particularly, "cause for a procedural fault . . . ordinarily turn[s] on whether the [petitioner] can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray*, 477 U.S. at 488; *Gravely v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996); *Rust*, 17 F.3d at 161.

To demonstrate prejudice, the petitioner must show that alleged errors "not merely . . . created a possibility, but that they worked to his actual and substantial disadvantage, infecting his trial with errors of constitutional dimensions."  *Frady*, 456 U.S. at 170; *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995); *Rust*, 17 F.3d at 161; *Maupin*, 785 F.2d at 139.  If, however, there is strong evidence of guilt, and a lack of evidence for the petitioner's claim, there is no prejudice.  *Frady*, 456 U.S. at 172; *Perkins*, 58 F.3d at 219-20; *Rust*, 17 F.3d at 161-62.  Moreover, where "one is left with pure speculation on whether the outcome of the trial or the penalty phase could have been any different," there also is no prejudice.  *Baze v. Parker*, 371 F.3d 310, 322 (6th Cir. 2004), *petition for cert. filed* (U.S. Jan. 25, 2005)(No. 04-8376).

As previously noted, absent a showing of cause and prejudice, the court may consider a procedurally defaulted claim only if the petitioner shows that a fundamental miscarriage of justice will occur if the court does not review those claims.  A "fundamental miscarriage of justice" means actual innocence.  *See Murray*, 477 U.S. at 495-96.

1.  Ineffective Assistance of Counsel as "Cause"

The petitioner argues that "cause" is supported by his allegations of ineffective assistance of counsel.  (DE # 23, ¶ II, pp. 3-7; DE # 32, ¶¶ I.D.4, p. 12; II.C, pp. 19-20; III, p. 20-22; DE # 103, ¶¶ I.B.1.c.3), pp. 24-25; I.C.4, pp. 40-46; III.B.c, pp. 55-56; V.C, pp. 80-81; VII.A.2, p. 88; DE # 181, ¶ I.B.3.a, pp. 42-45)  Although ineffective assistance of counsel may give rise to "cause," the ineffective assistance claim must itself have been exhausted in the state courts.  *Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000); *Richey*, 395 F.3d at 679; *Lancaster v. Adams*, 324 F.3d 423, 437-38 (6th Cir. 2003).  Ordinary attorney error does not constitute cause.  *Murray*, 477 U.S. at 488; *Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir. 1999).  Rather, the error must amount to constitutionally ineffective assistance of counsel under the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Coleman*, 501 U.S. at 753-54; *Manning v. Hoffman*, 269 F.3d 720, 723-24 (6th Cir. 2001).

To establish ineffective assistance of counsel, the petitioner must show that counsel's representation was deficient and that such deficient representation prejudiced the defense, rendering the trial unfair and the results unreliable.  *Strickland*, 466 U.S. at 687; *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004). "The benchmark for judging any claim of ineffective assistance of counsel must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland*, 466 U.S. at 686; *see also McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996), *overruled on other grounds by In re Addur' Rahman*, 392 F.3d 174 (6th Cir. 2004)(*en banc*).  The two-part *Strickland* test also applies to counsel on appeal.  *See Ballard v. United States*, 400 F.3d 404, 407 (6th Cir.  2005); *Smith v. Jago*, 888 F.2d 399, 405 n. 1 (6th Cir. 1989); *Bowne v. Foltz*, 763 F.2d 191, 194 (6th Cir. 1985).

a.  Alleged Ineffective Assistance of Appellate Counsel

The first group of procedurally defaulted claims falls under the general rubric of ineffective

40

assistance of appellate counsel set forth in ¶ 23, *supra* at p. 33. In these three procedurally defaulted claims, the petitioner argues that appellate counsel was ineffective for not raising: 1) the trial court's refusal to provide a jury instruction to clarify the meaning of the "mass-murder" aggravating circumstance; 2) the trial court's refusal to instruct the jury that it could return a life sentence even if the aggravating circumstances outweighed the mitigating circumstances;[24] 3) the prejudicial effect of the 911 transcript. (DE # 18, ¶ 24.a.7)-8), 24.b, pp. 30-31)

      The petitioner has addressed the alleged deficient representation of appellate counsel during the course of these proceedings. (DE # 32, ¶¶ II.C, pp. 19-20, III, pp. 20-22; DE # 47, ¶ III, pp. 6-9; DE # 103, ¶¶ I.B.4, pp. 31-32; II.C.4, pp. 44-46; III.B.1.c, p. 54-56; V.C, p. 81) However, a review of the record shows that, apart from making generalized references to appellate counsel's alleged deficient representation, the petitioner makes no effort to establish that his claims of ineffective appellate counsel were raised in state court in the context of the three claims that are the subject of this part of the analysis. As previously discussed, for a claim to be considered exhausted, it must have been raised in state court under the same theory as it is raised in federal *habeas corpus* proceedings.[25] Neither has the petitioner made any effort in these proceedings to show that appellate counsel's alleged deficient representation constituted "cause" as to these three specific claims. Having failed to show "cause" with respect to these three claims, the petitioner cannot establish both parts of the two-part "cause-and-prejudice" test. As such, these claims are procedurally defaulted

---

[24]    In his petition, the petitioner incorporates pp. 98-108 of his Application for permission to appeal in the Tennessee Supreme Court on post-conviction. (DE # 18, ¶ 24.a.8), pp. 30-31). A review of that document (DE # 14, Add. 18) shows that, although the petitioner does address jury instructions on these pages, there is no mention that an instruction should have been given that the jury was permitted to return a life sentence, even if the aggravating circumstances outweighed those in mitigation. The record shows, however, that this jury instruction was requested. (DE # 12, Add. 1, Bk. 1 of 9, Tech. Record, p. 113)

[25]    The petitioner asserts that his ineffective-assistance claims raised in state court were not "materially different" from those raised in these proceedings. (DE # 103, ¶ I.B.2.c.3), p. 24) The petitioner's assertion that the ineffective-assistance claims before this court are not "materially different" from those presented in state court is insufficient to establish that the legal theories under which his claims are before this court are the same as the legal theories under which his claims were brought in state court.

for purposes of federal *habeas corpus* review.

### b. Alleged Ineffective Assistance of Trial Counsel

The second group of procedurally defaulted claims pertains to the petitioner's allegations of ineffective assistance of trial counsel set forth in ¶¶ 1-8 and 12, *supra* at pp. 23-26, 28-29. In his reply to the respondent's Answer, the petitioner addresses some, but not all, of the claims at issue, arguing that the claims to which he does address himself are exhausted and, therefore, not procedurally defaulted. (DE # 23, ¶ II, pp. 3-7) Notwithstanding the petitioner's views to the contrary, a review of the record shows that the underlying theories/factual predicates pertaining to the claims in ¶¶ 1-8 and 12, *supra* at pp. 23-26, 28-29, were not raised in state court prior to being raised in these proceeding. Thus, for reasons previously explained, these unexhausted claims are procedurally defaulted.

The petitioner argues that his alleged deficient representation by trial counsel establishes "cause" to excuse procedural default. (DE # 23, ¶¶ II, pp. 3-7; DE # 32, ¶¶ I.D.4, p. 12; II.C, pp. 19-20; III, p. 20-22; DE # 47, pp. 6-9; DE # 103, ¶¶ I.B.1.c.3), pp. 24-25; I.C.4, pp. 44-46; III.B.c, pp. 54-56; V.C, pp. 80-81; DE # 181, ¶ I.B.3.a, pp. 42-45) However, trial counsel had nothing to do with the default of these claims. Under an ineffective assistance theory, "cause" is attributable to counsel responsible for the procedural default. Because the claims that are the subject of this part of the analysis should have been raised on post-conviction, post-conviction counsel – not trial counsel – is responsible for the default. However, the law is firmly settled that ineffective assistance of counsel in state post-conviction proceedings can never establish cause, because there is no constitutional right to effective assistance of counsel in such collateral proceedings in the first

place.[26] S*ee Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *see Coleman*, 501 U.S. at 742-53;

*Ritchie v. Eberhart*, 11 F.3d 587, 590 (6th Cir. 1993). As reasoned above, the petitioner has failed

to establish "cause" with respect to the issues that are the subject of this part of the analysis. As a

result, these claims are procedurally defaulted for purposes of federal *habeas* corpus review.

2. Remaining Procedurally Defaulted Claims

The remaining procedurally defaulted claims are those set forth *supra* ¶¶ 9-11, 13-22, 24-27,

*supra* at pp. 26-34. Relying on the foregoing analysis, those claims in ¶¶ a - g below are

procedurally defaulted for purposes of *federal habeas* corpus review for the reasons indicated.

a. The trial court erred in not suppressing statements that the petitioner made to the police – *supra* at ¶ 10, p. 27. The petitioner addressed this claim outside of his petition, but not in the context of procedural default. (DE # 23, ¶ IV, p. 9; DE # 103, ¶ VII.B, pp. 104-112)

b. The trial court erred in not suppressing the 911 tape and transcript – *supra* at ¶ 15, p. 30. The petitioner did not address this claim outside of his petition, either in the context of procedural default or otherwise.

c. Testimony of Robirds and Fields violated the petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments; Zastrow's testimony about Judith's fear of the petitioner, and Gunther's about the threatening phone calls, violated the petitioner's rights under the Eighth Amendment – *supra* at ¶ 20, pp. 31-32. The petitioner did not address this claim outside of his petition, either in the context of procedural default or otherwise.

d. Electrocution constitutes cruel and unusual punishment – *supra* at ¶ 24, p. 33. The petitioner addressed this claim outside of his petition, but not in the context of procedural default. (DE # 103, ¶ XI, pp. 117-118)

---

[26]     The petitioner argues that he should be entitled to relief for ineffective assistance of counsel on post-conviction, if post-conviction provides the first opportunity for a claim to be raised. (DE # 103, ¶ I.B.c.3), p. 24). The petitioner's opinion notwithstanding, the law is well established that there is no constitutional right to effective assistance of counsel on post-conviction or other collateral review.

43

e.      The death penalty violates the petitioner's fundamental right to life – *supra* at ¶ 25, pp. 33-34. The petitioner addressed this claim outside of his petition, but not in the context of procedural default. (DE # 103, ¶ X, pp. 112-117)

f.      The length of time that the petitioner has been confined on death row violates the Eighth Amendment – *supra* at ¶ 26, p. 34. The petitioner addressed this claim outside of his petition, but not in the context of procedural default. (DE # 103, ¶ XII, p. 118)

g.      The cumulative effect of errors during both phases of the trial rendered the finding of guilt and sentence to death violative of the Sixth, Eighth, and Fourteenth Amendments – *supra* at ¶ 27, p. 34. The petitioner addressed this claim outside of his petition, but not in the context of procedural default. (DE # 23, ¶ VIII, p. 15)

h.  Constitutionality of the "Reasonable Doubt" Jury Instruction at Both the Guilt and Penalty Phases of the Trial

The petitioner addressed this claim, *supra* at ¶ 9, pp. 26-27, in the context of procedural default in his reply to the State's Answer (DE # 23, ¶ III, pp. 7-9), in his motion for summary judgment (DE # 32, ¶ D, pp. 8-13), and in his response to the respondent's motion for summary judgment (DE # 103, ¶¶ II.C, pp. 40-47; VII.A-B.1, pp. 87-88, 94-95) The petitioner argues that: 1) there was no "adequate and independent" state procedural rule governing waiver; 2) he did not "knowingly and understandingly" waive any claims; 3) there was no "clear and express" statement of procedural bar by the Court of Criminal Appeals; 4) Tennessee has not consistently or regularly applied the doctrine of "waiver"; 5) ineffective assistance of counsel constitutes "cause and prejudice" for any procedural default of this claim; 6) failure to hear this claim will result in a fundamental miscarriage of justice.

With respect to the petitioner's argument that he violated no "adequate and independent" state procedural rule (DE # 103, ¶ II.C.1, pp. 40-41), Tenn. Code Ann. § 40-30-112, in effect at the time in question, provided that "a ground for relief is 'waived' if the petitioner knowingly and

understandingly failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." *Id*. at (b)(1). The "waiver" statute also stated that "[t]here is a rebuttable presumption that a ground for relief not raised in any such proceeding which was held was waived." Tenn. Code Ann. §40-30.112(c). This unambiguous rule clearly established an adequate and independent state procedural rule that specified what constituted "waiver" at the time the petitioner filed his direct appeal.

The petitioner argues next that he did not "knowingly and understandingly" waive any claim. (DE # 32, ¶ II.C, p. 19; DE # 103, II.C.1, p. 41) However, in *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998), the Sixth Circuit, relying on *House v. State*, 911 S.W.2d 705 (Tenn. 1995), held that "waiver" under Tenn. Code Ann. 40-30-112(b) did not require a "knowing and understanding waiver." *Coe*, 161 F.3d at 331. The statute relied on in *House*, *i.e.*, Tenn. Code Ann. 40-30-112 (1990), was the same statute that was in force when the petitioner pursued his direct appeal. *House*, 911 S.W.2d at 706 nn. 2-3. Given that the Sixth Circuit relied on *House* in its opinion in *Coe*, there is no reason to conclude that the Sixth Circuit did not take the following reasoning in *House* into consideration:

> Considering the vast majority of Tennessee decisions applying waiver in the post-conviction context, and the relevant policy considerations, we conclude that the rebuttable presumption of waiver is not overcome by an allegation that the petitioner did not personally, knowingly, and understandingly fail to raise a ground for relief. Waiver in the post-conviction standard under which a petitioner is bound by the action or inaction of his attorney.

*House*, 911 S.W.2d at 714. In a footnote to the foregoing, the Tennessee Supreme Court wrote, *inter alia*:

> We are not confronted with an alleged relinquishment of a fundamental constitutional trial right which may only be waived personally by a defendant . . . .

*Id.* at 714 n. 20 (citations omitted). That the Sixth Circuit considered the foregoing analysis is

45

supported by the fact that the Sixth Circuit cited to the page in *House* on which this analysis appears. Moreover, given that the Tennessee Supreme Court made reference to the "vast majority of Tennessee decisions applying waiver" in the past, and its reference to the footnote in support of their holding, it is clear that the result would have been the same had the issue been before that court at the time of the petitioner's trial.

As to the petitioner' third argument (DE # 103, ¶ II.C.2, pp. 42-43), citing *Harris v. Reed*, 489 U.S. 255 (1989), he argues that, because there was no "clear and express" statement by the Tennessee courts of procedural default, the petitioner's "waived" claims are not procedurally defaulted for purposes of federal *habeas corpus* review. (DE # 32, ¶¶ I.D.2, pp. 9-11; DE # 103, ¶¶ II.C.1, pp. 40-42-43, III.B.c, p. 54, V.A.1, pp. 71-72, VII.A.1, p. 87, VII.B.1, pp. 94-95, VII.C.1, p. 98) *Harris* extended the "plain statement" rule of *Michigan v. Long*, 463 U.S. 1032 (1983), to federal habeas *corpus review*. *Harris*, 489 U.S. at 263. Under the "plain statement" rule, "a procedural default does not bar consideration of a federal claim on either direct or federal habeas corpus review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Id*.

Two years after its decision in *Harris*, however, the U.S. Supreme Court held that a state court's "unexplained denial of a habeas petition raising federal claims is not sufficient, for purposes of federal review, to lift a procedural bar imposed on direct appeal." *Ylst v. Nunnemaker*, 501 U.S. 797, 797 (1991). Later that same year, the U.S. Supreme Court clarified its holding in *Ylst*, holding that a federal *habeas corpus* court may review a procedurally defaulted issue only if the state court did not clearly and expressly rely on adequate and independent state law grounds, and then, only if the state opinion "fairly appeared to rest primarily on resolution of [petitioner's federal] claims, or to be interwoven with those claims. *Coleman*, 501 U.S. at 734-735.

The Court of Criminal Appeals' opinion provides the following on appeal from the judgment

46

of the post-conviction court:

> To the extent the petitioner challenges the jury instructions, prosecution argument, and the constitutionality of the death penalty statute outside the scope of the ineffective assistance of appellate counsel, these issues have either been waived or previously determined. Tenn. Code Ann. § 40-30-112; <u>House v. State</u>, 911 S.W.2d 705 (Tenn. 1995).

(DE # 14, Add. 17, p. 55)  As shown above, the Court of Criminal Appeals' opinion regarding the petitioner's waived claims is based on state law grounds.  Consequently, under *Ylst* and *Coleman*, the petitioner's "no 'clear and express'" argument is without merit.

In his fourth argument, the petitioner maintains that Tennessee does not regularly apply the doctrine of waiver.  (DE # 103, ¶ II.C.3, pp. 43-44)  As previously established, *supra* at p. 39, the Sixth Circuit has held that not to be the case.

As to the petitioner's argument that ineffective assistance constitutes "cause" for any default of this claim (DE # 103, ¶ II.C.4, pp. 44-46), as explained in a related discussion, *infra* at pp. 96-98, the petitioner cannot show that he was prejudiced by defense counsels' failure to object to the "reasonable doubt" jury instruction.

Finally, the petitioner asserts that, if this claim is not heard, a "miscarriage of justice" will occur.  The court construes this argument to mean that the petitioner is asserting a claim of actual innocence.  However, as discussed in detail, *infra* at pp. 135-142, this argument is without merit.

As reasoned above, the petitioner has not established cause and prejudice to excuse the procedural default of his claim that the "reasonable doubt" jury instruction was unconstitutional.

### i. Unconstitutional Aggravating Circumstances

The petitioner raised this claim, *supra* at ¶ 11, pp. 27-28,  in the context of procedural default in his reply to the respondent's Answer (DE # 23, ¶ V.A-D, pp. 10-14), in his motion for summary judgment (DE # 32, ¶ II.C., pp. 19-20), and in his response to the respondent's motion for summary

47

judgment (DE # 103, ¶ III.B.1.c, pp. 54-56), arguing that: 1) the Tennessee Supreme Court's proportionality review addressed the aggravating circumstance on the merits; 2) there is no "adequate and independent" state procedural rule governing waiver; 3) the petitioner is innocent. (DE # 32, ¶ II.C, pp. 19-20) The petitioner offers the following additional arguments with respect to the HAC aggravating circumstance: 4) the petitioner did not "knowingly and understandingly" waive any claims; 5) the Court of Criminal Appeals gave made no "clear and express" statement of procedural bar; 6) Tennessee courts have not consistently or regularly applied the doctrine of "waiver"; 7) ineffective assistance of counsel constitutes "cause" as to any procedural default of this claim. (DE # 23, ¶ V.A, p. 11; DE # 103, ¶ IV.B.1.c, p. 54-55) As previously established, the arguments enumerated as 2)- 6) above are without merit.

The petitioner argues in 1) above that, because the Tennessee Supreme Court considered the aggravating circumstances at issue during its proportionality review, the Tennessee Supreme Court considered his claims as to these aggravating circumstances on the merits. The Tennessee Supreme Court wrote the following in its comparative proportionality review:

> Our comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the Defendant. *See State v. Black*, 815 S.W.2d 166 (Tenn.1991); *State v. Payne*, 791 S.W.2d 10 (Tenn.1990); and *State v. Johnson*, 743 S.W.2d 154 (Tenn.1987). We have studied, compared and analyzed cases, and conducted a meaningful proportionality review as outlined in *State v. Barber*, 753 S.W.2d 659, 663- 668 (Tenn.1988). As stated in *State v. Harris*, 839 S.W.2d 54, 77 (Tenn.1992), "no two cases are alike, and no two defendants are alike." A comparative review helps us make the determination of whether the penalty imposed in this case is or is not disproportionate to the penalty imposed in similar cases considering the nature of the crime and the defendant. *See Lockett v. Ohio*, 438 U.S. 586, 602-605, 98 S.Ct. 2954, 2963-2965, 57 L.Ed.2d 973 (1978).

> The Defendant's clearly identifiable bloody palm print was found on the sheet next to Judy Smith's body and the 911 tape established the

48

Defendant's presence at the scene at the time the murders were being committed. Clearly, the Defendant's bringing three weapons, including an awl, is evidence that he not only planned the murders ahead of time, but planned the torture as well. The murders of the three victims, as described earlier in this opinion, involved the intentional, senseless, brutal, gruesome and violent killing of three helpless people, which clearly warrants the imposition of the death penalty. We find that the sentence of death in the case of Judy Smith was not imposed in an arbitrary fashion, that the evidence supports the jury's findings of two statutory aggravating circumstances. We further find that the sentence of death in the cases of Chad and Jason Burnett was not imposed in an arbitrary fashion, that the evidence supports the jury's findings of four statutory aggravating circumstances, and that the evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances so found.

*State v. Smith*, 868 S.W.2d 561, 582-583 (Tenn. 1994). As shown above, the Tennessee Supreme Court compared the petitioner's death sentence to death sentences imposed in other cases. However, there is nothing in the opinion that supports the conclusion that the Tennessee Supreme Court considered the actual constitutionality of the aggravating circumstances as the petitioner argues. Where the Tennessee Supreme Court's review addresses only proportionality/arbitrariness of the death sentence, it cannot be inferred from such a review that the Court addressed the constitutionality of the underlying aggravating circumstances. *See Workman v. Bell*, 178 F.3d 759, 775 (6th Cir. 1998). Therefore, the Tennessee Supreme Court's proportionality review does not cure waiver as to these aggravating circumstances.

With respect to the petitioner's claim that ineffective assistance of counsel constitutes "cause" as to any procedural default, as discussed in greater detail *infra* at pp. 109-111, the petitioner has not established either that appellate counsels' representation was deficient or that he was prejudiced by appellate counsel's decision not to raise these issues on appeal.

As reasoned above, the petitioner has failed to establish cause and prejudice to excuse the procedural default of his claim that the aggravating circumstances considered by the jury were

49

unconstitutional.

j.  Improper, Unconstitutional, and Inflammatory Argument

The petitioner addresses this issue, *supra* at ¶ 13, p. 29, in the context of procedural default in both his reply to the State's Answer (DE # 23, ¶ VI, p. 14) and his response to the respondent's motion for summary judgment (DE # 103, ¶ V.B, pp. 74-80).  The petitioner argues here that: 1) there was no "clear and express" statement of procedural bar; 2) the Court of Criminal Appeals addressed this claim anyway; 3) he violated no "adequate and independent" state procedural rule; 4) he did not "knowingly and understandingly" waive any claims; 4) Tennessee has not consistently or regularly applied the doctrine of "waiver"; 5) ineffective assistance of counsel establishes "cause" for any procedural default.  For reasons previously explained, arguments enumerated 1), 3) and 4) are without merit.

As to 2) above, the petitioner argues that, by inference, the state courts addressed the procedurally defaulted claims on the merits, thereby curing any procedural default.  (DE # 23, ¶ VI, pp. 14-15; DE # 103, ¶ V.A.2, pp. 72-74)  The petitioner appears to be referring to the Court of Criminal Appeals' opinion on post-conviction in which that court wrote: "Nonetheless, as discussed above, there were no constitutional errors in the . . . prosecution argument."  (DE # 14, Add. 17, p. 55)  The discussion to which the Court of Criminal appeals was referring pertains to both defense counsels' failure to object to the prosecution's argument, and appellate counsel's failure to raise the prosecution's argument on appeal.  (DE # 14, Add. 17, pp. 50-53)

As previously established, *supra* at pp. 47-48, the Court of Criminal Appeals relied on procedural default in determining that issues pertaining to prosecution argument were "waived" on state procedural grounds.  The statement at issue followed immediately the Court of Criminal Appeals' "clear and express" statement of its reliance on state procedural grounds.  The statement is an alternative holding.  Under *Harris v. Reed*, *supra* at pp. 46-47, a federal *habeas corpus*

50

petitioner is not excused from his "cause and prejudice" burden, even if the last reasoned state opinion on the claim that explicitly imposed a state court procedural default also discussed the merits of the claim. *Harris*, 489 U.S. at 264 & n. 10 ("[A] state court need not fear reaching the merits of a federal claim in an *alternative holding*."); *Coe*, 161 F.3d at 330.

As to the petitioner's argument that ineffective assistance of counsel establishes "cause" for any procedural default of his prosecutorial misconduct claim, as discussed in greater detail, *supra* at pp. 107-109, the petitioner has not shown that he was prejudiced by defense counsels' representation in connection with this issue.

As reasoned above, the petitioner has failed to establish cause and prejudice to excuse the procedural default of his claim that the prosecution engaged in improper, unconstitutional, and inflammatory argument.

### k. *Sergeant Hunter's Testimony Pertaining to the Use of the ALS*

The petitioner addressed this claim, *supra* at ¶ 14, p. 29, in the context of procedural default in his post-hearing brief. (DE # 181, ¶ I.B.3.a, pp. 42-44): 1) In the brief, the petitioner argues that there is no procedural default because: 1) Sgt. Hunter lied to the jury; 2) the prosecution failed to disclose exculpatory evidence; 3) "cause" can be demonstrated because the basis of the claim was not reasonably available during state court proceedings; 4) "cause" can be demonstrated because defense counsel were misled. For reasons that will be explained more fully, *infra* at pp. 124-128, none of the arguments above to excuse procedural default have any merit. Consequently, the petitioner fails to establish cause and prejudice to excuse the procedural default of this claim.

### l. *Constitutionally Defective Jury Instructions on Premeditation and Deliberation*

### m. *Constitutionally Defective Jury Instruction on Witness Credibility*

51

n.  *Trial Court Error in Not Providing Jury Instructions*
*Requested by the Defense*

o. *Constitutionally Defective Jury Instruction*
*on Mitigating Evidence*

The petitioner addresses each of the claims above in the context of procedural default, *supra* at ¶¶ 16, 17, 19 and 22, pp. 30-32, in his response to the respondent's motion for summary judgment. (DE # 103, ¶¶ VII.A.1-2, B.1-2, pp. 87-88, 94-95, 98)  In his response, the petitioner argues that: 1) he violated no "adequate and independent" state procedural rule governing waiver; 2)  there was no "clear and express" statement of procedural bar by the Court of Criminal Appeals; 3) ineffective assistance of counsel constitutes "cause" for any procedural defaults.  As discussed previously, the arguments in 1)- 3) are without merit.  As discussed in detail, *supra* at pp. 45, and *infra* at pp. 89-94, 104, 109-111, the petitioner has not established that defense counsels' representation was deficient with respect to these claims.  Therefore, the petitioner has failed to demonstrate cause and prejudice to excuse the procedural default of these claims.

F.  Actual Innocence

As shown above, the petitioner has failed to establish cause and prejudice as to any of his procedurally defaulted claims.  Absent a showing of cause and prejudice, the petitioner must, therefore, show that he actually is innocent before the court may consider these procedurally defaulted claims.  Although the petitioner claims repeatedly throughout the record that he is innocent, as discussed in detail, *infra* at pp. 135-142, his claim of actual innocence is without merit.

G.  Conclusion with Respect to the Petitioner's
Procedurally Defaulted Claims

As reasoned above, and elsewhere in this Memorandum, the petitioner has failed to show "cause and prejudice" to excuse the procedural default of the claims discussed above or that he actually is innocent.  Consequently, the procedurally defaulted claims addressed above are procedurally defaulted for purposes of federal *habeas corpus* review.

H.  Petitioner's Remaining Claims, Other Than

53

Ineffective Assistance of Counsel

1. Whether the Trial Court Erred in Not Suppressing Statements
That the Petitioner Made to the Police

The petitioner argues that the statements he made to the police the day after the murders should have been suppressed.[27] (DE # 18, ¶ 10, pp. 13-14: DE # 23, ¶ IV, p. 9; DE # 103, ¶ VIII, pp. 104-112) The petitioner's argument is two-fold: 1) the trial court erred in not suppressing his statements on constitutional grounds; 2) the trial court erred in not suppressing his statement because Detective Bernard, who did not testify at the suppression hearing, testified as to the petitioner's statements at trial, rather than Detective Mike Smith, who testified at the suppression hearing.

In its opinion, the Tennessee Supreme Court identified the proper governing principle with respect to the first part of this claim, *i.e.*, *Miranda v. Arizona*, 384 U.S. 436 (1996). (DE # 12, Add. 4, § II, p. 569-571) Relying on *Oregon v. Mathiason*, 429 U.S. 492 (1977), the Tennessee Supreme Court concluded that, "[w]hether one is in custody turns not on whether the interrogation occurred in a 'coercive environment,' but whether the accused was 'deprived of his freedom of action in any significant way.'" (DE # 12, Add. 4, § II, p. 570) The Tennessee Supreme Court also correctly determined at the time that, under *California v. Beheler*, 463 U.S. 1121 (1983), the ultimate inquiry regarding whether a person is 'in custody' for purposes of *Miranda* was "whether there is a 'formal arrest or restraint of freedom of movement' of the degree associated with a formal arrest." (DE # 12, Add. 4, § II, p. 570)

Applying the principles set forth in *Matihson* and *Behler*, the Tennessee Supreme Court determined that the petitioner's rights under *Miranda* were not violated because "[t]he Defendant knew that he was free to go at any time, wanted to cooperate, went willingly with the police, gave

---

[27]   For reasons previously explained in ¶ 10, *supra* at p. 27, the petitioner's claims under the Fourth and Eighth Amendments are procedurally defaulted for purposes of federal *habeas corpus* review. This analysis pertains only to the petitioner's claims under the Fifth and Fourteenth Amendments.

a voluntary (and exculpatory) statement, and was allowed to go when he asserted his rights." (DE # 12 Add. 4, § II, p. 570) The petitioner's testimony that he clearly knew that he was not under arrest or in custody (DE # 12, Add. 1, Bk. 2 of 9, p. 251), coupled with the rest of the testimony offered at the suppression hearing (DE # 12, Add. 1, Bk. 2 of 9, pp. 192-251), supports the Tennessee Supreme Court's conclusion that the petitioner was not in custody within the meaning of *Miranda* at the time he gave the statements at issue to the police. As such, the trial court did not err in admitting those statements into evidence.

The petitioner asserts that the Tennessee Supreme Court used the wrong standard. Specifically, the petitioner argues that the Tennessee Supreme Court should have used the legal standard set forth in *Berkemer v. McCarty*, 468 U.S. 420 (1984) and *Stansbury v. California*, 511 U.S. 318 (1994). This argument is without merit. Citing *Beheler* with favor, the *Berkemer* Court wrote, "It is settled that the safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer*, 468 U.S. at 440. Of course, *Stansbury* was not decided until long after the petitioner was convicted.

As to the second half of the petitioner's claim, the Tennessee Supreme Court observed that defense counsels' objection to Detective Bernard's testimony at trial "was based on the theory that detective Bernard was testifying to a statement other than that described by Detective Smith at the suppression hearing." (DE # 12, Add. 4, p. 571) However, as the Tennessee Supreme Court noted, the record showed that Detective Bernard's testimony (DE # 12, Add. 1, Bk. 2 of 9, Vol. II, pp. 208-237; Bk. 7 of 9, Vol., XVI, pp. 2337-2363) pertained to the same statements at issue. The testimony was merely introduced into evidence by a different witness. The Tennessee Supreme Court also determined that, although the petitioner couched his claim on appeal in the context of *Miranda*, defense counsel did not renew their motion to suppress under *Miranda* at trial. (DE # 12, Add. 4, p. 571) The Tennessee Supreme Court's determinations with respect to this aspect of the

55

petitioner's claim are amply supported by the transcript of Detective Smith's and Bernard's testimony referred to above.

The Tennessee Supreme Court's decision regarding this claim is neither contrary to, nor an unreasonable application of, clearly established federal law under *Miranda*. Therefore, this claim is without merit.

2. Whether the "Avoiding-Arrest" and "Mass-Murder"
Aggravating Circumstances Were
Supported by the Evidence

The petitioner asserts that the evidence was insufficient to apply the "avoiding-arrest" and "mass-murder" aggravating circumstance, and as such, his rights under the Eighth and Fourteenth Amendments were violated.[28] (DE # 18, ¶ 11.c-d, pp. 18-20) Citing *State v. Wright*, 756 S.W.2d 669, 673 (Tenn. 1988), in support of his argument pertaining to the "avoiding-arrest" aggravating circumstance, the petitioner maintains that "the prosecution's contention that Chad or Jason were killed to prevent a lawful arrest or prosecution for the killing of Judy Smith . . . was 'nothing more than speculation.'" (DE # 18, ¶ 11.c.3), pp. 18-19; DE # 103, ¶ III.B.4, pp. 67-68) As to the "mass-murder" aggravating circumstance, the petitioner maintains that, because the murders "did not occur over an extended period of time" as set forth in *State v. Bobo*, 727 S.W.2d 945, 951 (Tenn. 1987), the "mass-murder" aggravating circumstance did not apply. (DE # 18, ¶ 11.d.2), pp. 19-20; Ex. # 103, ¶ III.B.3, pp. 65-67)

On federal *habeas corpus* review, evidence is deemed sufficient to support a verdict if, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,*

---

[28]    As previously noted in ¶ 1, *supra* at pp. 23, this claim is procedurally defaulted for purposes of federal *habeas corpus* review as to all of the petitioner's arguments, except sufficiency of the evidence in the application of the "avoiding-arrest" and "mass-murder" aggravating circumstances, both in the context of the Eighth and Fourteenth Amendments.

443 U.S. 307, 324 (1979); *Zuern v. Tate,* 336 F.3d 478, 482 (6th Cir. 2003). The record shows that the Tennessee Supreme Court correctly identified the proper governing legal standard regarding evidentiary challenges. (DE # 12, Add. 4, § I, pp. 568-568)

Although the Tennessee Supreme Court did not define the "avoiding-arrest" aggravating circumstance, *i.e.*, Tenn. Code Ann. § 39-2-203(i)(6)(1982), the statute in effect at the time of the petitioner's trial provided that the "avoiding-arrest" aggravating circumstance applied if "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." (DE # 12, Add. 4, § XVII, p. 580) The "mass-murder" statute in effect at the time of the petitioner's trial, Tenn. Code Ann. § 39-2-203(i)(12)(1982), was quoted by the Tennessee Supreme Court defining "mass murder" as "the murder of three or more persons within the state of Tennessee within a period of forty-eight (48) months, and perpetrated in such a fashion in a common scheme or plan." (DE # 14, Add. 4, § XIX, p. 581)

With respect to the petitioner's "avoiding-arrest" claim, citing *State v. McCormick*, 778 S.W.2d 48, 53 (Tenn. 1989) as analogous to the facts in the petitioner's case, the Tennessee Supreme Court held that a specific chronology is not a prerequisite to the application of the "avoiding-arrest" aggravating circumstance. (DE # 12, Add. 4, § XVII, pp. 580-581) The Tennessee Supreme Court explained that, as provided in *State v. Black*, 815 S.W.2d 166, 182 (Tenn. 1991), application of the "avoiding-arrest" aggravating circumstance was proper where the "proof supports a finding that at least one motive for killing Chad and Jason was the threat that they posed of the Defendant's apprehension regardless of the time of their mother's death." (DE # 14, Add. 4, § XVII, p. 580) Citing *State v. Branam*, 855 S.W.2d 563, 570 (Tenn. 1993), the Tennessee Supreme Court also pointed out that the petitioner was aware of Jason's attempt to contact the police, the successful consequence of which would have been the petitioner's arrest, and that Jason was murdered in an

57

effort to prevent that from happening. (DE # 14, Add. 4, § XVII, pp. 580-581) As to the petitioner's claim that preventing arrest and prosecution must be the "dominant motive," citing *State v. Carter*, 714 S.W.2d 241, 250 (Tenn. 1986), the Tennessee Supreme Court ruled that that was not the case. (DE # 14, Add. 4, § XVII, p. 581) Finally, the Tennessee Supreme Court determined without explanation that the petitioner's argument that the "avoiding-arrest" aggravating circumstance could not be applied if the HAC aggravating circumstances was applied was without merit. (DE # 14, Add. 4, § XVII, p. 581)

As to the "mass-murder" aggravating circumstance, the Tennessee Supreme Court explained that the statutory definition of "mass-murder" had been clarified by *Black*, 815 S.W.2d at 166, wherein it was held that the "term 'mass-murder' as used in the statute can apply to multiple murders committed close in time or multiple murders committed singly over a longer period of time, not to exceed four years," *Id*. at 182. Thus, any argument that the petitioner may have had under *Bobo* was rendered moot by *Black*. (DE # 14, Add. 4, § XIX, p. 581) The Tennessee Supreme Court also noted that the petitioner improperly relied on the dissent in *Black*, and that the majority opinion in that case was not in line with the petitioner's legal theory. (DE # 14, Add. 4, § XVII, p. 582)

The court concludes from the foregoing that any rational trier of fact could have found that the murders were committed in a manner that was consistent with the application of the "avoiding-arrest" and "mass-murder" aggravating circumstances. The court notes that, even if it were determined that these aggravating circumstances were applied improperly, the court may not grant a writ of *habeas corpus* merely because the state courts apply state law improperly. *See e.g.,* *Williams*, 529 U.S. at 411; *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003).

The Tennessee Supreme Court's determination that the evidence was sufficient to support the application of the "avoiding arrest" and "mass murder" aggravating circumstances was neither

58

contrary to, nor an unreasonable application of clearly established federal law under *Jackson*, nor

an unreasonable determination of the facts in light of the evidence presented at trial.  Accordingly,

these claims are without merit.

### 3.  Whether the Trial Court Erred in Admitting an Enhanced Version of the 911 Tape and a Transcript of That Tape

The petitioner argues that the trial court erred in admitting an enhanced version of the 911

tape and a transcript of that tape, thereby "denyin[g] his right to confrontation, to a highly reliable

guilt and sentencing determination, and to due process under the Sixth, Eighth, and Fourteenth

Amendments.[29]  (DE # 18, § 15, 15.e, p. 24)

As already noted above, there is a general prohibition against federal *habeas corpus* review

of issues arising under state law.  *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  "[F]ederal habeas

review of state court evidentiary rulings is extremely limited."  *Jordan v. Hurley*, 397 F.3d 360, 362

(6th Cir. 2005)(citing *Waters v. Kassulke*, 916 F.2d 329, 335 (6th Cir. 1990).  "[E]rrors in the

application of state law, especially rulings regarding the admission or exclusion of evidence, are

usually not to be questioned in a federal habeas corpus proceeding."  *Waters*, 916 F.2d at 335

(quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *see also Lundy v. Campbell*, 888

F.2d 467, 469-70 (6th Cir. 1989)(deference should be accorded state court determinations of whether

due process was denied by trial errors), *cert. denied,* 495 U.S. 950 (1990).  Such errors will result

in the granting of a writ of *habeas corpus* only if they result "'in the denial of fundamental fairness,

thereby violating due process.'"  *Id.* (quoting *Cooper,* 837 F.2d at 286).

On direct appeal, this claim was grounded in Tennessee's rules of evidence, *i.e.*, that the 911

tape and transcript "was inadmissible on hearsay grounds, and in any event, was far more prejudicial

---

[29]    As previously established in ¶ 15, *supra*, p. 30, the petitioner's claim under the Eighth Amendment is procedurally defaulted for purposes of federal *habeas corpus* review.

than probative. . . ." (DE # 12, Add. 2, § VI, p. 124)  The Tennessee Supreme Court affirmed the judgment of the trial court, ruling that the evidence at issue here was admissible under Tennessee Rule of Evidence 803(2) as an excited utterance, the probative value of which was outweighed by the danger of unfair prejudice. (DE # 12, Add. 4, § X, pp. 576-577)

In the instant petition, the petitioner challenges the admissibility of the 911 tape and transcript, arguing that "the enhanced tape was itself hearsay and the prosecution's . . . transcript of the enhanced tape was also hearsay as well, and neither fell within a firmly-rooted exception to the hearsay rule, and lacked reliability, especially the transcript." (DE # 18, ¶ 15.d, p. 24)  From the foregoing, it is clear that the crux of the petitioner's argument is, once again, that the trial court erred in applying Tennessee's rules of evidence.

The record shows that defense counsel filed two motions *in limine*, in an effort to prevent the 911 tape and transcript from being introduced into evidence. (DE # 12, Add. 1, Bk. 1 of 9, pp. 153-168, 169-175)  As to the motion *in limine* pertaining to the 911 tape, the record shows that a hearing was held on this issue on July 13, 1990, at which time the petitioner's motion was denied. (DE # 12, Add. 1, Bk. 1 of 9, pp. 180-182)  The record also shows that a jury-out hearing was held on July 23, 1990, at which time defense counsel argued that the transcript should be excluded as well. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, pp. 2108, 2114)  At the conclusion of argument, the trial court recessed for approximately one hour, during which time it considered the arguments of both parties, studied the cases relied on by them, and did some research on its own. (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, pp. 2115-2120)  After returning from recess, the trial court ruled that the transcript was admissible,[30] providing he gave the jury a proper limiting instruction (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, p. 2119), which he did (DE # 14, Add. 13, Ex. 13, 2967-2968).  It is clear

---

[30]    The trial court ruled that the tape was "part of the res gestae" and "a spontaneous declaration in the middle of a highly excited situation."  (DE # 12, Add. 1, Vol. XV, p. 2115, ℓℓ. 21-22)

from the foregoing, and the record as a whole, that the trial court properly admitted the 911 tape and transcript under the Tennessee Rules of Evidence and that the petitioner received all of the due process to which he was entitled. As such, there was no denial of fundamental fairness in the proceedings against him.

The Tennessee Supreme Court's determination with respect to this issue was not an unreasonable determination of the facts in light of the evidence presented at trial. Accordingly, this claim is without merit.

### 4. Whether the Evidence Was Sufficient to Support the Petitioner's Convictions

The petitioner argues that the evidence was insufficient to support his convictions. (DE # 18, ¶ 17, p. 25; DE # 103, ¶ IX, p. 112) Specifically, the petitioner argues that, under the Fourteenth Amendment, "the prosecution was required to exclude all reasonable hypotheses except the guilt of the [p]etitioner . . . [but] [t]hat standard was not met." (DE # 18, ¶ 17, p. 25; DE # 103, ¶ IX, p. 112)

Apart from the petitioner's allegation that the evidence was insufficient, in his response to the respondent's motion for summary judgment, the petitioner incorporates by reference the legal standard for reviewing sufficiency of the evidence challenges. (DE # 103, ¶ IX, p. 112) However, the petitioner provides no argument, citation to relevant authority, references to the record, or any facts in support of this claim. Consequently this claim is conclusory. The Sixth Circuit Court of Appeals has held that conclusory allegations, without supporting factual allegations or evidentiary support, do not provide a basis for *habeas corpus* relief. *See Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)(citing *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 301 (3d Cir.1991)(bald assertions and conclusory allegations do not provide sufficient basis to hold an evidentiary hearing in federal *habeas corpus* proceedings). Despite this defect, the court will address this claim.

As previously established, *supra* at p. 57, on federal *habeas corpus* review, evidence is

Case 3:99-cv-00731   Document 201   Filed 09/30/05   Page 61 of 144 PageID #: 61

deemed sufficient to support a verdict if, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

In addressing the sufficiency of the evidence on direct appeal, the Tennessee Supreme Court highlighted the following: 1) testimony at trial established that the petitioner had threatened to kill the victims prior to the murders; 2) the petitioner had solicited others to kill Judith; 3) the testimony of a disinterested witness placed the petitioner's car in the victims' driveway between 11:00 and 11:15 p.m. on the night of the murders; 4) Chad can be heard screaming in the background of the 911 tape, "'Frank, no. God help me!'"; 5) the petitioner's "bloody palm print was found on the sheet next to Judy Smith's body." (DE # 12, Add. 4, p. 569)  From this, the Tennessee Supreme Court determined that the petitioner's "challenge to the sufficiency of the evidence to be without merit." (DE # 12, Add. 4, p. 569)  Based on the foregoing, and the record as a whole, the court likewise concludes that the evidence was sufficient for any rational trier of fact to  have concluded that the petitioner was guilty of these murders beyond a reasonable doubt.

The Tennessee Supreme Court's determination that the evidence was sufficient to support the petitioner's convictions was neither contrary to, or an unreasonable application of, clearly established federal law under *Jackson*, *supra* at p. 57, nor an unreasonable determination of the facts in light of the evidence presented at trial.  Accordingly, these claims are without merit.

5.  Whether the Trial Court Erred in Admitting the Hearsay
Testimony of Zastrow and Gunther
Pertaining to Judith's Fear of the Petitioner

The petitioner alleges that the trial court erred in admitting the testimony of Judith's fear of the petitioner.  (DE # 18, ¶ 21.b, d, p. 27)  Specifically, the petitioner argues that the trial court erred in admitting the hearsay testimony of Zastrow and Gunther in violation of the petitioner's Fifth, Sixth and Fourteenth Amendment rights.[31]  (DE # 18, ¶ 21, pp. 26-27)

Once again, the petitioner's claims are conclusory.  More particularly, the petitioner provides no argument, citation to relevant authority, references to the record, or any facts to support these claims.  As previously established, *supra* at pp. 61-62, conclusory claims do not provide grounds for *habeas corpus* relief.  Despite this defect, the court will address these claims.

As previously established, *supra* at pp. 57, 59-60, federal *habeas corpus* review of state court evidentiary rulings is extremely limited.  State court rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal *habeas corpus* proceeding and will result in *habeas corpus* relief only if such errors violate due process.

A jury-out hearing was held regarding the potential testimony about Judith's fear of the defendant, and the trial court ruled the testimony admissible under the "state of mind" exception to the hearsay rule, Tennessee Rule of Evidence 803(3).  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIII, pp. 1767-1773)  From this, the court concludes that the petitioner was accorded due process.

Notwithstanding that the petitioner's due process rights were not violated, the court is mindful of the Tennessee Supreme Court's determination that, although the testimony would have been admissible to show Judith's state of mind, *i.e.*, that she was afraid of the petitioner, her state

---

[31]  As previously noted in ¶ 20, *supra* at pp. 31-32, the petitioner's claims with regard to Robirds and Fields are procedurally defaulted in their entirety for purposes of federal *habeas corpus* review, as is his Eighth Amendment claim related to the testimony of Zastrow and Gunther.

of mind was not "directly" probative as to whether the petitioner murdered her. (DE # 12, Add. 4, § IV, p. 573) However, observing that, "[w]hen one considers the proof of Defendant's previous threats and violent assaults upon the victims, that Judy Smith would have been afraid of the Defendant is obvious" (DE # 12, Add. 4, § IV, p. 573), the Tennessee Supreme Court ultimately determined that, although the testimony of Zastrow and Gunther was inadmissible hearsay,[32] "any error in the admission of this evidence [wa]s harmless beyond a reasonable doubt in light of the proof in this case." (DE # 12, Add. 4, § IV, p. 573)

In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the United States Supreme Court held that the harmless error standard in *Kotteakos v. United States*, 328 U.S. 750 (1946) "applies in determining whether habeas relief must be granted because of constitutional error of the trial type." *Brecht*, 507 U.S. 638. Under the *Brecht* standard, a *habeas* petitioner must establish that the trial court error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Id*. at 637 (quoting *Kotteakos*, 328 U.S. at 776).

Given the evidence against the petitioner, it is unlikely that the inadmissible hearsay testimony of Zastrow and Gunther about Judith's fear of the petitioner had a substantial and injurious effect or influence in determining the jury's verdict. *Id*. As the Tennessee Supreme Court correctly noted, even if Zastrow and Gunther had not so testified, Judith's fear of the petitioner would have been abundantly clear. (DE # 12, Add. 4, § IV, p. 573) From the foregoing, and the record as a whole, the court concludes that any error in admitting this testimony was harmless beyond a reasonable doubt.

The Tennessee Supreme Court's determination that the testimony at issue was harmless beyond a reasonable doubt was not contrary to, or an unreasonable application of clearly established

---

[32] Of course, Gunther's testimony about threats that she actually heard the petitioner make in telephone conversations with Judith, overheard by Gunther, was not hearsay and would have been admissible in any case.

64

federal law.  Accordingly, these claims are without merit.

6.  Whether Tennessee's Death Penalty
Statute is Unconstitutional

The petitioner asserts that Tennessee's death penalty statute is unconstitutional on numerous

grounds, further incorporating into his claim by reference "all the reasons stated in [his] direct

Appeal Brief . . . and Post-Conviction Application For Permission to Appeal . . . ."[33]  (DE # 18, ¶¶

22.b-d, h, j-k)[34]  In *Workman v. Bell*, 178 F.3d 759 (6th Cir. 1998), the Sixth Circuit held that

Tennessee's death penalty statute – enacted in 1977 – is constitutional.  *Id*. at 778.  This claim is

without merit.

I.  Petitioner's Ineffective Assistance
of Counsel Claims

1.  The Standard Applied by the
Court of Criminal Appeals

The standard for determining ineffective assistance of counsel is as previously set forth,

*supra* at p. 41.  The Court of Criminal Appeals on post-conviction correctly identified *Strickland*

as controlling in matters alleging ineffective assistance of counsel and determined that each of the

petitioner's ineffective-assistance claims was without merit. (DE # 14, Add. 17, p. 33-55).  However,

the petitioner argues that the Court of Criminal Appeals applied the *Strickland* standard improperly.

(DE # 103, ¶ I.B.1, pp. 8-12; DE # 105, ¶ 3, p. 2; DE # 181, pp. 53-56)

The petitioner argues that the standard applied by the Court of Criminal Appeals was "akin"

to requiring him to prove prejudice under *Strickland* by a "preponderance of the evidence."  (DE #

---

[33]    As previously noted, *supra* at p. 24 n. 9, such claims are inconsistent with Rule 2(c), Rules – Section 2254 Cases, which provides that "[t]he petition must . . . specify all the grounds for relief available to the petitioner . . . [and] state the facts supporting each ground . . . ." *Id*. at § (c)(1)-(2).  The court will address only those claims specifically identified as such.

[34]    As previously explained in ¶ 21, *supra* at p. 32, the remainder of this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

65

103, I.B.1, pp. 9-12; DE # 181, ¶ I.B.4, pp. 53-57) The petitioner argues next that the mere mis-statement of the standard constitutes a violation under *Strickland*. (DE # 103, I.B.1, p. 10; DE # 181, ¶ I.B.4, p. 55) The petitioner also argues that, by addressing his ineffective-assistance claims "'item-by-item' (as opposed to cumulatively)," the Court of Criminal Appeals also "ran afoul" of *Strickland's* "reasonable probability" standard. (DE # 103, ¶ I.B.1, pp. 9-10 & n. 9; DE # 181, ¶ I.B.4, pp. 53-54 & no. 28) Finally, although not entirely clear from the pleadings, it appears that the petitioner is claiming that the Court of Criminals Appeals applied *Strickland* in an "outcome determinative" manner, which he maintains is not the correct standard under *Strickland*. (DE # 103, ¶ I.B.1, pp. 9-10; DE # 181, ¶ I.B.4, pp. 53-57)

As an initial matter, the record shows that the petitioner did not raise this claim in state court prior to raising it in these proceedings. Specifically, this claim has its roots in his appeal from the judgment of the post-conviction court. A review of the petitioner's brief submitted with his Rule 11 application for permission to appeal in the Tennessee Supreme Court on post-conviction makes no mention of the Court of Criminal Appeals' alleged error. ( DE # 14, Add. 18) The first time that the petitioner raised this claim was in his response to the respondent's motion for summary judgment. (DE # 103, pp. 9-12) The petitioner raised this claim again in his post-hearing brief. (DE # 181, pp. 53-57)

The court is aware that, with the recent promulgation of Tennessee Supreme Court Rule 39, review by the Tennessee Supreme Court is no longer required for a federal *habeas corpus* petitioner to satisfy the AEDPA's exhaustion requirement. *Adams*, 330 F.3d at 398. However, given that the alleged error occurred in the Court of Criminal Appeals on post-conviction, the petitioner was required to at least try to raise the issue in the Tennessee Supreme Court, as that was the first court in which the claim could have been raised. As previously noted, *supra* at p. 35, even if the Tennessee Supreme Court then denied the petitioner's application for permission to appeal, as it did,

66

the claim would have been exhausted for federal *habeas corpus* purposes. Having made no effort

to obtain a review of the Court of Criminal Appeals' alleged error under *Strickland*, this claim is

procedurally defaulted for reasons previously explained, *supra* at pp. 34–38, 39-40, 54. Despite this

defect, the court will address the petitioner's claim.

As to the petitioner's first argument, under *Strickland*, prejudice is established if there is "a

***reasonable probability*** that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). The U.S. Supreme

Court defines "[a] reasonable probability [a]s a probability sufficient to undermine the confidence

in the outcome." *Strickland*, 466 U.S. at 694; *see also*, *Woodford v. Visciotti*, 537 U.S. 19, 23

(2003). The standard used by the Court of Criminal Appeals on post-conviction is quoted below in

part:

> In order for the petitioner to be granted relief on grounds of
> ineffective assistance of counsel, he must establish that the advice
> given or the services rendered were not within the range of
> competence demanded of attorneys in criminal cases and that, but for
> counsel's deficient performance, the result of his trial would have
> ***likely*** been different. . . .

(DE # 14, Add. 17, p. 33) The only relevant difference between the standard set forth in *Strickland*,

and that articulated by the Court of Criminal Appeals, is the Court of Criminal Appeals' use of the

word "likely" rather than *Strickland's* "reasonable probability" terminology.

The petitioner argues that the Court of Criminal Appeals' use of the word "likely"

"requiri[ed] [him] to prove" his ineffective-assistance claims "by a preponderance of the evidence

that the outcome of the proceeding would have been different . . . ." (DE # 13, p. 10; DE # 181, p.

54) Citing *Williams v. Taylor*, *supra* at p. 20, the petitioner argues further that the word "likely" is

"almost verbatim" the "preponderance of the evidence" standard that was found to be

"'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to [the U.S.

Supreme Court's] clearly established precedent . . . in *Strickland* . . . ." (DE # 103, ¶ I.B.1, p. 11; DE # 181, ¶ I.B.4, p. 55)  The court disagrees.

First, there is nothing in *Williams* that supports the conclusion that the term "likely" means the same thing as "preponderance of the evidence."  The petitioner's unsupported argument amounts to little more than a personal opinion, which falls well short of establishing by clear and convincing evidence that "likely" and "preponderance of the evidence" are synonymous, or nearly so.  Second, the court views as *de minimis* any difference between the term "likely" and the term "probability" in the phrase "reasonable probability."  The court's view is supported by the following relevant definitions:

> **Likely.**  Probable. . . .  In all probability. . . . .  Likely is a word of general usage and common understanding, broadly defined as of such nature or so circumstantial as to make something probable and having a better chance of existing or occurring than not.

> **Probable.**  Having the appearance of truth; having the character of probability; appearing to be founded in reason or experience.  Having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt; ***likely***.

> **Probability.**  Likelihood; appearance of reality or truth; reasonable ground of presumption . . . .  A condition or state created when there is more evidence in favor of the existence of a given proposition than there is against it.

*Black's Law Dictionary*, pp. 925, 1201 (6th ed. 1990)(emphasis added).  Moreover, at the time *Strickland* was decided, "likely" and "probability" were viewed as meaning the same thing.  *Roget's International Thesaurus*, § 510.5, p. 331 (3rd ed. 1963).

From the foregoing, the court concludes that "likely" and "probability" are synonymous.  In other words, the standard set forth in the Court of Criminal Appeals' opinion, *i.e.*, that "the result of his trial would have <u>likely</u> been different," means the same thing as *Strickland's* "a reasonable <u>probability</u> that . . . the result of the proceeding would have been different."  (underline added for

emphasis)  As reasoned above, the petitioner's argument that the Court of Criminal Appeals' use of the word "likely" imposed an undue burden of proof on him is without merit.

Citing *Williams*, the petitioner argues next that, "[a]s the Supreme Court explained in *Williams*, a state court adjudication of an ineffectiveness claim is 'contrary to' *Strickland* if the state court has failed to 'stat[e] the correct standard for judging ineffective-assistance claims.'"  (DE # 103, I.B.1, p. 10; DE # 181, ¶ I.B.4, p. 55)  The petitioner misrepresents *Williams*.  The passage from which the petitioner quotes actually reads, "Unlike the Virginia Supreme Court, the state trial judge omitted any reference to *Lockhart* and simply relied on our opinion in *Strickland* as ***stating the correct standard for judging ineffective assistance claims*."  *Williams*, 529 U.S. at 394 (bold representing that part of *Williams* that the petitioner quoted).  As shown above, the part of the *Williams* opinion from which the petitioner quotes does not stand for the proposition that any failure to state the correct standard under *Strickland* constitutes a *per se* violation of *Strickland*.  This argument is without merit.

Next, the petitioner argues that, by addressing his ineffective-assistance claims "'item-by-item' (as opposed to cumulatively)," the Court of Criminal Appeals again "ran afoul" of *Strickland's* "reasonable probability" standard.  (DE # 103, ¶ I.B.1, pp. 9-10 & n. 9; DE # 181, ¶ I.B.4, pp. 53-54 & no. 28)  *Strickland* does require that the effect of counsels' alleged errors be considered in toto, against the backdrop of the totality of the evidence.  *See Strickland*, 466 U.S. at 690; *Williams*, 529 U.S. at 395-396, 398-39; *see also Stanford*, 266 F.3d at 453; *Wilson v. Mintez*, 761 F.2d 275, 284 (6th Cir. 1985).

In its opinion, the Court of Criminal Appeals made an independent determination that counsels' representation was not deficient with respect to the following ineffective-assistance claims: 1) "the . . . defense team provide highly competent organized representation . . . ," (in response to the petitioner's claim that the defense team was unorganized)(DE # 14, Add. 17, p. 35);

2) "[c]ounsel's strategy appears to have been based upon more than adequate preparation and appears to be well within the range of competence demanded" (in response to the petitioner's claim that the defense team conducted an inadequate investigation)(DE # 14, Add. 17, p. 36); 3) "[w]e do not find that counsel was deficient for failing to challenge the time of death"(DE # 14, Add. 17, p. 39); 4) "[t]he petitioner has failed to show counsel's deficiency . . . ." in not investigating other factors that would have supported a reasonable doubt defense (DE # 14, Add. 17, p. 40); 5) the petitioner has failed to "argue why defense counsel was ineffective for failing to investigate" the hair dryer (DE # 14, Add. 17, p. 40); 6) "the petitioner fails to show why counsel was deficient" for not investigating whether the lights were on, or off, in the house (DE # 14, Add. 17, pp. 40-41); 7) counsel "made a tactical decision not to have the knife [found under the house] tested"(DE # 14, Add. 17, p. 43); 8) counsel "made a reasonable and informed decision not to . . . introduce [the knife found under the house] into evidence . . . ." (DE # 14, Add. 17, p. 43); 9) "counsel's actions were not deficient" as they pertained to the knife found under the house (DE # 14, Add. 17, p. 43); 10) counsels' decision not to use a forensic pathologist to challenge the crime scene analysis was "a reasonable and informed trial strategy" (DE # 14, Add. 17, p. 44); 11) "we believe counsel made an informed and reasonable decision" not to use a forensic criminologist to challenge the crime scene analysis (DE # 14, Add. 17, p. 45); 12) the decision not to "raise questions or cross examination about certain things when they could not question other things about the crime scene," including the left-hand glove found at the crime scene, "was a reasonable and informed trial strategy . . . ." (DE # 14, Add. 17, p. 46); 13) having made "all the pertinent pretrial motions to exclude the petitioner's statements to the police, " [t]he state appropriately argue[d] that a reasonable attorney would have no reason to believe that consulting a linguist . . . would be helpful," the inference being that defense counsel were not deficient in their representation on this issue; 14) counsels' failure to present the testimony of a speech perception expert"did not fall below the range of competence demanded in

70

criminal cases" (DE # 14, Add. 17, p. 48); 14); 15) "the petitioner has failed to demonstrate how his voluntary waiver of potential conflict connotes ineffectiveness on behalf of counsel" (DE # 14, Add. 17, p. 49); 16) "[n]othing in the record demonstrates that counsel undertook an uninformed trial strategy" by not objecting to allegedly improper arguments (DE # 14, Add. 17, p. 51); 17) "counsel's performance . . . was adequate" with respect to defense counsels' failure to object to jury instructions (DE # 14, Add. 17, p. 52).

The Court of Criminal Appeals did not make specific findings that counsels' representation was not deficient with respect to the following ineffective-assistance claims: 1) failure to discover that the state had made several drafts of the transcript of the 911 call (DE # 14, Add. 17, pp. 48-49); 2) appellate counsel's failure to raise issues pertaining to jury instructions provided to the jury (DE # 14, Add. 17, pp. 52-52; 3) appellate counsel's failure to raise on appeal that the trial court refused to give the defense's requested jury instructions (DE # 14, Add. 17, p. 53); 4) appellate counsel's failure to raise alleged prosecutorial misconduct (DE # 14, Add. 17, pp. 53-54); 5) appellate counsel's failure to challenge the constitutionality of Tennessee's death penalty statute (DE # 14, Add. 17, p. 54). However, at the conclusion of its review of the petitioner's ineffective-assistance claims, the Court of Criminal Appeals wrote, "After reviewing the entire record on appeal, we find that counsel was not ineffective in their representation of the petitioner in this case." (DE # 14, Add. 17, p. 55) The court concludes that this statement by the Court of Criminal Appeals includes those claims with respect to which it did not make a specific determination. Moreover, the court concludes that this statement cures any defect associated with the petitioner's argument that the Court of Criminal Appeals did not address the issue of ineffective assistance cumulatively. For these reasons, this argument is without merit.

Next, although not entirely clear from the record, it appears that the petitioner also may be arguing that the Court of Criminal Appeals' standard for prejudice was strictly "outcome

71

determinative," without giving due regard to whether the result of the proceeding was fundamentally unfair or unreliable, as the petitioner maintains is required under *Lockhart v. Fretwell*, 506 U.S. 364 (1993). (DE # 103, ¶ I.B.1, p. 9 & n. 2; DE # 181, ¶ I.B.4, pp. 53-54 & n. 28) The court infers this claim from the petitioner's reference to the following language in the Court of Criminal Appeals' opinion: "changed the outcome of the trial," "could have produced a different result at trial," "how the outcome . . . would have been different," "altered the outcome of the trial," "affected the outcome of the trial," "not likely to have produced a different result at trial," "would have affected the outcome." (DE # 14, Add. 17, pp. 36-38-42, 46-47; DE # 103, p. 9  n. 2; DE# 181, pp. 53-54 n. 28)

   In *Lockhart*, the U.S. Supreme Court held that, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart*, 506 U.S. at 369-70. However, in *Williams*, the U.S. Supreme Court wrote, "Cases such as . . . *Lockhart* . . . do not justify a departure from a straightforward application of Strickland . . . ." *Williams*, 529 U.S. 390-391; *see also Glover v. United States*, 531 U.S. 198, 203 (2001)("*Lockhart* did not supplant the *Strickland* analysis"). After construing *Lockhart* to stand for the proposition that, if "[t]he prejudice prong 'focuses on the question of whether counsel's deficient performance renders the result of . . . the proceeding fundamentally unfair," *see Combs v. Coyle*, 205 F.3d 269, 278 (6ᵗʰ Cir. 2000)(citing *Lockhart* for the proposition that the *Strickland* prejudice inquiry is not solely outcome-determinative), the Sixth Circuit has since re-characterized the *Strickland* standard as "outcome-determinative," *see Northrop v. Trippett*, 265 F.3d 372, 384 (6ᵗʰ Cir. 2001), in accordance with *Williams* and *Glover*. Because the *Strickland* prejudice is, in fact, outcome-determinative, the petitioner's claim is without merit.

   Finally, assuming for the sake of argument that the legal standard was incorrect with respect to *Strickland's* prejudice prong, a plain reading shows that the doctrine of harmless error may be

inferred from *Strickland*. *Strickland*, 466 U.S. at 687-694. This conclusion is supported by the U.S. Supreme Court's opinion in *Rushen v. Spain*, 464 U.S. 114 (1983), in which the Court wrote: "most constitutional rights are subject to harmless error analysis . . . unless the deprivation, by its very nature, cannot be harmless. *Id*. at 456 n. 2. The Sixth Circuit has held that, when reviewing state court decisions for harmless error, the harmless error standard in *Brecht v. Abrahamson, supra* at p. 64, applies. *Jordan*, 397 F.3d at 363. Under *Brecht*, a *habeas* petitioner must establish that the court's error had a "substantial and injurious effect or influence" on the outcome of the proceedings. *Brecht*, 507 U.S. 619, 637 (1993). Otherwise the error is harmless. The harmless error standard in *Brecht* applies even if a federal *habeas corpus* court is the first to review the harmless error. *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir. 1999).

As shown above, the Court of Criminal Appeals determined that counsels' representation was not deficient with respect to each of the petitioner's ineffective-assistance claims. Having determined that counsels' representation was not deficient, the court was not required to address *Strickland's* prejudice prong, *Strickland*, 466 U.S. at 697, which is the focus of the petitioner's claim. Consequently, any hypothetical error on the Court of Criminal Appeals' part in articulating the legal standard under *Strickland's* prejudice prong was harmless beyond a reasonable doubt.

As reasoned above, the petitioner's claim that the Court of Criminal Appeals applied the wrong standard to his ineffective assistance of counsel claims is without merit. However, even if the standard applied were incorrect, the error was harmless beyond a reasonable doubt. Accordingly, this claim is without merit.

> 2. Whether Defense Counsel Provided Ineffective Assistance
> Because They Did Not Investigate and Present
> Evidence That Fields Committed the Murders

The petitioner alleges that defense counsel were ineffective for not introducing evidence that

Judith's boyfriend, Billy Fields, "actually committed the murders."[35]  (DE # 18, ¶¶ 8.a.1)(a)-(d), p. 23; DE # 23, ¶ II p. 3; DE # 103, ¶ I.B.2, p.17; DE # 109, III.A, pp. 13, 22)  The petitioner argues that: 1) two witnesses placed Fields at the victims' home twice on the day of the murders, but Fields testified that he had been there only once; 2) witnesses believed that Fields would have been involved in the murders; 3) Fields had a motive, *i.e.*, according to the petitioner, the petitioner and Judith were "planning to get back together."

As to 2) and 3) above, the record shows that these two claims were not raised in state court prior to being raised in the instant proceedings.  (DE # 14, Add. 14, Vol. 1, pp. 22-23; DE # 14, Add. 18, p. 30)  For reasons previously explained, *supra* at pp. 23, 34-38, 39-40, 42-43, 54, these claims are procedurally defaulted.  Therefore, the court must determine if the petitioner has established cause and prejudice or whether a miscarriage of justice will result if these two claims are not reviewed.

A review of the record shows that the petitioner has raised the claim pertaining to the number of times that Fields was seen at the victims' house in the context of procedural default (DE # 103, ¶ I.B.2.b(3)c, pp. 24-27), but not with respect to the petitioner's claim that he and Judith were planning to get back together.  As to the claim regarding the number of times that Fields had been seen at the victims' house, the petitioner argues that this claim is not procedurally defaulted for the following reasons: 1) counsel was ineffective for not investing the circumstances of the offense; 2) his "claims here are not materially different from" his other ineffective-assistance claims; 3) counsel provided ineffective assistance of counsel on post-conviction; 4) the petitioner still can exhaust aspects of this claim under Tennessee's "motion-to-reopen" procedure; 5) there can be no procedural default where the denial of relief would cause a miscarriage of justice.

---

[35]  For reasons previously explained, *supra* at ¶ 1, pp. 23, 34-40, 42-43, 54, this claim was determined to be procedurally defaulted for purposes of federal *habeas corpus* review with respect to the possibility that the murders were committed by an unidentified black man, or that they were drug related.

For the petitioner's first argument to establish "cause," he must have exhausted this claim in state court, which he clearly has not done. As to his second argument, as previously established, *supra* at p. 35, for a claim to be exhausted for purposes of federal *habeas corpus* review, it must have been presented in the state courts under the same theory as it is presented in federal court. The petitioner's vague reference to this claim not being "materially different" is insufficient for that purpose. Regarding the petitioner's third claim, as previously discussed, *supra* at pp. 43, there is no constitutional right to effective assistance of counsel on post-conviction, where this claim should have been raised. As such, claims of ineffective assistance of counsel on post-conviction will never constitute "cause." The petitioner's fourth argument, *i.e.*, that he can still exhaust these claims in state court, is a course of action, not "cause" for this cause and prejudice analysis. Finally, with respect to the petitioner's claim that a miscarriage of justice will occur if his claim is not heard, as discussed *supra* at pp. 135-142, the petitioner has not made a showing of actual innocence. For these reasons, claims 2) and 3) above are procedurally defaulted for purposes of federal *habeas corpus* review.

As to the petitioner's remaining claim, the Court of Criminal Appeals addressed this claim on post-conviction, concluding that the petitioner "failed to show . . . that Fields had any involvement in the murders," and that "[n]othing in the record suggests the outcome of the trial would have been different if counsel had highlighted" the apparent conflict in testimony. (DE # 14, Add. 17, p. 41) The testimony on which the Court of Criminal Appeals relied included: 1) lead defense attorney Karl Dean's testimony that his office did investigate Fields thoroughly and concluded that he could not be a suspect (DE # 14, Add. 12, Vol.4, p. 409); 2) defense co-counsel, Paul Newman's testimony that he did not raise Fields' apparently contradictory testimony at trial because the second witness, a man named Burgess, had changed his story regarding the number of times that he had seen Fields at the victims' house (DE # 14, Add. 12, Vol. 9, p. 1105); 3) defense

attorney Newman's testimony that he nevertheless attempted to suggest to the jury that Fields was a suspect (DE # 14, Add. 12, Vol. 9, pp. 1104); 4) Detective McElroy's testimony that the police had interviewed Fields, and, after investigating his movements and whereabouts at the time of the murders, the Metro Police Department no longer considered him a suspect (DE # 14, Add. 12, Vol. 5, p. 530).

The record supports the conclusion that defense counsels' representation was not deficient, despite the fact that they did not attempt vigorously to portray Fields as a suspect. Even assuming for the sake of argument that it would have been the better practice to have done so, the petitioner has not shown that he was prejudiced by defense counsels' failure to try to implicate Fields in the murders. More particularly, the court notes that Chad was not heard to scream out Field's name on the 911 tape. Neither is there anything in the record to suggest that Fields is missing any fingers, much less the same two fingers as the petitioner, nor that it was Fields' bloody palm print, not the petitioner's, that was discovered on the sheet. Moreover, there is nothing in the record to suggest that Fields had threatened to kill Judith or that he would have had any motive for killing Chad or Jason.

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not investigating and presenting evidence that Fields committed the murders was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is without merit.[36]

### 3. Whether Defense Counsel Provided Ineffective Assistance Because They Did Not Establish a Defense to the Charges/Bolster the Petitioner's Alibi Defense

The petitioner argues that defense counsel failed to "establish a defense to the charges and/or

---

[36] The analysis, and result of that analysis, would have been the same had the petitioner's other two claims pertaining to Fields not been procedurally defaulted for purposes of federal *habeas corpus* review.

bolster the alibi defense" by not challenging the time of death.[37]  (DE # 18, ¶¶ 8.b, b(1)-(4)(b)-(c), pp. 4-6; DE # 23, ¶ II, p. 3; DE # 103, I.B1.b.3, pp. 18-20; DE # 109, III.A, pp. 12-14; DE # 181, ¶ I.A.5, p. 27)  Specifically, the petitioner asserts that defense counsel failed to investigate: 1) proof of *rigor mortis* that would have indicated the victims could have died between 5:00 and 9:00 a.m. on October 2; 2) proof of *livor mortis* that would have indicated the victims could have died before 8:40 a.m. on October 2; 3) proof that Jason's body had been moved fifteen and thirty minutes after death; 4) proof of other facts that would have shown that the victims were killed after the police arrived at 11:30 the night before.  These "other facts" are that the officers who responded to the 911 call testified that the lights were on in the house when they arrived; however, Fields testified that the lights were off when the bodies were found the next day.  (DE # 14, Vol. 1, ¶ III.B.3, pp. 21-22)  The officers who responded to the 911 call also testified that they did not hear any noise from inside the house, but a hair dryer was found running when the bodies were discovered.  (DE # 14, Add. 14, Vol. 1, ¶ III.B.2, p. 21)

To the extent that this claim pertains to the time of death, the petitioner on post- conviction relied on the testimony of Dr. Kris Lee Sperry, the Deputy Chief Medical Examiner from Atlanta, Georgia.  (DE # 14, Add. 12, Vol. 2, pp. 13-159)  As the Court of Criminal Appeals pointed out, however, Dr. Sperry testified that he "did not have any evidence to contradict Dr. Gretel Harlan's opinion that the time of death was around 11:30 p.m."  (DE # 14, Add. 17, p. 37)  The Court of Criminal Appeals's determination on this point is corroborated by the following exchange at the post-conviction hearing:

> Q       So, within the time frame that Dr. Harlan is working with, in her testimony, she testified that her view of the bodies and her

---

[37]    For reasons previously explained, *supra* at ¶ 2, pp. 23-34, 34-40, 42-43, 54, this claim was determined to be procedurally defaulted for purposes of federal *habeas corpus* review with respect to the alarm clock and the back door being ajar, ¶¶ 8.b.4)(a) and 8.b.4)(d) of the petition.

autopsy was consistent with death occurring at 11:30, on October the 1st of 1989. You have absolutely nothing to contradict that, do you?

A       Oh, no, as far as it being consistent with, I think you heard me earlier. I don't have a disagreement with all – with that at all. And if I'd been asked that question, I would have answered the same way.

(DE # 14, Add. 12, Vol. 2, p. 130)  Given Dr. Sperry's testimony, even if defense counsel should have challenged the State's theory regarding the time of death, the petitioner fails to show that he was prejudiced because they did not.

The petitioner raised the issues of the lights and hair dryer in his first amended post-conviction petition, and on appeal from the judgment of the post-conviction court.  (DE # 14, Add. 12, Vol. 1, ¶ I.C.(10), pp. 30-31; Add. 14, Vol. 1, ¶ III.B.2-3, pp. 21-22)  In concluding that these claims were without merit, the Court of Criminal Appeals observed, "[t]he petitioner does not even argue why defense counsel was ineffective for failing to investigate . . . " the hair dryer, and as to both issues, that he had failed to show that investigation of either would have changed the outcome to the trial.  (DE # 14, Add. 17, p 40-41)

In the present action, apart from alleging that, had defense counsel investigated these two inconsistencies, the investigation would have shown that the victims were murdered on the morning of October 2 by someone who entered the back door, rather than by the petitioner at 11:30 p.m. the evening before (DE # 18, ¶ 8.b(4)(e), p. 6), the petitioner has not provided any argument, citation to relevant authority, references to the record, or any other facts in support of this claim. As previously established, *supra* at pp. 61-62, such conclusory claims will not provide grounds for *habeas corpus* relief.  In other words, even if counsels' representation were determined to have been deficient by not pursuing these inconsistencies, owing to the conclusory nature of this claim, the petitioner fails to show that he was prejudiced.

78

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient because they did not establish defense to the charges and/or bolster the petitioner's alibi defense was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is without merit.

### 4. Whether Defense Counsel Provided Ineffective Assistance Because They Did Not Conduct a Forensic Investigation

The petitioner claims that defense counsel were ineffective for not conducting a forensic investigation "to establish proof confirming the alibi defense and/or establish[] a reasonable doubt as to [the petitioner's] guilt" based on the knife that was found under the house, and the hair dryer found the day after the murders, still running.[38]  (DE # 18, ¶ 8.c.6), 11), pp. 5-8; DE # 23, ¶ II, pp. 5-6; DE # 103, ¶ I.B.1.b, pp. 13–23; DE # 181, ¶¶ I.A.3-4, pp. 20-27)  The issue of the knife will be addressed at pp. 117-119.

The petitioner asserts the following with respect to the hair dryer and defense counsels' decision not to conduct a forensic investigation:

> Trial counsel also failed to conduct a forensic investigation to establish proof confirming the alibi defense and/or establishing a reasonable doubt about Oscar Smith's guilt, including, but not limited to, the failure of counsel to investigate and present the following evidence . . . . Proof that the hair dryer being found engaged on October 2 when the bodies were found, as being inconsistent with the prosecution's theory of the case.

(DE # 18, ¶¶ 8.c and 8.c.11), pp. 6-8)

As previously noted, *supra* at p. 78, the Court of Criminal Appeals wrote on post-conviction

---

[38]   For reasons previously explained, *supra* at ¶ 3, pp. 24-25, 34-40, 42-43, 54, this claim was determined to be procedurally defaulted for purposes of federal *habeas corpus* review with respect to unidentified fingerprints at the scene, hair evidence found in Jason's hand, fingernail scrapings from the victims, blood and other evidence on the sheet where Judith Smith was found, footprints outside the house, the belt found in the hallway, ballistics evidence, the alarm clock, the partially eaten bologna sandwich, serological and other trace evidence, *i.e.*, ¶¶ 8.c.1)3, 5), 8)-10), 12)-13) of the petition.

that "[t]he petitioner does not even argue why defense counsel were ineffective for failing to investigate" the hair dryer, concluding, "[t]here is nothing in the record to indicate the condition of the hair dryer could have bolstered the alibi defense or changed the outcome of trial." (DE # 14, Add. 17, p. 40) As shown above, the petitioner once again provides no argument, citation to relevant authority, reference to the record, or any other facts in support of this claim. As previously explained, *supra* at pp. 61-62, such conclusory claims will not provide the basis for *habeas corpus* relief. Once again, even if it would have been the better practice to have conducted a forensic investigation regarding the hair dryer, the petitioner has not shown how he was prejudiced because defense counsel did not.

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not conducting a forensic investigation of the broken knife and the hair dryer was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is without merit.

### 5. Whether Defense Counsel Provided Ineffective Assistance Because They Did Not Obtain the Assistance of a Forensic Pathologist

The petitioner argues that defense counsel provided ineffective assistance by not retaining the services of a forensic pathologist to: 1) investigate the time and circumstances of the victims' deaths; 2) establish proof inconsistent with the prosecution's theory; 3) establish an alibi and/or reasonable doubt; 4) cross-examine prosecution experts "about various issues, including but not limited to,"[39] the time of death, the length of struggle, the amount of blood on the murderer, and the movement of Jason's body. (DE # 18, ¶¶ 8.d, p. 8; DE # 23, ¶ II, pp. 5-6; DE # 103, ¶ I.B.1.b, pp.

---

[39] As previously noted, *supra* at p. 24 n. 9, such vague, open-ended claims as "but not limited to" fail to satisfy the requirements of Rule 2(c), Rules – Section 2254 Cases. Therefore, the court will address only those claims to which the petitioner refers specifically.

13–23; DE # 109, III.A, pp. 13; DE # 181, ¶ I.A.3, pp. 20-27)

As an initial matter, the court notes that the petitioner incorporates the ineffective assistance counsel claim in ¶ 8.b of his petition into this claim by reference. However, because each of the factual predicates comprising that ineffective assistance claim have been determined to be either procedurally defaulted for purposes of federal *habeas corpus* review or without merit, *supra* at pp. 23-24, 34-40, 42-43, 54, to the extent that the petitioner's claim in ¶ 8.d in his first amended petition relies on ¶ 8.b, the claim in ¶ 8.d is without merit.

As to the claim in ¶ 8.d., enumerated as 1) through 4) above, apart from outlining how a forensic pathologist may have aided the defense, the petitioner provides no argument, citation to relevant authority, references to the record, or any other facts in support of this claim. As previously explained, *supra* at pp. 61-62, such conclusory claims do not provide grounds for *habeas corpus* relief. Nevertheless, to the extent that it is able, the court will address this claim anyway.

On post-conviction, the Court of Criminal Appeals determined to be without merit the petitioner's ineffective assistance claim pertaining to defense counsels' decision not to obtain the services of a forensic pathologist to assist in challenging the prosecution's theory as to the time of death. (DE # 14, Add. 17, pp. 36-39)  Even assuming that defense counsels' representation was deficient, given Dr. Sperry's testimony, *supra* at p. 78, the petitioner has failed to show that he was prejudiced by that decision.

As to the "circumstances of the victims' deaths" to which the petitioner refers in 1) above, the petitioner does not elucidate to what "circumstances" he is referring. Consequently, the court cannot address this part of the claim.

With respect to the length of the struggle, a review of the record shows that this claim has never been raised in state court in the context of defense counsel's failure to retain the services of a forensic pathologist. Consequently, for reasons previously explained *supra* at pp. 34-40, 42-43,

54, this claim is procedurally defaulted for purposes of federal *habeas corpus* review. Even if this claim were not procedurally defaulted, owing to its conclusory nature, the petitioner once again fails to explain why defense counsels' representation was deficient for not obtaining the services of a forensic pathologist to assist with this claim, or how he was prejudiced by that decision.

Regarding the amount of blood that would have gotten on the murderer, the Court of Criminal Appeals determined that pursuing this claim would not have bolstered the petitioner's alibi defense. (DE # 14, Add. 17, p. 43) On the contrary, defense counsel testified at the post-conviction hearing that they wanted to minimize the medical evidence that would have highlighted the gruesomeness of these murders. As the Court of Criminal Appeals observed, minimizing the jury's exposure to the gruesomeness of the murders "was a reasonable and informed trial strategy." (DE # 14, Add. 17, p. 44) Such strategic choices, especially in the absence of any factual allegations to challenge those choices, will not support a claim of ineffective assistance. *Strickland*, 466 U.S. at 690-91.

Finally, the petitioner claims that "Jason's body had been moved in a manner that was inconsistent with Oscar Smith's guilt , and . . . that the prosecution's estimates of time of death were not accurate or []valid . . . ." The Court of Criminal Appeals determined that the petitioner failed to show how this fact would have changed the outcome at trial, in that the petitioner's alibi defense was that he was not present at the time of the murders. (DE # 14, Add. 17, p. 39) Here too, the petitioner has failed to show that there was a reasonable probability that obtaining the services of a forensic pathologist would have changed the outcome of the petitioner's trial. Thus, even if defense counsels' representation were deemed to be deficient with respect to this claim, the petitioner has not shown how he was prejudiced.

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not obtaining the assistance of a forensic pathologist was not contrary to, or an

unreasonable application of, clearly established federal law.  Accordingly, this claim is without merit.

6.  Whether Defense Counsel Were Ineffective for Not
Obtaining the Assistance of a Criminologist

The petitioner argues that defense counsel were ineffective for not retaining the services of a forensic criminologist to: 1) disprove the prosecution's theory that the victims were murdered between the 911 call and the time the police arrived; 2) establish that there was no valid photographic evidence that the glove found at the crime scene was used in committing the murders; 3) cross-examine Sgt. Hunter as to inconsistencies between the prosecution's theory and crime scene evidence.[40]  (DE # 18, ¶¶ 8.e(1)-(3), pp. 8-9; DE # 23, ¶ II, p. 6)

On post-conviction, the petitioner tendered the testimony of Dr. H. Dale Nute, Ph.D., a forensic science consultant employed by Forensic and Security Consultants Corporation in Tallahassee, Florida.  (DE # 14, Add. 12, Vol. 6, pp. 597-749)  Dr. Nute testified extensively as to the time of the victims' deaths, *vis-a-vis* the 911 call.  (DE # 14, Add. 12, Vol. 6, pp. 687-715)  With respect to this part of the petitioner's claim, the Court of Criminal Appeals noted that "[t]he petitioner apparently ignores the simple fact that Dr. Nute testified that the perpetrator could have acted exactly as the state professed and left before the police arrived."  (DE # 14, Add. 17, p. 45)  Dr. Nute's testimony at the post-conviction hearing supports the Court of Criminal Appeals' observation on this claim.  (DE # 14, Add. 12, Vol. 6, p. 694)

Considerable attention also was given to the glove at the post-conviction hearing.  (DE # 14, Add. 12, Vol.6, pp. 682-687)  Having testified that he was aware that a jury could totally reject the State's theory on a certain claim and still convict if they found that all the elements of the offense

---

[40]  For reasons previously explained in ¶ 4, *supra* at pp. 25, 34-40, 42-43, 54, that part of the claim in ¶ 8.e.3) in the petition pertaining to the telephone being  off the hook is procedurally defaulted for purposes of federal *habeas corpus* review.

83

had been proven (DE # 14, Add. 12, Vol. 6, p. 681), Dr. Nute admitted that the prosecution's case did not hinge on the glove (DE # 14, Add. 12, Vol. 6, pp. 682-685). The actual transcript of the prosecution's closing argument shows that the glove played a minor role in the State's case against the petitioner. (DE # 14, Add. 13, Ex. 12, p. 53) The Court of Criminal Appeals determined that, given the petitioner's insistence on pursuing an alibi defense, the "presence [of the glove], or lack thereof . . . would [not] have affected the outcome of the trial. (DE # 14, Add. 17, p. 46)

The third part of this claim is that defense counsel were ineffective for not obtaining the services of a forensic criminologist to assist in cross-examining Sgt. Hunter about inconsistencies between the prosecution's theory and crime scene evidence. Dr. Nute testified at length about: 1) the time it would have taken police officers to respond to the 911 call (DE # 14, Add. 12, Vol. 6, pp. 619-624, 637-639); 2) the time of death (DE # 14, Add. 12, Vol. 6, pp. 624-639); 3) the broken knife found under the house (DE # 14, Add. 12, Vol. 6, pp. 644-647); 4) the fact that Jason's body was moved after death (DE # 14, Add. 12, Vol.6, pp. 657-662); 5) such other issues as the bloody palm print, the absence of bloody footprints, the nature and timeliness of evidence tested by various laboratories, escape routes, the back door found ajar the day after the murders, photographic evidence, evidence of fingerprints on Chad's chest, the issue of the lights, and that people were permitted to walk through the crime scene. (DE # 14, Add. 12, Vol. 6, pp. 639, 654-55, 663, 667-674).

With respect to the foregoing, the Court of Criminal Appeals determined that defense counsels' decision not to challenge the crime scene analysis constituted "an informed and reasonable decision," given the petitioner's claim that he was innocent and his assertion of an alibi defense, and that the decision "not to raise questions or cross examine about certain things when they knew they could not question other things about the crime scene was a reasonable and informed trial strategy . . . ." (DE # 14, Add. 17, p. 46) A review of the record shows that, despite the breadth and scope

84

of Dr. Nute's testimony, nothing in his testimony or the record supports the conclusion that a reasonable probability exists that the assistance of a criminologist would have altered the outcome of the petitioner's trial.

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not obtaining the assistance of a criminologist was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is without merit.

### 7. Whether Defense Counsel Were Ineffective For Not Securing the Support of a Linguist

The petitioner argues that defense counsel were ineffective for not retaining a "linguist to assist the defense in demonstrating that Oscar Smith's purported use of the past tense concerning the deaths of his family members was not competent proof of guilt." (DE # 18, ¶ 8.f, p. 9; DE # 23, ¶ II, p. 6; DE # 103, ¶ I.B.1.c.1), p. 20)

Once again, the petitioner offers no argument, citation to relevant authority, references to the record, or any facts in support of this claim. Consequently, this claim is conclusory. As previously established, *supra* at pp. 61-62, conclusory claims will not provide grounds for *habeas corpus* relief. Nevertheless, the court will address this claim.

The petitioner relies on the testimony of Dr. Kay Dumas, Ph.D., an associate professor of English at the University of Tennessee in Knoxville. (DE # 14, Vol. 5, pp. 548-592) Doctor Dumas testified at the post-conviction hearing that the petitioner's use of the past tense when referring to the victims did not necessarily mean that he knew his wife was dead. (DE # 14, Vol. 5, pp. 567-77) However, Dr. Dumas also testified that, based on the information available to her, she had no way of knowing whether the petitioner knew, or did not know, about the murders at the time he spoke with the police. (DE # 14, Vol. 5, p. 581) Dr. Dumas testified further that, because the petitioner was a suspect in a triple-murder and would have known the purpose of her interviews, the results

85

of any testing of the petitioner's speech pattern would have been suspect. (DE # 14, Vol. 5, pp. 586-587)

The Court of Criminal Appeals pointed out on post-conviction that defense counsel filed "all the pretrial motions to exclude the petitioner's statements to the police." (DE # 12, Add. 1, Vol. 1 of 9, Tech. Record, pp. 77-78) Supported by the transcript of the petitioner's testimony at trial (DE # 12, Add. 1, Vol. 8 of 9, pp. 2851-2852, 2897), the Court of Criminal Appeals noted that the petitioner explained his use of the past tense to the jury, because "he was nervous and frightened when he gave his statement to the police." (DE # 14, Add. 17, p. 47) The record supports the Court of Criminal Appeals' conclusion that, even if defense counsel should have retained the services of a linguist, such expert testimony would not likely have produced a different result at trial. (DE # 14, Add. 17, p. 47)

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not obtaining the assistance of linguist was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is without merit.

### 8. Whether Defense Counsel Were Ineffective for Not Obtaining the Services of a Speech Perception Expert

The petitioner argues that defense counsel were ineffective for not obtaining the services of a speech perception expert "to demonstrate that the prosecution's use of a written transcript of . . . the 911 tape was . . . inaccurate," and that defense counsel failed to "get the transcript excluded" because it was prejudicial and "unduly influenced the jury . . . ."[41] (DE # 18, ¶ 8.g, p. 9; DE # 23, ¶ II, p. 6; DE # 103, ¶ I.B.1.b.3(1), p. 19)

Here again, the petitioner offers no argument, citation to relevant authority, references to the

---

[41] The petitioner's due process claim, embedded in this ground for relief, was previously deemed in ¶5, *supra* at pp. 25, 34-40, 42-43, 54, to be procedurally defaulted for purpose of federal *habeas corpus* review.

86

record, or any facts in support of his claim. Because this claim is conclusory, as previously explained, *supra* at pp. 61-62, it will not provide grounds for *habeas corpus* relief. Nevertheless, the court will address this claim.

On post-conviction, the petitioner relied on the testimony of Dr. Ralph Ohde, Ph.D., an associate professor of speech and hearing sciences at Vanderbilt University. (DE # 14, Add. 12, Vol. 7, pp. 763-790) The thrust of Dr. Ohde's testimony was that, "if you have a group of listeners listen to a tape without indicating to them what they should expect to hear . . . , their perception significantly changes when they're informed of what to . . . listen to . . . ." (DE # 14, Add. 12, Vol. 7, pp. 770-771) Doctor Ohde also testified that, having their perception already influenced, the jury was likely to ignore the trial court's instruction that the tape, not the transcript, was the evidence. (DE # 14, Add. 12, Vol. 7, pp. 775-779) On the other hand, Dr. Ohde testified that he could not say that the transcript influenced the jurors more than the "other variables that just go on in the course of a trial" (DE # 14, Add. 12, Vol. 1, p. 787), such as when Dalton, the person who took the 911 call, testified that Chad identified the assailant as "Frank" (DE # 12, Add. 1, Bk. 6 of 9, p. 2128; DE # 14, Add. 12, Vol. 7, p. 786). Doctor Ohde testified further that, even without the transcript, the jury would have been biased by merely knowing the petitioner's name. (DE # 14, Add. 12, Vol. 7, pp. 784-785) According to Dr. Ohde, "the only way to have filtered the problem out of th[e] trial would have been for the jury to . . . have heard the tape with no knowledge of who Oscar Frank Smith was and no knowledge of anything else" (DE # 14, Add. 12, Vol. 1, p. 788), a concession that he admitted defense counsel was unlikely to obtain (DE # 14, Add. 12, Vol. 7, p. 777; Add. 17, p. 48).

With respect to this claim, the Court of Criminal Appeals noted that defense counsel "did indeed complain that the transcript was prejudicial because the content of the tape was in dispute . . . ," but that the Tennessee Supreme Court had found no error in admitting the transcript into evidence. (DE # 14, Add. 17, p. 48) The Court of Criminal Appeals ultimately concluded that

87

nothing raised in Dr. Ohde's testimony would have caused a different result at trial. (DE # 14, Add. 17, p. 48)

A review of the record supports the Court of Criminal Appeals' conclusions. Specifically, the record shows that defense counsel filed an appropriate motion to suppress the contents of the 911 tape (DE # 12, Add. 1, Bk. 1 of 9, Tech. Record, p. 153); they argued against the admissibility of the transcript at a pre-trial hearing (DE # 12, Add. 1, Bk. 2 of 9, Vol. IV, pp. 489-493); and they argued against the admissibility of the transcript at trial prior to the tape's being played (DE # 12, Add. 1, Bk. 6 of 9, Vol. XV, pp. 2112-2122). The record also shows that the trial court's instruction regarding the transcript, given before the tape was played, was thorough and that at the end of the instruction, the jurors nodded affirmatively when asked by the Judge if they understood the instruction. (DE # 12, Add. 1, Bk. 7 of 9, Vol. XVII, pp. 2506-2507) Moreover, the trial court repeated its earlier admonition regarding the transcript during its charge to the jury. (DE # 12, Add. 1, Bk. 9 of 9, Vol. XX, pp. 2967-2968)

Based on the foregoing, the Court of Criminal Appeals determined that defense counsels' representation was not deficient, and that the petitioner had not shown that he was prejudiced by defense counsels' representation on this issue. (DE # 14, Add. 17, pp. 47-49) In consideration of the record as a whole, the court concludes that, even though the testimony of a linguist might have been helpful, the petitioner has failed to show that he was prejudiced by the fact that his counsel did not secure that testimony.

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not obtaining the assistance of a linguist was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is without merit.

9. Whether Defense Counsel were Ineffective for Not
Challenging the Constitutionality of the
Jury Instructions During the Guilt/Innocence phase

88

The petitioner argues that defense counsel were ineffective for not raising objections to the following jury instructions: a) the credibility of witnesses; b) the definitions of "premeditation" and "deliberation"; c) the evaluation of expert witnesses; d) reasonable doubt. (DE # 18, ¶ 8.k, p. 11; DE # 32, ¶ III, pp. 20-22; DE # 103, ¶¶ I.B.1.b.2, pp. 27-29, II.A-B, pp. 32-40, VII., pp. 98-104) The Court of Criminal Appeals observed that the Tennessee Supreme Court had upheld the constitutionality of these jury instructions on direct appeal, and as such, the Court of Criminal Appeals determined that defense counsels' failure to object to them did not constitute ineffective assistance. (DE # 14, Add. 17, pp. 51-52)

### a. Witness Credibility

The petitioner argues that defense counsel were ineffective because they did not object to the jury instruction pertaining to witness credibility. (DE # 18, ¶ 8.k.1), p. 11) The petitioner incorporates ¶ 18 of his *habeas corpus* petition by reference.[42] Paragraph 18, in turn, refers the court to pages 84-86 of the petitioner's Rule 11 application for permission to appeal in the Tennessee Supreme Court on post-conviction. (DE # 14, Add. 18)

In his brief on appeal from the judgment of the post-conviction court, this claim was based on attorney Dean's testimony at the post-conviction evidentiary hearing that the "defense team did not have any tactical decision for not objecting" to this jury instruction, and that not objecting was "due to a 'lack of awareness' that there was an issue." (DE # 14, Add. 14, Vol. 1, ¶ III, p. 100) The petitioner asserted in his brief that it "was the duty of counsel to object, if for no other reason than it was necessary to object to properly preserve the issues for appeal." (DE # 14, Add. 14, Vol. 1, ¶ III, p. 100) The petitioner made no additional arguments pertaining to this claim in his brief, nor

---

[42]   As previously noted in ¶ 17, *supra* at pp. 30, 38-40, 42-43, 54, the petitioner's claim in ¶ 18 is procedurally defaulted for purposes of federal *habeas corpus* review. However, the factual allegations that comprise ¶ 18 are not procedurally defaulted for purposes of federal *habeas corpus* review to the extent that they form the basis of this ineffective assistance claim.

did he incorporate by reference any part of his brief or the record in support his claim.[43]

In his Rule 11 brief, the petitioner renewed the claim that he raised in the Court of Criminal Appeals, including the same general arguments mentioned above. At the conclusion of the section on ineffective assistance, however, the petitioner notes that the "argument regarding these jury instruction issues is presented in full at Argument, Section IX© . . . ." (actually § IX.C). (DE # 14, Add. 18, ¶ VII, p. 62) The argument presented in § IX.C is the argument to which the petitioner refers the court in the instant petition. However, the record shows that the argument on pp. 84-86 of the petitioner's Rule 11 brief was raised in the Court of Criminal Appeals. Because this claim was not raised in the Court of Criminal Appeals, for reasons previously explained, *supra* at pp. 23-34, 34-40, 42-43, 54, it is procedurally defaulted for purposes of federal *habeas* corpus review. Nevertheless, this part of the petitioner's claim is included in the following analysis.

The instruction at the guilt/innocence phase of the petitioner's trial regarding which the petitioner complains is quoted below:

> If there are conflicts in the testimony of different witnesses, you must reconcile them, if you can, without hastily or rashly concluding that any witness has sworn falsely. . . . [A] witness may be impeached by a careful cross-examination, involving the witness in contradictory, unreasonable and improbable statements. However, immaterial discrepancies or differences in the statements of a witness do not affect their credibility unless it should plainly appear that some witness has wilfully testified falsely.

(DE # 12, Add. 1, Bk. 8 of 9, pp. 2976-2977)

The petitioner argues that the instruction "specifically informed the jurors that they 'must'

---

[43]    The petitioner refers to "Tr. Vol. XX, pp. 29, 42 and 80" in his brief on appeal from the judgment of the post-conviction court in connection with this claim. (DE # 14, Vol. 1, p. 99) However, the petitioner does not explain whether these pages contain the offending instruction, or some argument in support of his ineffective assistance claim. Volume XX of the trial transcript includes pp. 2804-2991 of the proceedings, not pp. 29, 42, and 80. The court is unable to decipher this reference based on the information available.

reconcile discrepancies in contradictory testimony . . . [and] that they had no discretion to 'hastily' discount the testimony of the State's witnesses, even if they wished to do so." (DE # 14, Add. 17, § IX.C.3, p. 85) The petitioner also asserts that the instruction provided that jurors "could not discount witness' testimony if there were immaterial discrepancies, and that the[y]. . . could only discount testimony if they found that the witness was 'wilfully' perjuring himself or herself." (DE # 14, Add. 17, § IX.C.3, p. 85) According to the petitioner, these "instructions went beyond the bare 'presumption of truthfulness' and general methods for assessing credibility upheld" in *Cupp v. Naughten*, 414 U.S. 141 (1973), and that, by "requiring the jury to make . . . factual assessments based upon any standard," he "was denied his right to trial by jury." (DE # 14, Add. 18, § IX.C.3, pp. 85-86)(bold in the original omitted)

The petitioner misreads *Cupp*. The holding in *Cupp* was not that every witness is presumed to testify truthfully. That was just one of several "disputable presumptions" mentioned by the dissent. In *Cupp*, it was the presumption that witnesses testify truthfully that was at issue.[44] More particularly, the petitioner in *Cupp* argued that the presumption of truthfulness jury instruction, *i.e.*, that all witnesses are presumed to testify truthfully, violated his right to due process by shifting the burden to him to prove his innocence by requiring him to show that the witnesses against him were testifying untruthfully. The Supreme Court ruled in *Cupp* that the presumption of truthfulness instruction in that case did not place the burden on the criminal defendant to prove his innocence because, as in criminal proceedings against the petitioner, the jury was provided specific instructions affirming the presumption of innocence and reinforcing the State's obligation to prove the criminal defendant's guilt beyond a reasonable doubt. Central to the Supreme Court's reasoning was that the

---

[44] The issue in *Cupp* was whether the "presumption-of-truthfulness" instruction, disapproved of at the time by every circuit, was "so repugnant to the American concept that it [wa]s offensive to any fair notion of due process of law . . . ." *Cupp*, 414 U.S. at 144, 151 n. 2. The "presumption-of-truth" instruction at issue in *Cupp* pertained to credit given to testimony offered by the prosecution where the defendant had offered no testimony of his own.

jury was instructed to:

> consider the manner of the witness, the nature of the testimony, and any other matter relating to the witness' possible motivation to speak falsely. [The jury] thus remained free to exercise its collective judgment to reject what it did not find trustworthy or plausible.

*Id*. at 149. The instruction that is at issue here is entirely consistent with the foregoing reasoning. In other words, the issue in *Cupp* is inapposite to this claim.

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not challenging the constitutionality of the witness credibility jury instruction was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is without merit.

### b. Premeditation and Deliberation

The petitioner claims that defense counsel were ineffective for not objecting to the jury instruction defining "premeditation" and "deliberation." (DE # 18, ¶ 8.k.2), p. 11) The petitioner incorporates ¶ 16 of the instant petition by reference.[45] In ¶ 16, the petitioner asserts that the instructions that "premeditation could be conceived and deliberately formed in an instant" and that premeditation "could be inferred f[ro]m repeated blows" are contrary to *State v. Brown*, 836 S.W.2d 530 (Tenn. 1992).

It is true that the Tennessee Supreme Court determined in *Brown* that the parts of the instruction to which the petitioner refers should be abandoned. However, the petitioner was tried in 1990, and the Tennessee Supreme Court's opinion in *Brown* was not rendered until 1992. Defense counsels' representation cannot be held to be deficient based on a state court ruling that was

---

[45]     As previously noted in ¶ 16, *supra* at p. 30, the petitioner's claim in ¶ 16 is procedurally defaulted for purposes of federal *habeas corpus* review. However, the factual allegations that comprise ¶ 16 are not procedurally defaulted for purposes of federal *habeas corpus* review to the extent that they form the basis of this ineffective assistance claim.

not in effect at the time of the ineffective assistance alleged. Even if the court were to determine that the model set forth in *Brown* existed in some fashion at the time of the petitioner's trial, federal *habeas corpus* courts may not grant relief on a jury-instruction claim simply because the instruction may have been deficient in comparison to some state-law model. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

In addition to the foregoing, the Tennessee Supreme Court has held that the ruling in *Brown* is not to be applied retroactively, except as provided in *Meadows v. State*, 849 S.W.2d 748 (Tenn. 1993). *See Miller v. State*, 54 S.W.3d 743, 745 (Tenn. 2001); *State v. Hall*, 958 S.W.2d 679, 711 (Tenn. 1997). Under *Meadows*, newly announced state constitutional rules are to be applied retroactively only to cases at trial or on direct appeal. *Meadows*, 849 S.W.2d at p. 754. On vacating and remanding a district court's judgment for applying *Brown* retroactively in another case, the Sixth Circuit explained that, "When and how a state applies a particular case is a matter on which the state supreme court has the last word. . . . No federal issues are implicated and no federal question is presented in determining whether change in state law is to be applied retroactively." *Houston v. Dutton*, 50 F.3d 381, 384-85 (6th Cir. 1995); *see also Estelle*, 502 U.S. at 67-68 (1991)("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law' . . . [I]t is not the province of a federal habeas corpus court to reexamine state court determinations on state law questions.")(citation omitted).

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not challenging the constitutionality of the premeditation and deliberation jury instruction was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is without merit.

### c. Expert Testimony

The petitioner claims that defense counsel were ineffective for not objecting to the jury

93

instruction pertaining to expert witness testimony. (DE # 18, ¶ 8.k.3), p. 11) The petitioner incorporates by reference pp. 92-93 of his brief in the Tennessee Supreme Court on post-conviction. For reasons previously explained, *supra* at pp. 34-40, 42-43, 54, this claim also is procedurally defaulted for purposes of federal *habeas corpus* review. Once again, however, the court will address this claim anyway.

The petitioner argues that the expert witness jury instruction "is essentially a direction to the jury to reject expert testimony outright . . . ." (DE # 14, Add. 18, ¶ IX.C.6, p. 93) The instruction at issue is quoted below in its entirety:

> Expert testimony should be received by you with caution. While expert testimony is sometimes the only means of, or the best way of reaching the truth, yet it is largely a field of speculation, beset with pitfalls and uncertainties and requires careful and intelligent evaluation on your part if it is to be a valid means of reaching the truth. You are not bound to accept expert testimony, but you should give it such weight and value as you think it deserves along with all the other evidence in the case, governed by the purpose to arrive at the truth.

(DE # 12, Add. 1, Bk. 8 of 9, p. 2968)

Thirteen witnesses were called during the defense's case in chief: Detective Smith, three employees of the Gold Rush restaurant, two Maintenance Service Corporation co-workers, a Seal Master employee, four family members, a florist, and the petitioner himself. None of these witnesses was offered as an expert. Therefore, the only expert testimony to which the offending instruction could have pertained was that offered by the prosecution's expert witnesses, in which case, the instruction was solely to the petitioner's advantage. Because this claim lacks an arguable basis in law or fact, it is frivolous. *Neitzke v. Williams*, 490 U.S. 319, 327-28 (1989)(an argument is frivolous and warrants dismissal when it lacks an arguable basis in law or fact); *Brown v. Bargery*, 207 F.3d 863, 866 (6th Cir. 2000); *see also Lawler v. Marshall*, 898 F.2d 1196, 1198-99 (6th Cir.

94

1990)(an argument lacks an arguable basis in law or fact if it contains factual allegations that are fantastic or delusional, or if it is based on a legal theory that is indisputably meritless).

Disregarding the frivolity of this claim for a moment, even if Detective Smith's testimony – the thrust of which was the petitioner's reaction when he learned that Judith, Chad and Jason had been murdered – were proffered as expert testimony, this claim still would be without merit. Specifically, in his Rule 11 brief on post-conviction, the petitioner relied on *State v. Phipps*, 883 S.W.2d 138 (Tenn. Cr. App. 1994), arguing that *Phipps* found "the specific instruction in this case . . . to be invalid." (DE # 14, Add. 18, p. 93) While it is true that the language of the instruction at issue in *Phipps* was the same as the language in the instruction before the court, *Phipps*, and the unpublished case on which *Phipps* relied, *State v. Donald Givens*, No. 01C01-9910-CC-00312 (Tenn. Crim. App., Nashville, Feb. 11, 1993), were decided after the petitioner's trial. *Phipps*, 883 S.W.2d at 152. As reasoned, *supra* at p. 93, the petitioner cannot maintain a claim of ineffective assistance of counsel based on a case that was decided after the alleged ineffective assistance of counsel occurred.

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not challenging the constitutionality of the expert witness credibility jury instruction was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is without merit.

### d. Reasonable Doubt

The petitioner claims that defense counsel were ineffective because they did not object to the "reasonable doubt" jury instruction. (DE # 18, ¶ 8.k.4), p. 11) The petitioner incorporates ¶ 9

of his petition by reference.[46]

The "reasonable doubt" jury instruction at issue is quoted below, the highlighted portions of which are the parts that the petitioner argues make the instruction unconstitutional.

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and inability, after such investigation, to *let [the] mind rest easily as to the certainty of guilt*. Reasonable doubt does not mean a captious, possible or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but *moral certainty* is required as to every proposition of proof requisite to constitute the offense.

(DE # 14, Add. 13, Ex. 3, p. 2975)(emphasis added) Notwithstanding the petitioner's argument, the Sixth Circuit has held that the following "reasonable doubt" instruction passed constitutional muster:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability after such investigation to *let the mind rest easily upon the certainty of guilt*. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but *moral certainty* is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

*Austin v. Bell*, 126 F.l3d 843, 846-47 (6th Cir. 1997)(emphasis added); *see Coe,* 161 F.3d at 329. The highlighted areas show that the language at issue is the same.

The petitioner also claims that the highlighted portion of the following associated instruction renders the overall instruction unconstitutional:

> Before a verdict of guilty is justified, the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole to a *satisfactory conclusion* and producing, in effect, a *moral certainty* that the defendant, and no one else, committed the offense.

(DE # 14, Add. 13, Ex. 3, p. 2974)(emphasis added)  In *Cone,* 243 F.3d at 961, the Sixth Circuit

---

[46]  As previously discussed in ¶ 9, *supra* at p. pp. 26-27, the petitioner's claims in ¶ 9 are procedurally defaulted for purposes of federal *habeas corpus* review.  However, the factual allegations that comprise the claim in ¶ 9 are not procedurally defaulted for purposes of *federal habeas* corpus review to the extent that they form the basis of this ineffective assistance claim.

96

considered the following language:

> Before a verdict of guilty is justified, the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole to a ***satisfactory conclusion*** and producing in effect a ***moral certainty*** that the defendant, and no one else, committed the offense.

*Id*. at 972 (emphasis added).  The Sixth Circuit determined that this identical language was not unconstitutional.  *Id*.

Finally, the petitioner argues that "the whole standard of 'reasonable doubt' was undermined by the fact that the jury allegedly was instructed to determine guilt under their own standard of proof," *i.e.*, to "'render [their] verdict with absolute fairness and impartiality *as you think truth and justice dictate*."  (DE# 18, ¶ 9.a.1)(c), p. 12 (citing DE # 14, Add. 3, Ex. 4, p. 2978))(italics in the original)  The petitioner's claim pertains to the following instruction:

> You can have no prejudice or sympathy or allow anything but the law and the evidence to have any influence on your verdict.  You must render your verdict with absolute fairness and impartiality as you think justice and truth dictate.

(DE # 12, Add. 1, Bk. 8 of 9, Vol. XX, p. 2978)

The petitioner argues that the instruction above pertains to the "reasonable doubt" instruction.  However, from the record, it appears more likely that this instruction was given in connection with trial court's repeated admonition that the jurors are the "exclusive judges of the facts in this case . . ." and that each of them was required to "decide the case [them]sel[ves] . . . ." (DE # 14, Add. 13, Ex. 3, pp. 2945,  2978)  Even if this instruction were intended to instruct as to "reasonable doubt," given the context in which the instruction was provided, it cannot be seen as having given *carte blanche* to the jurors to devise and use their own standard of proof.

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not challenging the constitutionality of the reasonable doubt jury instruction was not

97

contrary to, or a unreasonable application of, clearly established federal law.  Accordingly, this claim is without merit.

### 10.  Whether Defense Counsel Were Ineffective for Not Objecting to Jury Instructions at Sentencing

The petitioner argues that defense counsel were ineffective at the sentencing phase of trial for not objecting to the following jury instructions: a) the HAC aggravating circumstance; b) the "felony-murder" aggravating circumstance; c) reasonable doubt; d) the credibility of expert witnesses; e) the credibility of lay witnesses; f) the instruction that allegedly shifted the burden of proof to the petitioner to show the existence of mitigating circumstances; g) the instruction that "misled the jury into believing that mitigating circumstances had to be found unanimously . . . ." (DE # 18, ¶ 12.d, p. 21-22)  On post-conviction, the Court of Criminal Appeals observed that the Tennessee Supreme Court previously had upheld the constitutionality of these jury instructions and, as such, determined that defense counsels' failure to object to them did not constitute ineffective assistance.  (DE # 14, Add. 17, pp. 51-52)

### a.  The HAC Aggravating Circumstance Instruction

The petitioner argues that the HAC aggravating circumstance instruction considered by the jury was "unconstitutionally vague and overbroad."  (DE # 18, ¶ 12.c.1; DE # 32, ¶ III, pp. 20-22; DE # 47, ¶ III, pp. 6-9; DE # 103, ¶ I.B.2, pp. 27-29; DE # 109, ¶ II.B, pp. 17-18)  The petitioner incorporates ¶ 11.a of his petition by reference into this claim.[47]

The HAC aggravating circumstance instruction required that the jury find the following for it to apply: "The murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind."  (DE # 14, Add. 1, Bk. 9 of 9, Vol. XXII, p. 3278)  The trial court defined the

---

[47]  As previously discussed at ¶ 11, *supra* at p. pp. 27-28, ¶ 11.a is procedurally defaulted for purposes of federal *habeas corpus* review.  However, the factual allegations that comprise the claim in ¶ 11.a are not defaulted for purposes of federal *habeas corpus* review to the extent that they form the basis of this ineffective assistance claim.

terms as follows: 1) "'HEINOUS' means grossly wicked or reprehensible; abominable; odious; vile."; 2) "'ATROCIOUS' means extremely evil or cruel; monstrous; exceptionally bad; abominable."; 3) "'CRUEL' means disposed to inflict pain or suffering; causing suffering; painful."; 4) "'TORTURE' means the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious."; 5) "'DEPRAVITY' means moral corruption; wicked or perverse act." (DE # 14, Add. 1, Bk. 9 of 9, Vol. XXII, pp. 3278-3279)

In *Bell v. Cone*, __ U.S. __, 125 S.Ct. 847 (2005), the United States Supreme Court addressed the same Tennessee HAC aggravating circumstance instruction that is at issue here. In *Cone*, the Court determined that the manner in which the Tennessee Supreme Court applies its "narrowing construction" to the HAC aggravating circumstance is not unconstitutionally vague. *Id*. The Court went on to add, "we think this interpretation of the [HAC] aggravating circumstance, standing alone, would be sufficient to overcome the claim that the aggravating circumstance applied by the state court was 'contrary to' clearly established federal law under 28 U.S.C. § 2254(d)(1)." *Id*. at 854-55. Because the instruction given at the petitioner's trial was the same as the instruction at issue in *Cone*, the court concludes that the instruction at issue here is not unconstitutional.

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not challenging the constitutionality of the jury instruction on the HAC aggravating circumstance was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is without merit.

### b. The "Felony-Murder" Aggravating Circumstance Instruction

The petitioner claims that defense counsel were ineffective for not objecting to the "felony-murder" jury instruction. (DE # 18, ¶ 12.c.3), p. 21; DE # 103, ¶ I.B.2, p. 28) He incorporates ¶ 11

of his petition by reference, the applicable portion of which is ¶ 11.b.[48]

Notwithstanding the petitioner's argument as to the constitutionality of the "felony-murder" aggravating circumstance in ¶ 11.b, nowhere in ¶ 11.b does the petitioner address the issue of ineffective assistance of counsel. Because the petitioner provides no factual allegations pertaining to his ineffective assistance claim in ¶ 12.c.3), this claim is conclusory. As previously discussed, *supra* at p. 62, conclusory claims do not provide grounds for *habeas corpus* relief. Once again however, the court will address this claim anyway.

Merging ¶ 12.c.3) with ¶ 11.b, the following three claims emerge: 1) ineffective assistance for failure to object to the instruction, because the jury "acquitted" the petitioner on the felony-murder counts, counts 3 and 5; 2) ineffective assistance for failure to object to the instruction, because applying the felony-murder aggravating circumstance under the facts of this case involved double counting; 3) ineffective assistance for failure to object to the instruction because there was no "'new 'sentencing calculus as to each sentence on which the jury relied . . . ."

With respect to the first part of this ineffective assistance claim, the United States Supreme Court defines an acquittal as "a resolution . . . of some or all of the factual elements of the offense charged." *Lee v. United States*, 432 U.S. 23, 30 n. 2 (1977). There was no resolution regarding the two counts of felony murder, counts 3 and 5. Rather, the jury merely complied with the trial court's instruction that it could find the petitioner guilty of one or the other of the two charges pertaining to Chad and Jason (DE # 12, Add. 1, Bk. 8 of 9, Vol XX, pp. 2959-2960), but not both, which had they done otherwise, would have constituted double jeopardy. Neither has the petitioner cited any relevant authority, binding or otherwise, in support of his apparent argument that a criminal

---

[48]    As previously noted in ¶ 11, *supra* at pp. 27-28, the claim set forth in ¶ 11.b is procedurally defaulted for purposes of federal *habeas corpus* review. However, the factual allegations that comprise the claim in ¶ 11.a are not procedurally defaulted for purposes of federal *habeas corpus* review to the extent that they form the basis of this ineffective assistance claim.

100

defendant must be convicted of felony-murder before the felony-murder aggravating circumstance applies. Because this part of the petitioner's claim lacks an arguable basis in law or fact, it is frivolous. *See Neitzke*, 490 U.S. at 327-28; *Brown*, 207 F.3d at 866; *see also Lawler*, 898 F.2d at 1198-99. As to the remainder of this claim, the Sixth Circuit has previously held that the petitioner's "double counting" and "new sentencing calculus" arguments are without merit. *Coe*, 161 F.3d at 334-335, 349-350.

As reasoned above, the petitioner has not established that defense counsels' representation was deficient for not challenging the instruction on the "felony-murder" aggravating circumstance. Accordingly, this claim is without merit.

### c. The Reasonable Doubt Instruction

The petitioner claims that defense counsel were ineffective for not objecting to the "reasonable doubt" jury instruction, which he contends "lessened the prosecution's burden of proof . . . ." (DE # 18, ¶ 12.c.4), p. 21)  The instruction at issue, the petitioner's claim, and the court's analysis of that claim are identical to that previously addressed, *supra* at pp. 96-98.  This claim is without merit.

### d. The Expert Witness Credibility Instruction

The petitioner asserts that defense counsel were ineffective for not objecting to the jury instruction pertaining to the credibility of expert witness testimony. (DE # 18, ¶ 12.c.5), p. 21)  The petitioner incorporates by reference ¶ 19 of his petition.[49]  The jury instruction at issue is the same instruction previously addressed, *supra* at pp. 94-96.

The petitioner asserts that counsel at the sentencing phase provided ineffective assistance of counsel "[f]or failing to object to [the] jury instruction[] . . . [pertaining to] [e]xpert witnesses, which watered down his proof at sentencing by telling jurors to receive it with caution, and that it involved 'a field of speculation . . . .'" (DE # 18, ¶ 12.c.5), p. 21)  In ¶ 19, the petitioner asserts that the instruction "unconstitutionally watered down [his] proof at sentencing by telling jurors to receive it with caution, and that it involved 'a field of speculation,'" thereby depriving him of a "fair and reliable sentencing hearing, in violation of the Eighth and Fourteenth Amendments." (DE # 18, ¶ 19, p. 26)  Paragraph 12.c.5) provides no factual allegations in support of this claim.  Neither does ¶ 19.  Consequently, this claim is conclusory, and as previously established, *supra* at pp. 61-62, conclusory claims do not provide grounds for *habeas corpus* relief.  Once again, however, the court

---

[49]    As previously noted in ¶ 18, *supra* at p. 31, the claim set forth in ¶ 19 is procedurally defaulted for purposes of federal *habeas corpus* review.  However, the factual allegations that comprise the claim in ¶ 19.a are not procedurally defaulted for the purposes of federal *habeas corpus* review to the extent that they form the basis of this ineffective assistance claim.

Case 3:99-cv-00731   Document 201   Filed 09/30/05   Page 102 of 144 PageID #: 102

will address this claim anyway.

At the sentencing phase, defense counsel called only two witnesses who were proffered as experts: Joanne Sexton, a pediatric neurologist, and Dr. Jillian Blair, a psychologist. Sexton testified very briefly as to the condition of Merl Smith, the petitioner's severely retarded son. (DE 12, Add. 1, Bk. 9 of 9, Vols. XXI, pp. 3124-3127; XXII, pp. 31563208) However, apart from introducing Merl Smith's condition into evidence, nothing in Sexton's testimony linked the condition of the petitioner's son to the death sentence that the petitioner was facing. In other words, there was nothing in Sexton's testimony that, even if it had been disregarded by the jury in its entirety because of the instruction, would have changed the outcome of the sentencing phase of the trial.

Doctor Blair, on the other hand, testified at length about the petitioner's mental health. However, during her testimony, Dr. Blair testified that her field of expertise was not an exact science, that the tests on which she primarily relied had been revised repeatedly because of problems, and that cautions accompanied the test on which she relied, primarily not to use the results of those tests in legal proceedings. (DE # 12, Add. 1, Bk. 9 of 9, Vol. XXII, pp. 3193-3194, 3208) In other words, Dr. Blair's testimony tended, if anything, to verify the validity of the instruction. Thus, even if it would have been the better practice to challenge the instruction, and even if the instruction had been challenged successfully, Dr. Blair's testimony itself would have conveyed the same sense of caution/skepticism to the jury.

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not challenging the constitutionality of the expert witness credibility jury instruction was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is without merit.

103

### e. The Witness Credibility Instruction

The petitioner asserts that defense counsel provided ineffective assistance by not objecting to the jury instruction pertaining to the credibility of witnesses. (DE # 18, ¶ 12.c.6), p. 21) The instruction at issue, the petitioner's claim, and the court's analysis of that claim are identical to that previously addressed, *supra* at pp. 89-92. This claim is without merit.

### f. The Alleged Burden-Shifting Instruction

The petitioner asserts that defense counsel was ineffective for not objecting to the jury instruction that "shifted the burden of proof to [the petitioner] to show the existence of mitigating circumstances."[50] (DE # 18, ¶ 12.c.7), p. 21) The petitioner incorporates ¶ 20.c of his petition by reference, in which he refers the court to the trial transcript (DE # 12, Add. 1, Bk. 9 of 9, Vol. XXII, pp. 3275-3276), where the instruction at issue is located, and from there to his Rule 11 application for permission to appeal in the Tennessee Supreme Court on post-conviction (DE # 14, Add. 18, p. 88-90).

In the relevant part of his Rule 11 application, the petitioner argues that the statute provides no guidance pertaining to: 1) if the prosecution or the defense "has the burden of proving whether the mitigation outweighs aggravation; 2) what standard of proof the jury uses "in determining whether mitigation outweighs aggravation." (DE # 14, Add. 18, p. 89) The petitioner argues further that the language in the statute "is compounded . . . because the statute . . . infers that the burden is actually on the defendant, not the state." (DE # 14, Add. 18, ¶ IX.C.4.iii, p. 89)

The record shows that the following points were stressed throughout *voir dire*. (DE # 12, Add. 1, Bks. 3-5 of 9, Vols. V-XII) First, it was explained to the potential jurors that the State was

---

[50]    For reasons previously explained in ¶ 19, *supra* at p. 31, the petitioner's claims set forth in ¶ 20, ¶ 20.c of which is incorporated into this claim by reference, was determined to be procedurally defaulted for purposes of federal *habeas corpus* review. However, the factual allegations that comprise the claim in ¶ 20.c are not procedurally defaulted to the extent that they form the basis of this ineffective assistance claim.

Case 3:99-cv-00731   Document 201   Filed 09/30/05   Page 104 of 144 PageID #: 104

required to prove its case in the guilt/innocence phase "beyond a reasonable doubt to a moral certainty"; otherwise the trial was over. Second, it was explained to the potential jurors that it was the State's responsibility to prove "beyond a reasonable doubt to a moral certainty" that there was at least one aggravating circumstance; otherwise the death penalty could not be imposed. Third, it was explained to the potential jurors that, if the State proved the existence of at least one aggravating circumstance, it was up to the jury to weigh the aggravating circumstances against the mitigating circumstances, not up to the defendant to prove that the mitigating circumstances outweighed the aggravating circumstances. In addition to the foregoing, in returning the death sentence against the petitioner, each and every juror signed a statement in which he or she affirmed that each found that the "statutory aggravating circumstance or circumstances . . . outweigh[ed] the mitigating circumstance or circumstances beyond a reasonable doubt," demonstrating that they understood and complied with the instructions provided *during voir dire*. (DE # 12, Add. 1, Bk. 1 of 9, pp. 229-231) Similar considerations have been held by the Sixth Circuit to counter claims of burden shifting such as the petitioner's. *Hill v. Mitchell*, 400 F.3d 308 (6th Cir. 2005).

From the foregoing, and the record as a whole, the court concludes that the jury understood on whom the burden of proof fell, that the standard of proof when weighing the aggravating circumstances against the factors in mitigation was "beyond a reasonable doubt," and that each and every member of the jury was aware of, understood, and complied with those instructions.

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not challenging the constitutionality of the alleged burden shifting jury instruction was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is without merit.

g. Instructions Containing the Term "Unanimously"

The petitioner argues that jury instructions using the term "'unanimously' . . . misled the jury into believing that mitigating circumstances had to be found unanimously . . . .." (DE # 18, ¶ 12.c.8), pp. 21-22)  The petitioner refers the court to pp. 3276-3278 of the trial transcript, among which the offending instructions may be found.

Apart from referring the court to the applicable pages in the trial transcript, the petitioner does not provide any argument, citation to relevant authority, references to the record, or any facts in support of this claim.  Therefore this claim is conclusory.  For reasons previously explained, *supra* at pp. 61-62, conclusory claims will not provide the basis for *habeas corpus* relief.

In his Rule 11 application, the petitioner provides a brief argument regarding this claim. Citing *Houston*, 50 F.3d at 381, the petitioner writes that "[a] federal court has held there is a reasonable probability that jurors interpret such . . . instruction[s] so as to preclude the full consideration of mitigating evidence." (DE # 14, Add. 18, p. 88)  It does not appear from the record that this claim was raised in state court prior to being raised in the instant action.  For reasons previously explained, *supra* at pp. 34-40, 42-43, 54, this claim is procedurally defaulted for purposes of federal *habeas corpus* review.

Notwithstanding the fact that this claim is both conclusory and procedurally defaulted for purposes of federal *habeas corpus* review, the court will address it anyway.

*Houston* does not stand for the proposition alleged by the petitioner, *i.e.*, that "unanimous" instructions are interpreted by the jurors in a way that precludes full consideration of mitigating evidence.  Rather, it was the brevity of the trial court's instruction in *Houston* that violated the petitioner's constitutional rights.  *Houston*, 50 F.3d at 382, 387.  The issue of "unanimity" played no role in the Sixth Circuit's ruling in that case.  Notwithstanding the fact that *Houston* is inapposite to this claim, the Sixth Circuit has determined at least twice since *Houston* that such instructions do

106

not violate a criminal defendant's constitutional rights. *See Abdur'Rahman v. Bell*, 226 F.3d 696, 712 (6th Cir. 2000); *Coe*, 161 F.3d at 337-338. Even if it were possible to construe *Houston* in the petitioner's favor, and even if *Abdur'Rahman* and *Coe* had not already decided the issue, *Houston* was decided in 1995, five years after the petitioner's trial and direct appeal had concluded. As previously explained, *supra* at p. 93, defense counsels' representation cannot be viewed as having been deficient based on a ruling that was not in effect at the time of the ineffective assistance alleged.

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not challenging the use of the word "unanimously" in the jury instructions was not contrary to, or an unreasonable application of, clearly established federal law. Even assuming that the defense ought to have challenged this instruction, the petitioner has failed to establish that he was prejudiced because they did not do so. Accordingly, this claim is without merit.

### 11. Whether Defense Counsel Were Ineffective for Not Objecting to Improper Argument

The petitioner claims that defense counsel were ineffective for not objecting to allegedly improper opening and closing arguments by the prosecution. (DE # 18, ¶ 12d, pp. 22-23; DE # 12, ¶ VI, p. 14; DE # 103, ¶ I.B.3, pp. 29-30) The specific elements of this claim include that the prosecution: 1) relied on its own expertise in arguing for the death penalty; 2) inflamed the jury by calling the case one of the most horrible ever seen by the prosecutors; 3) inflamed the jury by referring to the crime scene as a slaughter house, where the petitioner had worked once; 4) made statements about insurance money, unsupported by the record; 5) argued that a life sentence was not a life sentence; 6) made false statements about the petitioner's arrest record; 7) made remarks designed to relieve the jury of its responsibility. (DE # 18, ¶ 13, pp. 22-23)

The Court of Criminal Appeals addressed this issue on post-conviction, concluding that the

decision not to object to the prosecutor's "brief and limited statements" was a matter of trial strategy.[51]  (DE # 14, Add. 17,  pp. 50-51)  The Court of Criminal Appeals determined further that the petitioner failed to show how objecting would have resulted in a different verdict in view of the "overwhelming evidence against him."  (DE # 14, Add. 17,  pp. 50-51)

Because defense counsel did not object, the court analyzes this claim for plain error.  *See United States v. Collins,* 78 F.3d 1021, 1039 (6th Cir. 1996). To establish plain error on a claim for prosecutorial misconduct, the petitioner must show that the comments made by the prosecutor were improper and so flagrant that, when viewed in context, they would undermine the fundamental fairness of the trial and contribute to a miscarriage of justice.  *United States v. Young,* 470 U.S. 1, 16 (1985); *United States v. Beverly,* 369 F.3d 516, 543 (6th Cir. 2004). In considering whether the prosecutor's statements were flagrant, thereby rendering the trial fundamentally unfair, the court evaluates four factors: 1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; 2) whether the conduct or remarks were isolated or extensive; 3) whether the remarks were deliberately or accidentally made; and 4) whether the evidence against the defendant was strong.  *United States v. Modena,* 302 F.3d 626, 635 (6th Cir. 2002)(citing *United States v. Carter,* 236 F.3d 777, 783 (6th Cir.2001)); *see also United States v. Monus,* 128 F.3d 376, 394 (6th Cir.1997).

The court assumes for the sake of discussion that the argument at issue was improper.  Thus, the next step is to determine whether the argument was flagrant.  In assessing the factors under *Modena*, the court concludes that the prosecution's argument did not mislead the jury and that the challenged statements were isolated rather than extensive.  Although it would appear that the statements were deliberately made, because of the overwhelming weight of evidence against the

---

[51]  For instance, objecting to the horror of the crime scene would have been inconsistent with the petitioner's alibi defense.

petitioner, the court concludes that these few inappropriate remarks did not prejudice the petitioner or undermine the fundamental fairness of the trial, resulting in a miscarriage of justice.

The Court of Criminal Appeals' determination that defense counsels' representation was not deficient for not objecting to the prosecution's improper argument was not contrary to, or an unreasonable application of, clearly established federal law. Even assuming that it would have been the better practice to have objected, the petitioner has failed to establish that he was prejudiced because defense counsel did not. Accordingly, this claim is without merit.

### 12. Whether Counsel on Appeal was Ineffective

The petitioner argues that "appellate counsel failed to present any and all meritorious issues on direct appeal, including those cited , and all issues contained in this petition for a writ of habeas corpus, ¶¶ 8 *et seq.*"[52] (DE # 18, ¶ 24, p. 30; DE # 109, ¶ III, p. 17) In particular, the petitioner claims that counsel on appeal was ineffective for not raising the issue of trial court error for not providing the following jury instructions requested at trial: a) that a life sentence is a life sentence; b) that any lingering or residual doubt should be considered as a mitigating circumstance; c) that mercy was appropriate in capital sentencing; d) that mitigation evidence is not a justification or excuse; e) that further defined balancing mitigating and aggravating factors; f) that cooperation with law enforcement officers is properly considered as mitigating evidence.[53] (DE # 18, ¶¶ 24.a-1)-6), p. 30)

As previously noted, *supra* at p. 41, when evaluating the assistance of counsel on appeal, the court looks to the analysis provided by *Strickland*. The law is well established that *Strickland* does

---

[52]    As previously noted, *supra* at p. 24 n. 9, this claim cuts too broadly, thereby failing to satisfy the requirements of Rule 2(c), Rules – 2254 Cases. Consequently, the court will address only those claims of ineffective assistance of appellate counsel specifically set forth in the petition.

[53]    As previously established in ¶ 23, *supra* at p. 33, 34-40, 42-43, 54, ¶¶ 24.a.7)-8) and ¶ 24.b are procedurally defaulted for purposes of federal *habeas corpus* review.

Case 3:99-cv-00731   Document 201   Filed 09/30/05   Page 109 of 144 PageID #: 109

not require appellate counsel to raise every non-frivolous claim on appeal. *Caver v. Straub*, 349 F.3d 340, 348-49 (6th Cir. 2004). Indeed, the courts have acknowledged that the process of "winnowing out weaker arguments on appeal and focusing on those more likely to prevail . . . is the hallmark of appellate advocacy." *Id.* (citations omitted).

Apart from enumerating numerous jury instructions not given that the petitioner claims should have been raised on direct appeal, the petitioner provides no argument, citation to relevant authority, references to the record, or any facts in support of this claim. As previously established, such claims are conclusory, and as explained, *supra* at pp. 61-62, and do not provide grounds for *habeas corpus* relief. However, the court will address this claim anyway.

In its opinion on appeal on post-conviction, the Court of Criminal Appeals identified the proper legal standard, *i.e.*, *Strickland*. (DE # 14, Add. 17, p. 54) With respect to the petitioner's claims pertaining to the issues that are the subject of this analysis, the Court of Criminal Appeals wrote:

> The petitioner contends it was error for appellate counsel not to challenge the trial court's refusal to give the jury all of the petitioner's requested instructions . . . . Counsel, however, testified that he did not think he would have succeeded by raising these issues on appeal. Moreover, the petitioner ***has failed to cite to any relevant authority holding that failure to provide these instructions was prejudicial***. . . . Again, the petitioner has failed to show how the appeal of his conviction and sentence would have differed had counsel raised these seemingly meritless issues.

(DE # 14, Add. 17, p. 53)(emphasis added) A review of the record shows that the Court of Criminal Appeals's determination was correct. Then, as now, apart from the very general claim that appellate counsel's representation was deficient, the petitioner makes no effort whatsoever to explain why it was. Neither does the petitioner make any effort to show that he was prejudiced by appellate counsel's alleged deficient representation.

The Court of Criminal Appeals' determination that appellate counsel's representation was not deficient was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, this claim is without merit.

### J. Evidentiary Hearing

Under the AEDPA, there are express limitations on a federal court's discretion to grant an evidentiary hearing. Section 28 U.S.C. 2254 provides the following:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim, unless the applicant shows that –
>
> (A) the claim relies on:
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

*Id*. at § (e). If the petitioner has not developed the factual basis of a claim in state court, the federal court may hold an evidentiary hearing only if the petitioner's factual allegations, if proved, would entitle him to relief. *Vroman v. Brigano*, 346 F.3d 598, 606 (6th Cir. 2003); *see also Byrd v. Collins*, 209 F.3d 486, 550 (6th Cir. 2000).

The court granted an evidentiary hearing regarding whether defense counsel were ineffective for not investigating: 1) the time of death of the victims; 2) the bloody palm print found at the crime

scene; 3) the broken knife found under the victims' home.  (DE # 116, p. 2)  The petitioner also was permitted to present evidence pertaining to the use of the ALS, "but only as it relate[d] to trial counsel's investigation of and objection to such evidence."  (DE # 116,  p. 2)  The evidentiary hearing was held on November 24, 2003.  (DE # 179)

1.  Whether Defense Counsel Provided Ineffective Assistance
by Not Investigating/Challenging
the Time of Death

This claim was raised in the petitioner's petition in the context of defense counsels' decision not to: 1)  "establish a defense to the charges and/or bolster the alibi defense . . . by conceding the prosecution's theory about the time of death . . . ." (DE # 18, ¶ 8.b, p. 4); 2) retain the services of a forensic pathologist (DE # 18, ¶ 8.d., p. 8); 3) obtain the services of a criminologist (DE # 18, ¶ 8.e.1), p. 8); 4) discuss the time of death with the petitioner (DE # 18, 8.h.1, p. 9).  On post-conviction, the Court of Criminal Appeals determined that the petitioner failed to show that he was prejudiced by defense counsels' failure to investigate the time of death.  (DE # 14, Add. 17)

In his brief in support of an evidentiary hearing, the petitioner argues that the proof concerning the time of death was incomplete at the post-conviction hearing.  (DE # 109, p. 13)  The petitioner asserted further that he would present evidence that "the prosecution's claims about the time of death were simply wrong." (DE # 109, p. 14)  More particularly, the petitioner alleged that the Davidson County Medical Examiner, Dr. Charles Harlan, was not competent to testify at the post-conviction hearing about the time of death.  (DE # 109, p. 14)  The question of Dr. Charles Harlan's competency will be discussed separately, *infra* at pp. 129-135.

At the *habeas corpus* evidentiary hearing, the petitioner offered the testimony of attorney Dean, lead defense counsel at the petitioner's trial, regarding the issue of the time of death.  (DE # 179, pp. 139-191)  Dean testified that the defense did not contest the time of death because the State could establish it by the 911 tape.  (DE # 179, p. 164, 167)  The petitioner also introduced a

112

newspaper article into evidence in which it was reported that Dr. Charles Harlan said that the murders could have occurred between 10:00 p.m. and 10:00 a.m. (DE # 179, p. 136-137, Ex. 3) When asked why the defense did not challenge the time of death based on that newspaper article, Dean testified that the defense team did not think that they could get around the 911 tape, but in any event, the defense team's strategy was to pursue an alibi defense, not to challenge the State's theory as to the time of death. (DE # 179, pp. 166-169)

At the *habeas corpus* evidentiary hearing, the petitioner also offered the testimony of Dr. Walter Hofman, M.D., a certified forensic pathologist. (DE # 179, pp. 8-20) Dr. Hofman testified that the time of death could not have been fixed at 11:30 p.m. because Dr. Charles Harlan did not: 1) examine the bodies until more than 4 hours after they were discovered; 2) document the presence or absence of rigor in parts of the body; 3) check the body temperature; 4) do a chemical analysis of the fluid in the victims' eyeballs. (DE # 179, pp. 14-17) As to Dr. Gretel Harlan's determination of the time of death, the Dr. Hofman testified that she did not examine the bodies until almost 24 hours later. (DE # 179, p. 15) According to Dr. Hofman, Dr. Gretel Harlan's testimony regarding the time of death was "misleading," because the time of death could have been as late as 8:00 to 9:00 a.m. the following morning. (DE # 179, p. 18) Dr. Hofman also testified that factors such as the 911 tape were not relevant in establishing the time of death. (DE # 179, p. 19)

The court assumes for the sake of argument that defense counsel's representation was deficient for not investigating/challenging the prosecution's theory as to the time of death. Thus, the question becomes whether the petitioner has established "a reasonable probability" that, but for defense counsels' hypothetical deficient representation, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Doctor Hofman's testimony clearly showed that it was possible to challenge the time of death – in a technical/scientific sense. However, the court concludes that Dr. Hofman

113

unrealistically failed to take into account the other evidence that supported the prosecution's theory as to the time of death, *i.e.*, the 911 tape. A jury would not be so restricted in their view of the evidence. On the contrary, given the impact of the 911 tape, the court concludes that most reasonable jurors would have perceived a challenge to the time of death along the lines advocated by Dr. Hofman as unpersuasive. Moreover, challenging the time of death would have undercut the petitioner's alibi defense, and the presentation of inconsistent defenses would indeed have been ineffective assistance of counsel. Dr. Sperry's testimony at the post-conviction evidentiary hearing, discussed *supra* at p. 78, supported that the time of death could have been just as the prosecution claimed.

From the foregoing, and the record as a whole, the court concludes that, although the defense might have investigated/challenged the prosecution's theory as to the time of death, the petitioner has not demonstrated that he was prejudiced by defense counsels' tactical decision not to do so. Having failed to establish the prejudice half of the two-part test under *Strickland*, the petitioner has failed to show that he received ineffective assistance of counsel. Therefore, this claim is without merit.

### 2. Whether Defense Counsel Provided Ineffective Assistance for Not Investigating the Bloody Palm Print Found at The Crime Scene

In his brief in support of an evidentiary hearing, the petitioner argued that "there was proof presented in post-conviction that examination of the palm print was not accurate," that "no expert for the defense . . . ever examined the sheet," and that he had "proof that the . . . bloody palm print on the sheet does not belong to him," *i.e.*, "that the print has a 'ring finger' which [the] petitioner does not have . . . ." (DE # 109, p. 13, 15) The Petitioner has made the same claim throughout these proceedings. (DE # 18, ¶ 8c.4), pp. 6; DE # 103, ¶ I.B.1.a), pp. 13-15; DE # 181, ¶ I.A.1-2, pp. 3-20)

114

This claim was raised in ¶ 8.c.4) of the petitioner's first amended petition in this action. However, as previously explained, in ¶ 3, *supra* at pp. 24-25, 34-40, 42-43, 54, this claim was not raised in any state court proceeding prior to its being raised in his petition for federal *habeas corpus relief*. Moreover, as will become clear, this claim does not meet any of the circumstances under 28 U.S.C. § 2254(e)(2) that authorize an evidentiary hearing where the factual basis of the claim was not raised in state court. Although in retrospect, an evidentiary hearing on this issue may have been improvidently granted, because proof relating to this issue was presented at the hearing, the court will address this claim.

Counsel questioned Sgt. Hunter at length at the *habeas corpus* evidentiary hearing about: 1) what he observed, and what equipment was available to him, at the crime scene; 2) the circumstances that led to his examining the sheet in January 1990, including his reasons for not examining it earlier; 3) what defense counsels' response was upon seeing the bloody palm print; 4) what he told the trial judge and defense counsel before, and during, trial regarding his observations and equipment available to him at the crime scene; 5) what defense counsel asked him at trial on cross-examination; 6) whether the ALS had been used as the basis of testimony in cases prior to the petitioner's. (DE # 179, pp. 46-107, 122-134)

Lead defense counsel, Dean, also was questioned at the *habeas corpus* evidentiary hearing about the bloody palm print. (DE # 179, pp. 139-192) Dean was asked: 1) when and how he first became aware of the bloody palm print; 2) whether there was any evidence related to the bloody palm print introduced by the FBI; 3) when and where he first saw the bloody palm print; 4) the attitude of the prosecution when defense counsel saw the bloody palm print; 5) whether he spoke to Sgt. Hunter after seeing the bloody palm print; 6) what Sgt. Hunter told him regarding the type of illumination that he had used at the crime scene; 7) who provided the information to the defense about the bloody palm print; 8) what Sgt. Hunter told him regarding what he had found when he saw

the bloody palm print at the crime scene; 9) what he asked Sgt. Hunter at trial; 10) whether it would have made any difference if the defense had known that Sgt. Hunter was unable to identify the bloody palm print at the crime scene; 11) whether he had any evidence to contradict Sgt. Hunter's testimony at trial; 12) whether the defense team had a strategic reason for not investigating the bloody palm print; 13) whether Sgt. Hunter had any training on the ALS.   (DE # 179, pp. 142-163)

The court assumes for the sake of argument that defense counsels' representation was deficient for not investigating the bloody palm print.  Therefore, the question becomes, once again, whether the petitioner has established "a reasonable probability" that, but for defense counsels' hypothetical deficient representation, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

It is clear from the record that no expert retained by the defense examined the sheet and bloody palm print prior to trial.  It is equally clear from the record that the post-conviction team did not raise this ineffective-assistance claim during state post-conviction proceedings, when the petitioner should have done so, but did not, despite the fact that the alleged evidence presented during the course of the present proceedings should have been apparent in those previous proceedings.  As discussed in detail *infra* at pp. 114-117, 120-128, 139-142, the record also is devoid of any *proof* that establishes that the analysis of the bloody palm print is incorrect, or that the bloody palm print is not the petitioner's.  Moreover, the petitioner made no effort to offer any *proof* at the *habeas corpus* evidentiary hearing that the bloody palm print is not the petitioner's, even though the lengthy examination of Sgt. Hunter offered ample opportunity to do so.

In his post-hearing brief, the petitioner repeated his claim that the bloody palm print does not belong to him, offering several arguments to support his claim.  (DE # 181, ¶ I.A.2, pp. 18-20 & Ex. 1-3)  As noted above, however, the petitioner made no effort to offer any such proof at the *habeas corpus* evidentiary hearing.  Moreover, as discussed in detail, *infra* at pp. 139-142, the report on

116

which the petitioner relies in support of his claim that the bloody palm print is not his does not support that conclusion.

The petitioner's reliance on *United States v. Havvard*, 117 F.Supp.2d 848, 853 (S.D. Ind. 2000) in his post-hearing brief to attack the points of identification on the bloody palm print is unpersuasive. First, *Havvard* does not constitute binding authority in the Sixth Circuit. Second, even if *Havvard's* "single-unexplained-discrepancy" rule did apply in the Sixth Circuit, the petitioner fails to rebut Sgt. Hunter's sworn testimony that the bloody palm print had "15 points of identification" and that there "were no dissimilarities that w[ere] not explainable." (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 2015) For reasons explained, *infra* at pp. 139-142, the report on which the petitioner relies (DE # 181, Ex. 1) amounts to comparing apples to oranges, the consequence of which is that the report lacks indicia of reliability sufficient to challenge Sgt. Hunter's testimony as to the points of identification.

From the foregoing, and the record as a whole, the court concludes that the petitioner has not demonstrated that he was prejudiced by defense counsels' decision not to investigate the bloody palm print. Having failed to establish the prejudice half of the two-part test under *Strickland*, the petitioner has failed to show that he received ineffective assistance of counsel. Therefore, this claim is without merit.

### 3. Whether Defense Counsel Were Ineffective
### for Not Investigating the Knife Found
### Under the Victims' House

The issue before the court at the *habeas corpus* evidentiary hearing was whether defense counsel were ineffective for not investigating the broken knife found under the victims' house. (DE # 18, ¶ 8.c.6), p. 6; DE # 23, ¶ II, pp. 5-6; DE # 103, ¶ I.B.1.b.1)b), pp. 15-16; DE # 105, p. 2; DE # 181, ¶ I.A.4, pp. 24-27)  That defense counsel were aware of the knife at the time of trial was established during the testimony of attorney Newman, defense co-counsel, at the post-conviction evidentiary hearing. (DE # 14, Add. 12, Vol. 9, pp. 1107-1109)

At the *habeas corpus* evidentiary hearing, the petitioner elicited testimony from attorney Dean on this issue. (DE # 179, pp. 139-191)  Dean testified, on the one hand that, to the best of his recollection, the first time he became aware of the knife was in 1996. (DE # 179, p. 172)  On the other hand, Dean testified that there were reports in his file from the defense team's investigator, Lisa Freeman, that showed the knife had been found under the victims' house well before trial, leading Dean to admit that "[o]ne can conclude that I probably read that investigative report and knew it in 1990, but I can't tell you – I still don't recall that specifically of my own recollection." (DE # 179, pp. 174-176; DE # 14 Add. 13, Ex. 22.C-D)  Dean went on to conclude that, either the report was in the file and he did not read it, or the report was in the file and he read it, but took no action. (DE # 179, pp. 175-176)  Dean testified further that, had he been aware of the knife, he would have used it to impeach the quality of the police's investigation. (DE # 179, p. 173)

The court assumes for the sake of argument that defense counsel's representation was deficient for not investigating/challenging the prosecution's theory as to the time of death.  Thus, the question becomes whether the petitioner has established "a reasonable probability" that, but for defense counsels' hypothetical deficient representation, "the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

118

The petitioner presented expert testimony at the *habeas corpus* evidentiary hearing from Mr. Gary Harmor of the Serological Research Institute in Richmond, California. (DE # 179, pp. 21-46) Harmor testified regarding DNA tests that were performed on the broken knife in preparation for the *habeas corpus* evidentiary hearing. The DNA tests were conducted on a single stain on the handle, approximately one-third of an inch in diameter, the only blood found on the knife. (DE # 179, p. 25, 39-40) Using reference profiles of the petitioner, Judith, Chad and Jason, Harmor testified that the blood matched Chad's DNA (DE # 179, pp. 31-34) but did not match the petitioner's, Judith's, or Jason's (DE # 179, pp. 32-33). Harmor also testified that the results of the test he performed could not have been provided at the time of the time of trial, because procedures available at the time of trial required more blood than was on the knife. (DE # 179, pp. 42-43)

Based on Harmon's testimony at the *habeas corpus* evidentiary hearing, the court concludes the following. First, the small amount of blood on the handle of the knife could have not produced meaningful test results at the time that the trial was held in this case. Second, even assuming that the blood on the handle would have been sufficient, Harmon testified that the blood on the knife matched only Chad's DNA, not the petitioner's, Judith's, or Jason's. Third, the absence of any of the petitioner's blood carries little weight, given the very superficial nature of the petitioner's injuries that were documented the day after the murders. Fourth, if the knife were used in the murders, a reasonable juror would have expected that the blood of all three victims would have been found on it, in that there was no indication at trial that more than one knife was used in the murders. Fifth, notwithstanding the petitioner's claim to the contrary, no evidence was offered at the *habeas corpus* evidentiary hearing that the knife was cleaned or otherwise tampered with; nor apart from unsupported allegations on post-conviction, is there anything in the record that would support such

an inference.[54] Sixth, and perhaps most important, Dr. Gretel Harlan testified at trial that the fatal

stab wounds were not made by a knife with a serrated edge (DE # 12, Add. 1, Bk. 7 of 9, Vol.,

XVIII, pp. 2572, 2600, 2610-2611), which the broken knife found under the house had. Finally, as

discussed *infra* at p. 139, it simply does not make any sense that the murderer would have gathered

up the broken pieces of the knife, taken them with him, and then discarded them under the house to

be found by investigators. From the foregoing, the court concludes that, even if defense counsel had

investigated the broken knife, a reasonable probability does not exist that the result of the trial would

have been different.

From the foregoing, and the record as a whole, the court concludes that the petitioner has not

demonstrated that he was prejudiced by defense counsels' decision not to investigate the knife found

under the house. Having failed to establish the prejudice half of the two-part test under *Strickland*,

the petitioner has failed to show that he received ineffective assistance of counsel. Therefore, this

claim is without merit.

### 4. Whether Defense Counsel Were Ineffective For Not Hiring a Forensic Criminologist to Assist With Sgt. Hunter's Testimony

The petitioner asserts the following with respect to this ground for relief and the expert

testimony challenged:

> The 'alternate light source' technique used by Detective Hunter was
> not reliable and highly prejudicial, and there was (and is) no proof
> that this purported technique is, from a scientific standpoint, either
> reasonably reliable or trustworthy. In fact, this purported technique
> was so lacking in acceptance as being relied upon by experts or
> trustworthy that Detective Hunter had never before testified

---

[54] The broken knife was introduced into evidence at the post-conviction hearing during the testimony of Detective McElroy. (DE # 14, Add. 12, p. 455) Although the post-conviction team tried to portray the evidence as having been secreted by Detective McElroy (DE # 14, Add. 12, pp. 453-494), the post-conviction court concluded just the opposite, *i.e.*, "I think it is, as far as the Court's concerned, a knife that is apparently from the testimony been in the Property Room for about six or seven years. . . ." (DE # 14, Add. 12, Vol. 8, 941)

concerning this alleged technique. Even the T.B.I. failed to use such a technique.

> With the test being unreliable and not valid as proof under accepted standards for the reliability of testimony (including those throughout the fifty states) its introduction in this case violated [the petitioner's] right to due process, to a fundamentally fair trial and sentencing hearing, and to a highly reliable determination of guilt and sentence, in violation of the Eighth and Fourteenth Amendments.

(DE # 18, ¶¶ 14.b-c, p. 23)(internal citations omitted)  The foregoing was raised in the instant proceedings in terms of trial court error.  The petitioner's request for an evidentiary hearing with respect to this issue was granted in the context of ineffective assistance of counsel.  (DE # 103, ¶ I.B.1b.1)a), pp.13-14; DE # 109, ¶ II.A, pp. 12-13DE # 181, ¶ I, p. 2)

As previously explained in ¶ 14, *supra* at p. 29, this claim was never raised in a state court proceeding.  Moreover, this claim does not meet any of the circumstances under 28 U.S.C. § 2254(e)(2) that authorize an evidentiary hearing where the factual basis of the claim was not raised in state court.  Although in retrospect an evidentiary hearing may have been improvidently granted with respect to this issue, the court will address this claim.

The record shows that Sgt. Hunter's testimony regarding the bloody palm print was  based on his certification as a latent fingerprint expert.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 1928) As to the use of the ALS, the record shows that a jury-out hearing was conducted that included the defense's challenge to Sgt. Hunter's expert testimony regarding its use.  (DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, pp. 1925-1930)  In that hearing, Sgt. Hunter testified that the ALS:

> has no effect [and] does not alter a print in any way.  It does not even touch the material that the print is on.  The only thing it does is shine – shine a light on it.  And by the use of filters, it enhances the print. . . . [by] making the ridge detail more visible and taking the background out.

(DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, p. 1921)  In overruling the defense's motion *in limine*

regarding the ALS testimony, the trial court observed that:

> Sergeant Hunter has testified in this Court numerous times, and I think is one of the most imminently qualified experts to have done so in his particular field . . . .
>
> I think that . . . the questions as to this particular technique will go to the weight of the evidence rather than the fact of whether or not he should testify. He's received training . . . from the manufacturer, but I understand it also was from a consultant who is a police officer who was trained in this technique. And I think the fact that this happens to be the first time it's been offered at a trial is not anything that would cause this Court not to allow the jury to consider it.
>
> Sergeant Hunter has indicated that he has used this particular alternate light source technique on a number of occasions, but this just happens to be the first time it's been offered. And I think there are a number of things that are done by witness trades [*sic*] and latent prints and the recovery of them that are used in developing the prints and making comparisons between known prints and latent prints. And I think this is just one added technique that I'm satisfied, Sgt. Hunter, is qualified to testify about.

(DE # 12, Add. 1, Bk. 6 of 9, Vol. XIV, pp. 1930-1931) Defense counsel subsequently cross-examined Sgt. Hunter in front of the jury about the ALS and attempted to call his testimony regarding its use into question by pointing out that he had been trained by the manufacturer and that, prior to his testimony at the petitioner's trial, he had never testified as to its use before. (DE # 12, Add. 1, Bk. of 9, Vol. XIV, pp. 2035-2037, 2040)

On direct appeal, the petitioner raised the same argument, in response to which the Tennessee Supreme Court wrote the following, in ruling that the trial court did not err in admitting Sgt. Hunter's testimony:

> Although the Defendant tries to characterize the alternate light source as a new and unique area of scientific expertise, it is apparent from the record that the machine is simply a tool, used by an examiner to make a fingerprint clearer for examination and comparison. The Defendant contends that light source is not trustworthy. Tenn. R. Evid. 703 provides that a 'court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.' The underlying facts in this case do not render

Sgt. Hunter's testimony untrustworthy or indicate in any way that the alternate light source is unreliable. The Defendant admits, and the record establishes, that Sgt. Hunter is an expert in the area of latent fingerprint comparison and blood and stain analysis and had been trained in the use of the alternate light source machine. Traditional fingerprint analysis, *i.e.*, comparison of ridges, whorls, and other identifying marks was used to establish that the palm print was the Defendant's.

(DE # 12, Add. 4, p. 576)

The court assumes for the sake of argument that defense counsel's representation was deficient for not securing the services of a forensic criminologist to assist with Sgt. Hunter's testimony pertaining to the ALS. Thus, the question becomes whether the petitioner has established "a reasonable probability" that, but for defense counsels' hypothetical deficient representation, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

At the *habeas corpus* evidentiary hearing, Sgt. Hunter was questioned at length about his actions both at the crime scene and prior to trial. However, the petitioner offered no proof to support his claim that the ALS is either untrustworthy or unreliable, a necessary showing to establish that the petitioner was prejudiced. In fact, the record of those proceedings is utterly silent as to the issue at hand. Instead, the questioning at the *habeas corpus* evidentiary hearing focused exclusively on Sgt. Hunter's veracity, an apparent effort to bolster the petitioner's *Brady* claim discussed *infra* at pp. 124-128.

Although no proof was adduced at the *habeas corpus* evidentiary hearing regarding the trustworthiness and reliability of the ALS, the court concludes, just as the Tennessee Supreme Court did, that the ALS is merely a tool used to make fingerprints clearer for examination and comparison. In other words, the ALS does not perform the analysis or produce the results. Rather, it merely permits the user to see the image more clearly. In that regard, using the ALS is no different than using a flashlight or a magnifying glass.

From the foregoing, and the record as a whole, the court concludes that the petitioner has not demonstrated that he was prejudiced by defense counsels' decision not to retain the services of a

Case 3:99-cv-00731   Document 201   Filed 09/30/05   Page 123 of 144 PageID #: 123

forensic criminologist to assist the defense with Sgt. Hunter's testimony pertaining to the ALS. Having failed to establish the prejudice half of the two-part test under *Strickland*, the petitioner has failed to show that he received ineffective assistance of counsel. Therefore, this claim is without merit.

### K. Petitioner's Post-Evidentiary Hearing Motions

#### 1. Petitioner's Claim that the Prosecution Presented Perjured Testimony and Withheld Evidence

The petitioner filed an amendment to his petition on January 20, 2004, arguing that the state withheld exculpatory evidence and knowingly presented false testimony at trial concerning the bed sheet recovered at the crime scene. (DE # 185, 186) The focus of this claim is Sgt. Hunter's examination of, and testimony regarding, the bloody palm print found on the sheet.

Under *Brady*, 373 U.S. at 83, a defendant's right to due process is violated if the government suppresses favorable evidence where the evidence is material to guilt or punishment, regardless of whether the evidence is suppressed due to the good or bad faith of the prosecution. *Id*. at 87; *Stricker v. Greene*, 527 U.S. 263, 280 (1999); *Mason v. Mitchell*, 320 F.3d 604, 628 (6th Cir. 2003); *Buell v. Mitchell*, 274 f.3d 337, 361-62 (6th Cir. 2001). There are three elements of a *Brady* claim: 1) the evidence at issue must be favorable to the defendant, either because it is exculpatory or impeaching; 2) the state must have suppressed the evidence, whether wilfully or inadvertently; 3) the defendant must have been prejudiced. *Stricker*, 527 U.S. at 281-82; *Castleberry v. Brigan*, 349 F.3d 286, 291 (6th cir. 2003); *Esparza v. Mitchell*, 310 F.3d 414, 424 (6th Cir. 2002). All three parts of this test must be satisfied to maintain a *Brady* claim.

A *Brady* claim also may arise when the prosecution introduces testimony that it knows, or should know, is perjurious. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997). To establish a denial of due process because of allegedly perjured

testimony, the petitioner must show that: 1) the statement was actually false; 2) the statement was material; and 3) the prosecution knew, or should have known, that the statement was false. *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)(citing *United States v. O'Dell* 802 F.2d 637, 441 (6th Cir. 1986), *cert. denied*, 484 U.S. 859 (1987). The burden is on the petitioner to show that the testimony actually was perjured; mere inconsistencies will not support a claim of the knowing use of false testimony. *Id.* (citing *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987).

As an initial matter, the court notes that this claim was not raised in state court prior to being raised in the instant action, even though the record shows that the facts giving rise to this claim were known to defense, appellate, and post-conviction counsel in time to do so. Because the petitioner has not made a showing of cause and prejudice, or, for reasons previously explained, *supra* at pp. 34-40, 42-43, 54, this claim is procedurally defaulted for purposes of *habeas corpus* review.

In addition to being procedurally defaulted, the court notes that this claim was filed after the AEDPA's one-year limitations had run. Under the AEDPA, prisoners have one year within which to file a petition for *habeas corpus* relief, which runs from the latest of four (4) circumstances, one of which is "the date on which the [state court] judgment became final by the conclusion of direct review . . . ." 28 U.S.C. § 2244(d)(1)(A). The one-year limitations period is tolled by the amount of time that "a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending . . . ." *Id.* at (d)(2); *see Isham v. Randle*, 226 F.3d 691, 693 (6th Cir. 2000).

Without considering any of the other periods during which the AEDPA's one-year limitations period might not have been tolled, the record shows that the petitioner brought this action on August 5, 1999, but did not move to amend his petition until January 20, 2004, nearly four and one-half years later. Because the time during which a petition is pending in the district court does not toll the one-year limitations period, *see* 28 U.S.C. 2254(d)(2); *Duncan v. Walker*, 533 U.S. 167,

125

180 (2001); *Griffin v. Rogers*, 308 F.3d 647, 651 (6th Cir. 2002), it is clear that this claim was filed well beyond the AEDPA's one-year limitations period.

Of course, the one-year limitations period expressed in § 2244(d)(1) does not operate as a jurisdictional bar, and can be equitably tolled under exceptional circumstances. *Dunlap v. United States*, 250 F.3d 1001, 1004, 1004 n. 1, 1005 (6th Cir. 2001). However, "[t]he petitioner bears the ultimate burden of persuading the court that he . . . is entitled to equitable tolling." *Griffin*, 308 F.3d at 653 (citing *Dunlap*, 250 F.3d at 1001). Because the petitioner has not argued that this claim should be tolled for equitable reasons, the court concludes that equitable tolling is not warranted.

Given the fact that this claim is both procedurally and time barred, and that there has been no showing of actual innocence, it appears in retrospect that the petitioner's motion to amend his petition to add this claim was improvidently granted. However, because the court granted the petitioner's motion to amend, the court will address this claim anyway.

The petitioner asserts that Sgt. Hunter's testimony at the *habeas corpus* evidentiary hearing "demonstrates that his testimony to the jury was false and misleading," *i.e.*, that "[h]e did not test or examine the sheet for the first time on January 29, 1990." (DE # 186, ¶ 29.d.1), p. 2) According to the petitioner, testimony at the *habeas corpus* evidentiary hearing shows that Sgt. Hunter "carefully and thoroughly examined the bed sheet at the scene, inspecting it visually, using a flashlight, and using an alternate light source." (DE # 186, ¶ 29.d.1), p. 2) According to the petitioner, Sgt. Hunter "lied in order to bolster his credibility and mislead the jury. Had the jury known that [Sgt.] Hunter was lying, [the petitioner] would never have been convicted." (DE # 186, ¶ 29.e.3).b), p. 4) The petitioner repeats these assertions in his post-hearing brief. (DE # 181, 3-20)

Sergeant Hunter testified at the evidentiary hearing that, although the ALS equipment was brought to the scene, he did not remember using it to examine anything. It can be used, he testified, to examine hair, fiber, tool marks and other pieces of evidence. Sergeant Hunter testified that he did

126

examine the palm print on the sheet at the scene with a flashlight but did not see enough ridge detail for him to conclude that there would be any evidentiary value to the print on the sheet. He collected the sheet for use as fiber evidence. Importantly, Sgt. Hunter testified that he did not notice at the scene that it looked like the hand that made the palm print had two fingers missing; it simply did not occur to him. Also at the scene, he did not yet know that the petitioner had two fingers missing on his left hand. He did discover that the next day, but he never went back to look at the print on the sheet until January 29, when the prosecution met prior to the trial and decided that all of the evidence needed to be looked at again. It was upon this later examination that Sgt. Hunter realized that the palm print looked like it was of a left hand that was missing the same two fingers that the petitioner was missing on his left hand. This court found Sgt. Hunter's testimony eminently credible and his explanation for not having initially given significance to the palm print understandable and, again, credible.

With respect to the *Brady* aspect of this claim, the petitioner has failed to provide any proof whatsoever that any evidence pertaining to the bloody palm print was favorable to him, that any evidence pertaining to the bloody palm print was withheld, intentionally or unintentionally, and/or that the petitioner was prejudiced in any way by either Sgt. Hunter or the prosecution team with respect to the manner in which the evidence at issue was discovered and divulged. Sergeant Hunter testified that he showed the print to defense counsel on January 30, the day after he recognized its significance.

As explained above, the court concludes that the petitioner has failed to establish that the prosecution withheld any material evidence or that it presented perjured testimony. Accordingly, this claim is without merit.

### 2. The Petitioner's Request for Relief
#### Under the Schaivo Act

127

The petitioner argues that, under the Schaivo Act, he is "no longer subject to any provisions of the . . . AEDPA, nor are any of his claims subject to any assertion of procedural default."  More particularly, the petitioner argues that, in the recent case involving Marie Schiavo, "Congress and the President have enshrined the principle that when a fundamental right to life is involved . . . [a] federal petitioner cannot be subjected to procedural default, and state court determinations which will result in the deprivation of life are entitled to no deference."  (DE # 195, p. 1)

Section 1 of the Schaivo Act provides the following:

> The United States District Court for the Middle District of Florida shall have jurisdiction to hear, determine, and render judgment on a suit or claim by or on behalf of Theresa Marie Schaivo for the alleged violation of any right of Theresa Marie Schaivo under the Constitution or laws of the United States relating to the withholding or withdrawal of food, fluids, or medical treatment necessary to sustain her life.

Section 2 of the Schaivo Act provides, in pertinent part, that "[a]ny parent of Theresa Marie Schaivo shall have standing to bring a suit under this Act."

A plain reading of the Schaivo Act shows that it permits the complainant to assert a violation only as to the rights of Theresa Marie Schaivo, and no one else.  Moreover, this court is not located in the Middle District of Florida.  Therefore, it does not have jurisdiction under the Schaivo Act.  Finally, § 2 of the Schaivo Act clearly states that only a "parent of Theresa Marie Schaivo" shall have standing to bring a suit under this act.  Because the petitioner clearly is not one of Marie Schaivo's parents, he lacks standing to raise this claim.

As explained above, there is nothing in the plain, unambiguous text of the Schaivo Act that even remotely suggests that Congress intended it to pertain to federal *habeas corpus* petitioners. The petitioner's reliance on legislative history of the Schaivo Act is misplaced, because, "[w]hen confronted with a statute which is plain and unambiguous on its face, [the courts] do not look to

legislative history as a guide to its meaning. . . ." *TVA v. Hill*, 437 U.S. 153, 184 n.29 (1978).

The petitioner's argument that none of his *habeas corpus* claims are procedurally defaulted pursuant to the Schaivo Act lacks an arguable basis in law or fact. As such, his argument is frivolous. *See Neitzke*, 490 U.S. at 327-28; *Brown*, 207 F.3d at 866; *see also Lawler*, 898 F.2d at 1198-99. Because this claim lacks merit, the petitioner's relief under the Schaivo Act will be denied.

3. Petitioner's Apparent Request for a Second
Evidentiary Hearing Based on
Allegations of Perjury
Against Dr. Charles Harlan

At the conclusion of the evidentiary hearing, the petitioner made numerous allegations of professional incompetence and misconduct against the former Davidson County Medical Examiner, Dr. Charles Harlan, and was permitted to introduce Exhibits 18 and 19 in support of those arguments. (DE # 179, 193-202) In his post-hearing brief, filed January 20, 2004, the petitioner repeated his allegations, arguing that Dr. Charles Harlan had been charged with: 1) withholding facts from autopsy reports to avoid being impeached; 2) committing perjury as to the number of autopsies that he had performed; 3) submitting false or forged documents to receive payments for autopsies that he did not perform; 4) issuing fraudulent death certificates; 5) issuing erroneous autopsy reports in homicide cases; 6) destroying evidence. (DE # 181, pp. 49-50) According to the petitioner, this alleged misconduct establishes that "this Court [i]s . . . authorized to conduct the hearing and review the claim *de novo*." (DE # 181, pp. 49-51)

On April 1, 2004, the petitioner filed a document captioned, "SUPPLEMENTAL AUTHORITY ***IN SUPPORT OF CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL***, PETITION ¶ 8.B: NEWLY DISCOVERED EVIDENCE THAT STATE'S WITNESS CHARLES HARLAN HAS COMMITTED PERJURY." (DE # 189)(emphasis added) The document focuses on Dr. Charles Harlan's testimony during state post-conviction proceedings in the petitioner's case.

129

In that document, the petitioner points to Dr. Charles Harlan's testimony in two cases. Specifically, the petitioner claims that Dr. Charles Harlan "testified under oath that he had performed 8,000-10,000 autopsies" in *State v. Edward Thompson*, No. 93-D-1629 (Twentieth Judicial District, Nashville). (DE # 189, pp. 1-2) The petitioner also alleges that Dr. Charles Harlan testified that he had performed "'about 16,000'" autopsies in *State v. Jones*, 15 S.W.2d 880 (Tenn. Crim. App. 1999). Based on these discrepancies, the petitioner concludes that Dr. Charles Harlan lied during his testimony in *State v. Jones*. The petitioner concludes further that, because neither he nor the Tennessee courts were aware of Dr. Charles Harlan's alleged perjury, this "newly-discovered evidence proves . . . that [he] was denied a fair state court process," and as such he "is entitled to plenary review of his ***ineffectiveness claims***, and he is entitled to habeas corpus relief."[55] (DE # 189, p. 3)(emphasis added)

In a subsequent document captioned "SUPPLEMENTAL AUTHORITY CONCERNING CRIMINAL, UNPROFESSIONAL, AND UNETHICAL ACTIVITIES OF DR. CHARLES HARLAN," filed April 22, 2005, the petitioner brought to the court's attention that the Tennessee Board of Medical Examiners had "stripped [Dr.] Harlan of his medical license after finding him guilty of 35 charges including violation of a criminal statute, malpractice, negligence, and unprofessional conduct." (DE # 197, p. 1) The petitioner's authority is an April 22, 2005 article in *The Tennessean* (DE 197, p. 1-2 & n. 1), from which the petitioner concludes that:

> If known at the time, [Dr. Charles] Harlan's criminal, unprofessional, and unethical activities would have demonstrated [his] lack of credibility and competence, and would have shown that his post-conviction testimony about the time of death was false and misleading. . . . .

---

[55] It is difficult for the court to understand how these allegations against Dr. Charles Harlan, allegedly unknown to the petitioner at the time of his post-conviction proceedings, translate into a claim of ineffective assistance of counsel. However, the allegation will be analyzed nevertheless.

> The Board's conclusions make clear that the post-conviction process in Oscar Smith's case was unfairly tainted, and that he did not receive a full and fair hearing in state court. Oscar Smith was thus entitled to a hearing in this court, he is entitled to a de novo review, and he is entitled to habeas corpus relief on his claims that *he was denied effective assistance of counsel at trial*.

(DE # 197, p. 2)(emphasis added)

As incomprehensible as it may seem, the petitioner's first argument appears to be that the petitioner "was denied the effective assistance of counsel at trial," because Dr. Charles Harlan's testimony at the post-conviction evidentiary hearing was unreliable. (DE # 197, p. 2) The record shows that it was the Assistant Davidson County Medical Examiner, Dr. Gretel Harlan, who testified at trial, not Dr. Charles Harlan. (DE # 12, Add. 1, Bk. 7 of 9, pp. 2513-2626; # 179, pp. 195, 197) The petitioner has offered no explanation for what possible effect Dr. Charles Harlan's testimony on post-conviction had on the jury who heard only the testimony of Dr. Gretel Harlan at trial. Therefore, he fails to establish even the most fundamental circumstances required to maintain a claim of ineffective assistance of counsel at trial.

The petitioner also cannot maintain an ineffective assistance claim at trial based on the theory that, because Dr. Charles Harlan assisted Dr. Gretel Harlan in estimating the time of death, the jury was indirectly exposed to any alleged unprofessional conduct by Dr. Charles Harlan. By the petitioner's own admission, there was no "proof" even as late as post-conviction, that Dr. Charles Harlan was "acting incompetently . . . [and] not performing his duties in a way that is required under the standards of forensic pathology." (DE # 179, p. 199) Once again, the factors to be considered under *Strickland* simply are not present with respect to a claim of ineffective assistance of defense counsel at trial.

The court turns next to the petitioner's other apparent claim, *i.e.*, that the post-conviction process was "unfairly tainted, and that he did not receive a full and fair hearing in state court,"

Case 3:99-cv-00731   Document 201   Filed 09/30/05   Page 131 of 144 PageID #: 131

because Dr. Charles Harlan's testimony "about the time of death was false and misleading." (DE # 197, p. 2) Here, the petitioner alleges that, because of this allegedly "false and misleading" testimony, "he was denied a full and fair post-conviction proceeding, because the state presented testimony from Dr. Charles Harlan . . . whose testimony formed the basis of the denial of relief." (DE # 197, p. 1)

As previously established, *supra* at pp. 124-125, to show that his due process rights were violated, the petitioner must show that Dr. Charles Harlan's testimony was false, that the testimony was material, and that the State knew, or should have known, that his testimony was false. Acknowledging that Dr. Charles Harlan's testimony as to the time of death was material, it, therefore, remains for the petitioner to establish that Dr. Charles Harlan's testimony was false and that the State knew, or should have known, that it was.

Doctor Gretel Harlan testified at trial that the victims died between 11:20 and 11:30 p.m. on the night of October 1, 1989.[56] (DE # 12, Add. 1, Bk. 7 of 9, pp. 2592, 2604) At the post-conviction hearing, Dr. Charles Harlan testified that the victims died "at some time between 11:23 p.m., that date, and 12 o'clock, midnight, that date." (DE # 14, Add. 12, Vol. 8, p. 980) The earlier time was within the time frame established by Dr. Gretel Harlan at trial; the later time being to the advantage of the petitioner. Dr. Charles Harlan also testified that he concurred in Dr. Gretel Harlan's determination that the victims died at approximately 11:30 p.m, a statement that was, once again, wholly consistent with the time of death established at trial. (DE # 14, Add. 12, Vol. 8, pp. 977-978). As previously noted, *supra* at p. 78, Dr. Sperry, the petitioner's expert, testified that he had no grounds to dispute Dr. Gretel Harlan's determination as to the time of death, a time with respect

---

[56]    The record shows that Dr. Gretel Harlan set the official times of death for all three victims at "± 2323," or 11:23 p.m., plus or minus. (DE # 14, Add. 13, Ex. 48A-B, Reports of Investigation by County Medical Examiner, p. 2 and Certificates of Death)

to which Dr. Charles Harlan concurred. By inference, Dr. Charles Harlan's testimony was consistent with the petitioner's own expert at the post-conviction evidentiary hearing.

The record shows that Dr. Charles Harlan was questioned extensively at the post-conviction evidentiary hearing regarding the time of death. (DE # 14, Add. 12, Vol. 8, pp. 1030-1059) The thrust of the questioning was two-fold. First, counsel attempted – unsuccessfully – to get Dr. Charles Harlan to agree to a specific time of death, to which Dr. Charles Harlan answered repeatedly that, under the facts of this case, the time of death could not be fixed precisely. (DE # 14, Add. 12, pp. 1030-1033) Second, Dr. Charles Harlan testified about various scientific, technical, and analytical principles associated with determining the time of death, the upshot of which was that Dr. Charles Harlan offered no estimates of the time of death that were at odds with what the jury heard at trial. (DE #14, Add. 12, pp. 1034-1035)

As shown above, there was nothing in Dr. Charles Harlan's testimony at the post-conviction hearing that deviated from what the jury heard at trial. Because Dr. Charles Harlan's testimony did not vary from that of Dr. Gretel Harlan, the petitioner cannot show that he was prejudiced by the former's testimony.

In addition to the foregoing, a detailed review of Dr. Charles Harlan's testimony at the post-conviction hearing reveals that none of the categories of misconduct cited *supra* at pp. 129 are apparent here. Specifically, the autopsy reports were Dr. Gretel Harlan's, not his. Therefore, Dr. Charles Harlan cannot be said to have withheld facts from such reports to avoid being impeached or to have issued erroneous reports. Dr. Charles Harlan did not testify at the post-conviction evidentiary hearing as to the number of autopsies that he had performed in his career, nor was he credited with having performed an erroneous number that he failed to correct. The record shows that autopsies clearly were, in fact, performed in this case. Therefore, it cannot be shown that Dr. Charles Harlan submitted false or forged documents to receive payments for autopsies he did not

133

perform. The record shows that Dr. Gretel Harlan issued the death certificates for the victims. Thus, it cannot be shown that he submitted fraudulent death certificates. Finally, there is nothing in the record that supports even an inference that Dr. Charles Harlan destroyed any evidence pertaining to the time of the victims' deaths, nor does the petitioner allege that he did.

As shown above, the record simply does not support the petitioner's allegation that Dr. Charles Harlan offered perjured or unreliable evidence at the post-conviction evidentiary hearing. Even assuming that were the case, however, the petitioner still cannot make a showing that he was denied his right to due process. Specifically, on appeal from the judgment of the post-conviction court, the Court of Criminal Appeals wrote the following regarding Dr. Charles Harlan's testimony as to the time of death:

> Based solely upon the anatomic changes when he viewed the bodies and the existence of the 911 call, Dr. Charles Harlan estimated the range of time of death between 11:30 p.m. and 2:30 a.m. However, Dr. Harlan further testified that he agreed with his wife's opinion, based upon the status of the rigor mortis; livor mortis; the appearance of the bodies; the amount of drying of various portions of the body; the quality, quantity, and appearance of the blood at the scene; the stomach contents of the victims; as well as other circumstances of the case; that death probably occurred between 11:23 p.m. and midnight.

(DE # 14, Add. 17, p. 27)  The Court of Criminal Appeals also noted twice in its analysis that the petitioner's expert, Dr. Sperry, testified that he did not have any evidence to contradict Dr. Gretel Harlan's opinion that the time of death was around 11:30 p.m.  (DE # 14, Add. 17, pp. 37-38)

From the foregoing, it can be concluded that the Court of Criminal Appeals considered all of the evidence as to the time of death, not just Dr. Charles Harlan's testimony. Thus, even if Dr. Charles Harlan's testimony were impeachable, it would have made no difference to the outcome of the post-conviction proceedings, because the Court of Criminal Appeals did not rely solely on his testimony.

As reasoned above, the petitioner is not entitled to an evidentiary hearing on the theory that Dr. Charles Harlan's testimony was false and misleading at the post-conviction evidentiary hearing. Not only has the petitioner failed to establish that he received ineffective assistance of counsel, he has failed to establish that he was denied his due process rights on post-conviction. Because this claim is without merit, the petitioner's request for an evidentiary hearing on this matter will be denied.

### 4. Petitioner's Claim of Actual Innocence

The petitioner asserts that he is innocent of the crimes for which he was convicted and sentenced to death. First, the petitioner claims that there is proof that someone else committed the murders, *i.e.*, 1) Fields, Judith's boyfriend; 2) an unidentified black male seen near the house on the morning before the bodies were found; 3) a drug dealer nicknamed "Dead Leg," who allegedly was looking for Judith; or 4) Frankie Lane, who had been seen on Lutie Street just prior to the murders. (DE # 103, ¶ I.B.b.2), pp. 17-18, Ex. 11-12; DE # 181, I.A.5, p. 27) Second, the petitioner argues that casts of footprints found outside the house did not match his shoes. (DE # 103, ¶ I.B.b.1).b)(3), p. 16) Third, the petitioner argues that the broken knife found under the house is a murder weapon because it had a drop of Chad's blood on it, that the knife was not the petitioner's, and that the petitioner's fingerprints were not on the knife. (DE # 103, ¶ I.B.b.1).b)(2), p. 16; DE # 104, ¶ 2, p. 2; DE #181, I.A.4a-c, pp. 24-27) Fourth, the petitioner argues that there was a single fingerprint in the house that did not belong to the victims or to him. (DE # 103, ¶ I.B.b.1).b)(1), pp. 15-16) Finally, the petitioner claims that the "bloody palm print" is not his. (DE # 103, ¶ I.B.b.1).a), pp. 13-18 & Ex. 11; DE # 109, ¶ III.A, pp. 15-16; DE # 104, ¶ 1, p. 1; DE # 181, ¶ I.A.2.a-c, pp. 17-20) As previously noted, the petitioner relies on the report of Herbert MacDonell of the Laboratory of Forensic Science in New York. (DE # 103, Ex. 1) Based on this report, the petitioner argues that: 1) the ridge detail on the palm print is not from the ridges on a hand, but "just texture of the sheet";

2) the bloody palm print cannot be his because it has a ring finger, whereas he does not; 3) the match made between the petitioner's palm print and the bloody palm print on the sheet is "illusory."  (DE # 103, ¶ I.B.b.1).a), p. 14; DE # 104, ¶ 1, p. 1)

a.  The Petitioner's Claim That Someone
Else Committed the Murders

The petitioner argues, first, that Fields committed, or had something to do with, the murders of Judith and her teenage sons, because she and the petitioner were planning to get back together. Apart from this alleged motive, the only proof that the petitioner offers is that Fields was seen at the victims' house on the day that the bodies were found.  However, nothing in the fact that Fields was seen around the victim's house the day after the murders were committed links Fields with the murders, much less establishes that the petitioner is innocent.  The court also notes that, in his memorandum in support of an evidentiary hearing, the petitioner did not offer to show that Fields' alleged activity the day after the murders would establish the petitioner's innocence.

The petitioner asserts next that an unidentified black man was seen near the victims' house the morning of the day that the bodies were discovered.[57]  Although the petitioner asserts that this unidentified black man could have murdered Judith and her sons, the mere fact that this person was seen near the house the morning after the murders were committed does not link that person to the crimes the night before, much less establish the petitioner's innocence.  Although the petitioner suggests that this unidentified black man may have been linked to "Dead Leg," who allegedly was looking for Judith, the witness who saw this unidentified black man reported that he ran to a nearby bus stop, where he appeared to wait for a bus – just as it was reported that he had done two weeks

---

[57]    In his amended petition, the petitioner asserts that this "unidentified black man" was seen by the police after responding to the 911 call and that he was seen "again" the next day.  (DE # 18, ¶¶ 8.a.2)(a-(b), p. 3)  The petitioner appears to have modified this claim to reflect that the "unidentified black man" was seen only on the morning after the murders.  (DE # 103, ¶ ¶ I.B.b.2), p. 17)

136

earlier. There is nothing in the record to suggest that this unidentified black man was doing anything but passing by on his way to the bus stop. Once again the court notes that, in his memorandum in support of an evidentiary hearing, the petitioner did not offer to provide proof that the actions of this unidentified black man would establish his innocence.

The petitioner also asserts that a confidential informant told the police that she had driven "Dead Leg" around looking for Judith, who allegedly had stolen "Dead Leg's" Thunderbird. However, the confidential informant reported that they had not been able to locate Judith's house and that she did not know whether "Dead Leg" had located it later. The petitioner's theory as to "Dead Leg' is purely speculative. Moreover, in his memorandum in support of his motion for an evidentiary hearing, the petitioner once again was silent regarding this aspect of his claim of innocence.

Frankie Lane was not mentioned in the petitioner's amended petition, in his comprehensive response to the respondent's motion for summary judgment, or in his memorandum in support of an evidentiary hearing. Neither has it ever been established that Frankie Lane and Judith were acquaintances. The first time that Frankie Lane's name arose during the course of these proceedings was during the evidentiary hearing, where the petitioner implied that, because Frankie Lane had been seen "hanging out" in a nearby parking lot thirty minutes before the murders, he was the "Frank" whose name was heard on the 911 tape. Although Frankie Lane was discussed at length at the evidentiary hearing, the petitioner did not offer any proof in support of this theory that he was the "Frank" on the 911 tape, or that Chad, who screamed the name, "Frank," even knew Frankie Lane.

As reasoned above, the petitioner's claim that he is innocent because someone else murdered Judith and her teenage sons is without merit.

b. The Petitioner's Claim That the Footprints

Found Outside the Victims' House
Establishes His Innocence

The petitioner's second argument is that, because the casts of the footprints outside of the house did not match his footprints, this is proof that someone else committed the murders. The petitioner has not provided any evidence that these footprints were even related to the crime. Neither is there anything in the record that suggests that the footprints were anything more than just random footprints found around the victims' house. Here again, in his memorandum in support of his motion for an evidentiary hearing, the petitioner did not offer to provide proof that the casts of the footprints found outside the house establish his innocence. Because the petitioner's assertion regarding the footprints do not support the conclusion that he is innocent, this claim is without merit.

c. The Petitioner's Claim That the Broken Knife
Found under the House
Establishes His Innocence

The petitioner's third argument is that the broken knife found under the house is a murder weapon and that, because it did not belong to him, this establishes his innocence. The petitioner claims that the broken knife is a murder weapon because it had Chad's blood on it. However, if the broken knife were a murder weapon, a reasonable juror in this case would have expected to find not just Chad's blood on it, but Judith's and/or Jason's as well. Although the petitioner does not address this obvious discrepancy, the court concludes that his argument would likely parallel his allegation that the knife was wiped clean. If that is the case, then the next obvious question is, why was Chad's blood not removed with the rest of the blood evidence that he claims was wiped off.

The next obvious question is how the broken knife came to be under the house. The petitioner's theory must be that the murderer had the presence of mind to realize that the knife had broken during the course of events and that he took the time to find and retrieve the pieces, knowing full well that Jason had placed a 911 emergency call and that the police might be en route. For the

138

murderer to have taken precious time to retrieve the pieces of the knife suggests that it was more important to the murderer than the awl that he left at the scene of the crime. If the broken knife were as important to the murder as the petitioner's theory implies, then why would the murderer go to all the trouble of picking up the pieces, only to abandon them under the house, knowing that the house likely was going to be the subject of an intensive police investigation.

The petitioner also claims that the presence of a single, unidentified fingerprint in the house establishes his innocence. The photographs of the house in the record show that it was an older home that appears to have been built in the 1920s or 1930s. The record also shows that the house was a rental house, belonging to a landlord who lived out of state. Nothing regarding the petitioner's claim of innocence can be inferred from the fact that a single, unidentified finger print was found in a seventy-plus-year-old rental house.

### d. The Petitioner's Claim That Scientific Evidence Shows That the Bloody Palm Print Is Not His

Finally, the petitioner argues that the bloody palm print found on the sheet next to Judith's body is not his and, as such, this proves his innocence. The petitioner relies on the report of Herbert MacDonell of the Laboratory of Forensic Science in New York. (DE # 103, Ex. 1) Based on this report, the petitioner argues that: 1) the bloody palm print cannot be his because it has a ring finger, whereas he does not; 2) the ridge detail on the palm print is not from the ridges on a hand, but "just texture of the sheet"; 3) the match made between the petitioner's palm print and the bloody palm print on the sheet is "illusory." (DE # 103, ¶ I.B.b.1).a), p. 14; DE # 104, ¶ 1, p. 1)

As to the petitioner's first argument, the report does, in fact, make several references to a ring finger that the petitioner does not have. (DE # 103, Ex. 1, ¶¶ 3, 7, p. 2) However, MacDonell's analysis was limited to "photographs, reports, a transcript, and palmprint . . . ." (DE # 103, Ex. 1, p. 1) Moreover, apart from MacDonell's vague reference to the "nature of . . . fabric which allows

139

it to be 'teased,'" nowhere in the report does MacDonell take into consideration, or make any allowances for, the fact that he was comparing the petitioner's palm print taken in a controlled setting, on a smooth flat surface (paper or a piece of cardstock), backed by a solid surface (a table or desk) with the bloody palm print that was made in the heat of a violent triple-murder, on a surface subject to distortion, wrinkles, and folds (the sheet), on a soft background (the mattress), itself capable of movement and causing distortion. This conclusion is supported by MacDonell's statement that, for there to be a match, "there should be a good agreement between the bloodstain image and the general outline of Mr. Smith's hand," which MacDonell concluded there was not. (DE # 103, Ex. 1, ¶ A, p. 4)

It is intuitively obvious that there is little likelihood that a "geometric" match, to use MacDonell's terminology, could be found between two prints made under such polar-opposite circumstances. Based on this apparent flaw in MacDonell's analysis of the "photographs, reports, a transcript, and palmprint . . . ," and the clear image of the two missing middle fingers in the photograph of the bloody palm print actually analyzed by MacDonell (DE # 103, Ex. 1, Attach. Diag. # 1), the court is not persuaded that the report establishes that the bloody palm print has a ring finger.

Next, the petitioner argues that the "ridge detail on the palm print is not from the ridges on a hand, but 'just texture of the sheet.'" The report provides the following with respect to this claim:

> The photocopy I received of the enhanced 'Latent Palm Print' exhibit is typical of bloodstains on the surface of woven textiles. It should be noted that what is assumed to be friction ridge detail is at a 45 degree angle to the vertical and horizontal weave pattern. This type of pattern is consistent with a surface transfer by an object having no ridge detail whatsover.
>
> . . .
>
> Separation of a pattern resulting from the weave or texture of a fabric from friction ridge detail left by a bloody finger, palm, or foot has

> long been recognized as a serious problem.  Identification made with
> evidence of this type must always be carefully scrutinized.

(DE # 103, Ex. 1, ¶ D, p. 4 & pp. 3-4)  The report does not say, as the petitioner would have the court believe, that what appears to be ridge detail on the bloody palm print is just the texture of the sheet.  MacDonell's observation is only that the pattern, observed forty-five degrees to the "vertical and horizontal weave pattern," is consistent with no ridge detail.  Neither here, nor anywhere else in the report, does MacDonell state definitively that there is no ridge detail on the bloody palm print, much less that Sgt. Hunter had mistaken the weave pattern for ridge detail.  On the contrary, in his conclusion that "[t]he prosecution can not have it both ways," MacDonell appears to concede that it is possible to view the bloody palm print as exhibiting ridge detail – but if that is the case, then he concludes that the prosecution "match[ed] the overall handprint . . . completely wrong."

As to MacDonell's alternative conclusion that, if the ridge detail is correct, then the overall match is wrong, the court has previously noted that MacDonell's inability to make a "geometric" match stemmed from the vastly different circumstances under which the two prints were made and his failure to take those circumstances into consideration in his analysis.  Therefore, notwithstanding MacDonell's views to the contrary, the court concludes that the prosecution can have it both ways.  Specifically, it is entirely reasonable to conclude that the two palm prints, made under the radically different circumstances described above, would not yield a geometric match when superimposed on one another.  Second, given the distortion of the bloody palm print caused by the circumstances under which it was left on the sheet, it is equally reasonable to conclude that a specific physical feature exhibited by the palm print made under controlled circumstances could give the appearance of being on another part of the bloody palm print because of that distortion.

Finally, the court addresses the petitioner's claim that the match made between the petitioner's palm print and the bloody palm print on the sheet is "illusory."  Not only does the

141

petitioner misstate the report, there is nothing in the report that would support even an inference that this is the case. Although MacDonell does conclude that there is "no compelling evidence to suggest Mr. Smith is the only person who could have left the bloodstain pattern on the sheet," he also writes that:

> While it is impossible to conclude that the faint stained areas on the blue sheet were not made by the hand or fingers of a specific individual, it can be stated that a positive identification can not be made from the photocopies of the exhibits that were submitted to this laboratory.

(DE # 103, pp. 4-5) In other words, although MacDonell was unable to make a positive identification based on the materials that had been submitted to him for analysis, he conceded that it was impossible to conclude that a specific individual could not be identified based on the print on the sheet. Based on MacDonell's own words, the report on which the petitioner relies to support his claim that the bloody palm print is not his is, at best, inconclusive.

As reasoned above, none of the arguments proffered by the petitioner establishes his innocence. Accordingly, this claim is without merit.

V. CONCLUSION

The circumstantial evidence case against the petitioner was a strong one, and the testimony he chose to give at trial did not help him. He conceded that, in his initial interview, he may have referred to Judith in the past tense but excused this by saying that he had been up 36 hours and was tired. He denied telling Judith's father that "the gloves [we]re coming off," denied ever calling Judith at work, let alone threatening her on the phone with Gunther listening, and denied threatening Gunther herself. He denied ever trying to hire anyone to kill Judith and her children and stated that the testimony of Jerry Williams and Ray Merritt to the contrary was false. He stated that he had not owned a .22 caliber pistol since the 1970s and that Jerry Watts's testimony about firing that gun at

142

the range was not true.  He testified that he had not carried a knife at his side since the 1970s, contradicting the testimony of several witnesses, including one of his own.  He admitted the existence of the three life insurance policies and never explained why they were with three different companies.  He admitted not asking, while being interviewed on the night of October 2, the logical questions about the murders that he supposedly had just heard of and, when asked why he did not ask those questions, responded, "I don't really have an explanation for that."  He denied telling detectives that he left for Kentucky at 10:30 p.m., denied telling Jerry Watts that he had made the leather holster, denied that there were any grounds for the issuance of the two arrest warrants against him for aggravated assault, and denied that the awl introduced into evidence as one of the murder weapons was his.  He maintained that the injuries photographed by officers on the night of October 2 had been sustained by him just hours earlier, when his dog jumped on him and pushed him into a barbed wire fence.  In the photographs, however, the scrape or burn on the petitioner's back did not look consistent with being backed into a barbed wire fence, and none of the wounds appeared to be fresh ones.

The victims in this case were viciously attacked by use of multiple weapons.  The medical examiner testified that Judith's throat was slit and her chest punctured after she was dead.  Likewise, Chad's throat was slit either while he was dying or after he was dead.  Even though the case was entirely circumstantial, the jury had to have believed that only someone who knew all three of these individuals well could have hated them enough to have murdered them in this way.  In this court's view, it was reasonable for the jury to believe that the murderer was the estranged husband, who maintained at trial that numerous disinterested witnesses, including some of his own, had testified falsely. This was a "verdict worthy of confidence." *Spirko v. Mitchell*, 368 F.3d 603, 615 (6th Cir. 2004).

The petitioner has failed to establish that he is entitled to *habeas corpus* relief on any of the

grounds alleged.  The petition will be denied.

_____
Aleta A. Trauger
United States District Judge